# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

```
_____x
                                       :
JA SOLAR USA INC., JA SOLARVIETNAM     :
CO. LTD., and JA SOLAR PV VIETNAM CO.  :
LTD.,                                  :
                                       :
                    Plaintiffs,        :
                                       :
BOVIET SOLAR TECHNOLOGY CO. LTD.,      :
JINKO SOLAR (VIETNAM) INDUSTRIES CO.   :
LTD., JINKOSOLAR (U.S.) INC.,          :
and JINKO SOLAR (U.S.) INDUSTRIES INC.,:
                                       :
              Consolidated Plaintiffs, :   Consol. Court No. 25-00158
                                       :
        and                            :   PUBLIC VERSION
                                       :
TRINA SOLAR ENERGY DEVELOPMENT CO.     :
LTD.,                                  :
                                       :
              Plaintiff-Intervenor,    :
        v.                             :
                                       :
UNITED STATES,                         :
                                       :
                    Defendant,         :
                                       :
        and                            :
                                       :
THE AMERICAN ALLIANCE FOR SOLAR        :
MANUFACTURING TRADE COMMITTEE,         :
                                       :
              Defendant-Intervenor.    :
_____x
```

## JINKO'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Pursuant to Rule 56.2 of the Rules of this Court, Consolidated Plaintiffs Jinko Solar

(Vietnam) Industries Co. Ltd., Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar

(U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc. (collectively, "Jinko"), respectfully move for judgment on the agency record. Jinko challenges certain aspects of the U.S. Department of Commerce's ("Commerce") final determination in the less-than-fair-value investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from the Socialist Republic of Vietnam, published as *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 17,388 (Apr. 25, 2025), as amended by the antidumping duty order published as *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 26,786 (June 24, 2025), corrected by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders; Correction*, 90 Fed. Reg. 29,843 (July 7, 2025).

Jinko requests that the Court remand this matter to Commerce with instructions consistent with this Court's decision. The legal arguments in support of this motion are detailed in the attached Memorandum of Law in Support of Jinko's Motion for Judgment on the Agency Record.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*

Jordan C. Kahn
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022
212-557-4000

*Counsel for Jinko Solar (Vietnam)
Industries Company Limited, JinkoSolar
(U.S.) Inc., and Jinko Solar (U.S.)
Industries, Inc.*

Dated: April 6, 2026

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| ———————————————— x <br> : <br> JA SOLAR USA INC., JA SOLARVIETNAM : <br> CO. LTD., and JA SOLAR PV VIETNAM CO. : <br> LTD., : <br> : <br> : <br> Plaintiffs, : <br> : <br> BOVIET SOLAR TECHNOLOGY CO. LTD., : <br> JINKO SOLAR (VIETNAM) INDUSTRIES CO. : <br> LTD., JINKOSOLAR (U.S.) INC., : <br> and JINKO SOLAR (U.S.) INDUSTRIES INC., : <br> : <br> Consolidated Plaintiffs, : <br> : <br> and : <br> : <br> TRINA SOLAR ENERGY DEVELOPMENT CO. : <br> LTD., : <br> : <br> Plaintiff-Intervenor, : <br> v. : <br> : <br> UNITED STATES, : <br> : <br> Defendant, : <br> : <br> and : <br> : <br> THE AMERICAN ALLIANCE FOR SOLAR : <br> MANUFACTURING TRADE COMMITTEE, : <br> : <br> Defendant-Intervenor. : <br> ———————————————— x | Consol. Court No. 25-00158 <br><br> **PUBLIC VERSION** |

## MEMORANDUM OF LAW IN SUPPORT OF JINKO'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Ned H. Marshak*
Jordan C. Kahn
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022

*Counsel for Jinko Solar (Vietnam)
Industries Company Limited, JinkoSolar
(U.S.) Inc., and Jinko Solar (U.S.)
Industries, Inc.*

Dated: April 6, 2026

**TABLE OF CONTENTS**

I.   STATEMENT PURSUANT TO USCIT RULE 56.2 ....................................................... 1

  A.   ADMINISTRATIVE DETERMINATION SUBJECT TO APPEAL ........................... 1

  B.   ISSUES OF LAW AND SUMMARY OF ARGUMENT ............................................. 1

    1.   COMMERCE UNLAWFULLY VALUED SOLAR GLASS AT $4.85/KG .............. 1

    2.   COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL
         RATIOS, BY INCLUDING THE SUBSIDIZED STATEMENT OF SATNUSA
         AND REJECTING THE JEMBO STATEMENT ....................................................... 2

    3.   COMMERCE UNLAWFULLY VALUED POLYSILICON AND WAFERS BASED
         ON HTS DATA RATHER THAN BLOOMBERG DATA ....................................... 3

II.  STANDARD OF REVIEW ....................................................................................... 4

III. STATEMENT OF FACTS ......................................................................................... 5

IV.  ARGUMENT ............................................................................................................ 7

  A.   COMMERCE UNLAWFULLY VALUED SOLAR GLASS AT $4.85/KG ................. 7

    1.   RECORD EVIDENCE ......................................................................................... 7

      a.   HTS Import Data ........................................................................................... 8

      b.   PV Insights Data ........................................................................................... 9

      c.   Jinko Import Data ......................................................................................... 9

      d.   Module Cost Structure: USITC And Jinko ................................................. 10

      e.   Romania And Turkish Import Data ............................................................. 12

    2.   SOLAR GLASS SHOULD BE VALUED AT $0.59/KG RATHER THAN $4.85/KG
         ...................................................................................................................... 13

    3.   COMMERCE UNLAWFULLY EXCLUDED MALAYSIAN DATA, REJECTED
         PV INSIGHTS DATA, AND RELIED ON SMALL QUANTITIES OF HIGH
         PRICED MERCHANDISE ................................................................................. 15

      a.   Commerce Unlawfully Excluded Malaysian Data ...................................... 15

      b.   Commerce Unlawfully Rejected PV Insights Data ..................................... 19

      c.   Commerce Unlawfully Relied On Aberrational Data .................................. 21

  B.   COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL
       RATIOS ..................................................................................................................... 25

    1.   COMMERCE SHOULD HAVE USED JEMBO'S FINANCIAL STATEMENT .... 25

2.  COMMERCE SHOULD HAVE REJECTED THE FINANCIAL STATEMENT OF SATNUSA BECAUSE IT RECEIVED COUNTERVAILABLE SUBSIDIES ........ 28

C.  COMMERCE UNLAWFULLY VALUED POLYSILICON AND WAFERS BASED ON HTS DATA RATHER THAN BLOOMBERG DATA.......................................... 36

V.  CONCLUSION.................................................................................................................. 43

**TABLE OF AUTHORTIES**

**Cases**

*Ancientree Cabinet Co. v. United States,* 532 F. Supp. 3d 1241 (CIT 2021) .............................. 23

*Best Mattresses International Co. v. United States*, 622 F. Supp. 3d 1347 (CIT 2023)............... 22

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312 (CIT 2016).................................. 37

*Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334 (CIT 2020).................................. 22

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (CIT 2019)............................ 37

*Catfish Farmers of Am. v. United States*, 33 CIT 1258 (CIT 2009)............................................ 22

*Coal. of Am. Manufacturers of Mobile Access Equip. v. United States*, 2024 WL 2796654 (CIT May 31, 2024) ................................................................................................................... 19

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ....................................................................... 4

*CS Wind Vietnam Co. v. United States*, 971 F. Supp. 2d 1271 (CIT 2014).................................. 19

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) .................................. 4, 5, 28

*Hebei Metals & Mins. Imp. & Exp. Corp. v. United States,* 28 CIT 1185 (2004)........................ 23

*Itochu Bldg. Prods. Co. v. United State*, 2017 WL 2703810 (CIT June 22, 2017) ...................... 19

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (CIT 2018) ..................................... 15

*Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308 (CIT 2019) ................................ 15, 23

*Jacobi Carbons AB v. United States*, 619 Fed. App'x 992 (Fed. Cir. 2015) ............................... 22

*Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 794 F. Supp. 3d 1334 (CIT 2025) ....................................................................................................................................... 5

*Jiaxing Brother Fastener Co. v. United States*, 751 F. Supp. 2d 1345 (CIT 2010)...................... 29

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994)................................................. 42

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024).................................................................. 5

*Mid Continent Steel & Wire, Inc. v. United States*, 2025 WL 40344 (Fed. Cir. Jan. 7, 2025)..... 18

*NEC Home Elecs., Ltd. v. United State*s, 54 F.3d 736 (Fed. Cir. 1995) ....................................... 35

*Peer Bearing Co.-Changshan v. United States,* 35 CIT 1626 (2011).......................................... 19

*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp.3d 1329 (CIT 2018) ........................... 23

*Risen Energy Co. v. United States*, 569 F. Supp. 3d 1315 (CIT 2022) .................................. 22, 23

*Risen Energy Co. v. United States*, 611 F. Supp. 3d 1384 (CIT 2022) ........................................ 22

*Shenzhen Xinboda Indus. Co. v. United States*, 976 F. Supp. 2d 1333 (CIT 2014) ...................... 30

*Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265 (CIT 2017) ...................... 30

*Shenzhen Xinboda Indus. Co. v. United States*, 361 F. Supp. 3d 1337 (CIT 2019) ...................... 30

*Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272 (CIT 2020) ...................... 31

*Shenzhen Xinboda Indus. Co. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) ................ 31, 32

*Sichuan Changhong Elec. Co. v. United States,* 30 CIT 1481 (2006) .......................................... 16

*SNR Roulements v. United States,* 402 F.3d 1358 (Fed. Cir. 2005) .............................................. 42

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ........................ 21, 22

*U.S. Steel Grp. v. United States*, 225 F.3d 1284 (Fed. Cir. 2000) ................................................ 42

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................................ 5

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 37 CIT 308 (2013) ................................ 19

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............ 43

**Rules**

Fed. Rule Evid. 201(b)(2) ............................................................................................................. 37

**Statutes**

19 U.S.C. § 1516 ............................................................................................................................. 4

19 U.S.C. § 1677 ............................................................................................................... 5, 16, 29

**Administrative Decisions**

*Aluminum Extrusions from Indonesia*, 89 Fed. Reg. 17,405 (Mar. 11, 2024) (preliminary
    determination) .......................................................................................................................... 34

*Aluminum Extrusions from Indonesia,* 89 Fed. Reg. 80,536 (Oct. 3, 2024) (final determination)
    ................................................................................................................................................. 34

*Common Alloy Aluminum Sheet from China*, 88 Fed. Reg. 16,589 (Mar. 20, 2023) (final results)
    ................................................................................................................................................. 17

*Corrosion Inhibitors from China*, 89 Fed. Reg. 82,975 (Oct. 4, 2024) (final results) ................. 26

iv

*Mattresses from Indonesia*, 89 Fed. Reg. 57 (Jan. 2, 2024) (preliminary determination) ...... 34, 35

*Mattresses from Indonesia*, 89 Fed. Reg. 59,050 (July 7, 2024) (final determination) ............... 34

*Pure Magnesium from China*, 75 Fed. Reg. 80,791 (Dec. 23, 2010) (final results) .................... 26

*Stilbenic Optical Brightening Agents from China*, 77 Fed. Reg. 17,436 (Mar. 26, 2012) ........... 16

*Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 89 Fed. Reg. 43,809
    (May 20, 2024) (initiation notice) ................................................................................. 5

*Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 90 Fed. Reg. 26,786
    (June 24, 2025) (amended final determination) .................................................... 1, 6

*Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 90 Fed. Reg. 29,843
    (July 7, 2025) (correction) ............................................................................... 1

*Solar Cells from China*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results) ............................. 38

*Solar Cells from China*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) (preliminary results) ................... 39

*Solar Cells from China*, 84 Fed. Reg. 36,886 (July 30, 2019) (final results) ............................. 39

*Solar Cells from China*, 85 Fed. Reg. 79,163 (Dec. 9, 2020) (final results) ............................. 20

*Solar Cells from China*, 86 Fed. Reg. 21,691 (Apr. 23, 2021) (preliminary results) .................. 20

*Solar Cells from China*, 87 Fed. Reg. 38,379 (June 28, 2022) (final results) ............................. 38

*Solar Cells from China*, 88 Fed. Reg. 1355 (Jan. 10, 2023) (preliminary results) ...................... 20

*Solar Cells from China; 2019*, 87 Fed. Reg. 40,491 (July 7, 2022) (final results) ...................... 20

*Solar Cells from Vietnam*, 89 Fed. Reg. 96,219 (Dec. 4, 2024) (preliminary determination) ........ 6

*Solar Cells from Vietnam*, 90 Fed. Reg. 85 (Jan. 2, 2025) (amended preliminary determination)  6

*Solar Cells from Vietnam*, 90 Fed. Reg. 17,388 (Apr. 25, 2025) (final determinstion) ........ passim

*Tapered Roller Bearings and Parts Thereof, Finished and Unfished, from China*,
    78 Fed. Reg. 3396 (Jan. 16, 2013) ................................................................. 17

This Memorandum is filed by Consolidated Plaintiffs Jinko Solar (Vietnam) Industries Company Limited ("Jinko-VN"), JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc. (collectively, "Jinko") to support their Motion for Judgment on the Agency Record.

## I.    STATEMENT PURSUANT TO USCIT RULE 56.2

### A.    ADMINISTRATIVE DETERMINATION SUBJECT TO APPEAL

Jinko appeals the U.S. Department of Commerce's ("Commerce or "Department") final determination in its less-than-fair-value ("LTFV") investigation on crystalline silicon photovoltaic cells, whether or not assembled into modules ("Solar Cells"), from the Socialist Republic of Vietnam ("Vietnam"). *Solar Cells from Vietnam*, 90 Fed. Reg. 17,388 (Apr. 25, 2025), PR639 ("*Final Determination*"), and accompanying Issues and Decision Memorandum ("IDM"), PR636, resulting in the antidumping duty ("ADD") order published as *Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 90 Fed. Reg. 26,786 (June 24, 2025), PR673 (amended final determination) ("*ADD Order*"), corrected by *Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 90 Fed. Reg. 29,843 (July 7, 2025) (correction), PR678.

### B.    ISSUES OF LAW AND SUMMARY OF ARGUMENT

#### 1.    COMMERCE UNLAWFULLY VALUED SOLAR GLASS AT $4.85/KG

In its *Final Determination*, Commerce valued solar glass at $4.85/kg based on data in Indonesia 8-digit Harmonized Tariff Schedule ("HTS" or "HS") 7007.19.90, excluding exports from Malaysia, which were valued at $0.57/kg. If Malaysian data were included, the surrogate value ("SV") would have been $0.79/kg. That valuation is corroborated by PV Insights data ($0.46/kg), Jinko import data from its unaffiliated market economy ("ME") vendor ([

]), U.S. International Trade Commission ("USITC") data, Romania import data ($0.84/kg from Bulgaria), and Turkish import data ($0.98/kg). Commerce should not have rejected Malaysia data since the record did not contain substantial evidence that Malaysia

1

exports were subsidized during the period of investigation ("POI"). Alternatively, Commerce should have adjusted the Malaysia prices by 9.71% – the subsidy rate calculated by the Malaysian government for the fully cooperative mandatory respondent who was [

] to $0.625/kg. At the very least, the data points specified above corroborate each other.

In contrast, the data upon which Commerce relied included 10,469 kg of glass from the U.K. with an average unit value ("AUV") of $1.07/kg, and 2,764 kg from other countries with an AUV of $19.18/kg. These 2,764 kg could not possibly have been solar glass used by Jinko in its solar panels, in light of the miniscule quantity and/or high values of each shipment. By relying on commercially unrealistic data to value solar glass – $19.18/kg of small shipments from multiple countries – Commerce ignored its longstanding precedent, as affirmed by this Court.

> **2.    COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS, BY INCLUDING THE SUBSIDIZED STATEMENT OF SATNUSA AND REJECTING THE JEMBO STATEMENT**

In its *Final Determination*, Commerce did not address Jinko's argument that PT Jembo Energindo's ("Jembo") statement should be used to value surrogate financial ratios. Consequently, this Court should find Commerce's *Final Determination* unlawful and order remand for further consideration. In fact, record evidence supports reliance on Jembo's statement, since the record contains substantial evidence that Jembo produces and sells cables (merchandise comparable to solar panels), and that a Jembo subsidiary produces and sells solar panels. On remand, Commerce is required to consider all record evidence, which clearly demonstrates the comparability of Jinko's solar production process with that of Jembo. By relying on its normal three-prong test, Commerce should include Jembo's financial statement in its financial ratio analysis.

Commerce also erred by relying on the financial statement of PT Sat Nusapersada Satnusa ("Satnusa"), notwithstanding substantial record evidence showing that, during the POI,

2

Satnusa received countervailable subsidies. Specifically, the record included direct communication with Satunusa confirming its use of a countervailable benefit and direct communication with Batam Free Trade Zone Administrator that Satnusa received countervailable subsidies in the form of an exemption from import duties on capital goods, and an exemption from import duties due to its presence in a duty-free zone. Commerce has previously concluded that these benefits constitute countervailable subsidies. Thus, since Commerce is required to reject financial statements if there is a reason to believe or suspect that subsidies exist, and since the receipt of subsidies does not have to be expressly referenced in a financial statement for that standard to be satisfied, Commerce's reliance on Satnusa's statement was unsupported by substantial evidence and unlawful.

### 3. COMMERCE UNLAWFULLY VALUED POLYSILICON AND WAFERS BASED ON HTS DATA RATHER THAN BLOOMBERG DATA

Commerce preliminarily valued Jinko's wafers and polysilicon at $8.84/ kg, based on Bloomberg market data. In its *Final Determination*, Commerce reversed course, valuing polysilicon using Indonesia HTS 2804.61 data at $127.89/kg (quantity: 48,231 kg; value: $6,168,401) and wafers using Indonesia HTS 3818.00 data at $564.47/kg (quantity: 9563 kg; value: $5,398,066). This decision is unsupported by substantial evidence and is unlawful. In multiple prior decisions, Commerce has valued polysilicon and wafers using Bloomberg data rather than HTS data, reasoning that Bloomberg data constitute commercially reasonable prices for these inputs, while HTS data includes products other than solar grade polysilicon and wafers. In this investigation, Commerce acknowledged that "Commerce has indeed previously explained that the constituent imports within the HS subheadings at issue significantly differ from the silicon purity level required for wafers used to manufacture solar cells and has used market price sources in the alternative." There is no difference between the Bloomberg data upon which

3

PUBLIC VERSION

Commerce relied in its preliminary decision (and subsequently rejected in its *Final Determination*) and the Blomberg data upon which Commerce had consistently relied in prior proceedings. Moreover, valuing wafers at $564.47/kg, equal to $0.650/watt, results in purchased wafer costs being seven times greater than the sustainable costs of wafers and 10 times Jinko's cost of production of self-produced wafers. Similarly significant is that Jinko consumed [     ] kgs of wafers during the POI, which is over [  ] times greater than the [     ] kgs it purchased, and over [   ] times greater than the 9563 kg used to calculate the SV. And the $127.89/kg ($0.199/watt) polysilicon valuation is based on data for merely 48,231 kgs ([     ] of Jinko's ME purchases) and is [   ] times greater than Jinko's purchase price. Commerce ignored these facts, incorrectly claiming that commercial reasonableness is not relevant in selecting SVs. Commerce should not have relied on previously discredited HTS data merely because, in its opinion, there was no other choice. Rather, Commerce should have reopened the record after it rejected the Bloomberg data, to give parties an opportunity to present additional evidence.

## II.    STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's decisions that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather, "the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Id*. (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Commerce by statute, "in valuing the factors of production {('FOP")} . . . shall utilize, to the extent possible, the prices or costs of {FOPs} in one or more {ME} countries that are – (A) at a level of economic development comparable to that of the nonmarket economy {('NME')}; and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Such "valuation . . . **shall be based on the best available information** regarding the values of such factors in a {ME} country or countries." *Id*. § 1677b(c)(1)(B) (emphasis added).

In *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 369-70 (2024), the Supreme Court held that courts "need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous." Further, *Loper* forecloses this Court from affirming Commerce merely by finding that the government's statutory interpretation is "reasonable," and for that reason alone, "must" affirm. *Id*. at 395, 400. *Loper* clarified that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible." *Id*.; *see Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, 794 F. Supp. 3d 1334, 1342 (CIT 2025) ("Commerce must select the best available information, meaning it must choose the information available to it that is better than all other information on the record.").

## III.    STATEMENT OF FACTS

In May 2024, Commerce initiated a LTFV investigation on Solar Cells from Vietnam having the POI October 1, 2023, through March 31, 2024. *Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 89 Fed. Reg. 43,809, 43,810 (May 20, 2024) (initiation notice), PR80. In July 2024, Commerce selected Jinko-VN and JA Solar Vietnam Co. Ltd ("JA") as mandatory

5

respondents. Commerce Memorandum (July 5, 2024), PR204, CR168. Jinko timely responded to all of Commerce's questionnaires and submitted SVs to value its FOPs. *See*, *e.g.* Jinko Section D Supplemental Response (Nov. 6, 2024), CR470-76, PR559 ("SDQR"); Jinko Initial SV Rebuttal (Oct. 22, 2024), PR 387-99; Jinko Final SV Submission (Nov. 6, 2024), PR433-43.

In December 2024, Commerce preliminarily assigned Jinko an ADD rate of 56.51%, increased to 71.85% in January 2025. *Solar Cells from Vietnam*, 89 Fed. Reg. 96,219, 96,220 (Dec. 4, 2024) (preliminary determination), PR545, accompanying Preliminary Decision Memorandum ("PDM"), at 12; *Solar Cells from Vietnam*, 90 Fed. Reg. 85 (Jan. 2, 2025) (amended preliminary determination), PR573. Commerce preliminarily selected Indonesia as the primary surrogate country to value Jinko's FOPs. PDM at 12. In December 2024, Commerce conducted verification. Jinko-VN Verification Exhibits (Dec. 17, 2024), CR652-73, PR559 ("VE"). In March 2025, Jinko briefed the issues raised. Jinko Case Brief (Mar. 7, 2025), CR722-23, PR608-09; Jinko Rebuttal Brief (Mar. 19, 2025), CR728-29, PR619-20. The issues briefed included the values for Jinko's: (1) solar glass; (2) polysilicon and wafer inputs; and (3) surrogate financial ratios. IDM Comments 1, 7, 22.

In August 2025, Commerce published its *Final Determination* in which it assigned Jinko an 125.91% ADD rate. *Final Determination*, 90 Fed. Reg. at 17,389. Commerce then increased Jinko's ADD rate to 126.18% when publishing its *ADD Order*, 90 Fed. Reg. at 26,789. Commerce maintained Indonesia as the primary surrogate, declined to change the SV of glass and the financial ratios as requested by Jinko, and substituted SVs for wafers and polysilicon proposed by Petitioner for SVs preliminarily used. IDM Comments 1, 7, 22. Jinko subsequently initiated this appeal. Summons (July 24, 2025), ECF1; Complaint (Aug. 25, 2025), ECF8.

6

IV.    **ARGUMENT**

A.    **COMMERCE UNLAWFULLY VALUED SOLAR GLASS AT $4.85/KG**

In its *Final Determination*, Commerce valued solar glass based on data in Indonesia 8-digit HTS 7007.19.90, which encompasses "safety glass, consisting of toughened (tempered) or laminated glass." IDM at 24. Jinko agrees with this HTS selection. The HTS 7007.19.90 data, by exporting country, which Commerce used to calculate this SV, is attached to this Brief as an **Attachment**, showing the data by quantity, value and average unit value in kilograms and in pieces (*i.e.*, number of solar panels if the HTS 7007.19.90 imports, in fact, were used as solar panels). CR722, Jinko Case Brief, Attachment.

These data show a stark difference between the quantity, value, and AUV of solar glass imported into Indonesia during the POI from Malaysia, the United Kingdom, and 14 other countries. Imports from only two countries – Malaysia (250,852 kg with an AUV of $0.57/kg) and U.K. (10,469 kg. with an AUV of $1.07/kg) – potentially could be categorized as solar glass used by Jinko to produce modules; imports from the other countries were in insufficient quantities and/or aberrational values, thereby making it impossible that these imports could possibly constitute solar glass used as a major component of solar modules. Yet in its *Final Determination*, Commerce rejected Malaysian data and used aberrational data. As discussed below, this decision was unsupported by substantial evidence and unlawful.

1.    **RECORD EVIDENCE**

The following record evidence is relevant to this Court's determination.

PUBLIC VERSION

a.        **HTS Import Data**

The **Attachment** to this Brief shows that HTS 7007.19.90 data fall into three groups.[1]

| Group | No. Lines | Value - USD | QTY - KG | QTY–PCS | AUV USD/kg | AUV USD/PCS |
|---|---|---|---|---|---|---|
| Malaysia | 3 | $143,457 | 250,852 | 19,576 | $0.57/kg | $7.33/pcs |
| UK | 1 | $11,238 | 10,469 | 817 | $1.07/kg | $13.76/pcs |
| Malaysia + UK | 2 | $154,695 | 261,321 | 20,393 | $0.59/kg | $7.586/pcs |
| Other | 40 | $53,006 | 2,764 | 216 | $19.18/kg | $245.74/pcs |
| Total | 44 | $207,701 | 264,085 | 20,609 | $0.79/kg | $10.08/pcs |

Commerce rejected the Malaysia data and instead relied on the other data, consisting of 13,217 kg, valued at $64,152, for an AUV of $4.85/kg. In the 40 lines of "other" shipments (excluding Malaysia and the U.K.), the quantities range from one kg to 927 kg and the $/kg AUV ranges from $2.35/kg to $1,069/kg. Since each solar glass panel weighs 12.81 kg, the maximum number of solar glass panels which could have been shipped from any country other than Malaysia and the U.K. in a month is 72 units (927/12.814 = 72.34 from Singapore in November 2023). Only five-line items show more than 128.10 kg, which equals 10 panels, 17-line items show between 14–122 kg (one to 10 panels), and 19-line items show less than 12.81 kg, which is the weight of one solar glass panel.

As these small quantity, high priced data establish, HTS 7007.19.90 is not limited to solar glass – but also includes glass imported in multiple different sizes, for multiple different uses, *e.g.*, glass screen protector for the iPhone 14 cell phone, safety shield or barrier system for ice arenas and rinks. Jinko Initial SV Rebuttal Exhibit 4B: Customs Rulings N113071 (July 26, 2010) ("piece of tempered flat glass"), N336478 (Mar. 4, 2024) ("glass screen protector for the iPhone 14 cell phone, . . . and a glass screen protector for the iPad Pro 12.9-inch iPad/tablet,"); HQ 958525 (Feb. 2, 1996) ("safety shield or barrier system for ice arenas and rinks")

---

[1]        Notes: (1) One piece (solar glass panel) = 12.81 kg.; (2) Other country imports include small shipments from Malaysia in March 2024 (15 kg) and January 2024 (one kg).

### b.    PV Insights Data

PV Insights data show that during the POI, the average "glass price non-China" was $0.46/kg. This price was supported by business proprietary information ("BPI") from PV Insights, showing the monthly average prices from January 2023–March 2024, for solar glass 2.0 mm (USD/M2 and USD/kg), for glass from China, Non-China, Malaysia, Thailand, Vietnam, and worldwide. JA Final SV Submission (Nov. 6, 2024), CR 495, PR 461, Exhibit 3. The prices, in USD/kg from these six sources, for each month range between USD [                    ].

### c.    Jinko Import Data

During the POI, Jiko purchased large quantities of solar glass panels from [                    ], an unaffiliated Malaysian vendor, at prices ranging from [                    ] which is equivalent to [                    ], since each panel weighs 12.81 kg.

| F | I | J | K | L | M | N |
|---|---|---|---|---|---|---|
| Quantity purchased (pcs) | Units | Units purchased | Price/piece | kg per piece | Price per kg (k/l) | Terms of sale |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |
| [        ] | KG | PC | [    ] | [    ] | [    ] | [  ] |

SDQR Exhibit SD12-A; *see* VE 19F.

Jinko's smallest purchase from ME vendors was for [    ] panels and the largest for [    ] panels. VE 19F, at 4-5, 14-15. The record further shows that: (1) glass for each panel weighs 12.8 kg/panel; (2) each case contained 150 panels; and (3) between 36 and 360 cases were shipped on each invoice. *Id*. at 33-56. The smallest weight of solar glass on a packing list is

[      ] kg, and the average weight on each list is [              ]. For ME purchases, the smallest

weight is [        ] kg and the largest weight is [        ] kg. *Id*. at 33-56, 60-78 (documentation

for two representative shipments showing the quantity (cases, pieces, kilograms) of the shipment,

as well as the unit price ([              ]) and unit weight (12.814 kg/ panel)).

Finally, Jinko's Cost Reconciliation shows that during the POI, Jinko consumed [        ]

pieces of solar glass, valued at [            ], equal to [                        ]. Solar glass

constituted [    ] of Jinko's cost of materials for modules (*i.e.*, [                    ]). SDQR

Exhibit SD-2; CR652-673, Cost Reconciliation R-2 at 113-125.[2]

> **d.    Module Cost Structure: USITC and Jinko**

USITC data specify the minimal sustainable price for four types of modules – PERC,

PERC +, n-PERT, and SHJ – ranging from $0.32/watt to $0.37/watt. JA Final SV Rebuttal (Nov.

18, 2024), CR573, PR497, Exhibit 4 at I-19. These prices reflect wafer prices, cell metallization

costs, other direct cell costs, stringing and tabbing consumables, bill of materials ("BOM")

materials, module assembly costs, and R&D, Sales and Administrative Expenses. The BOM

material costs range from $0.082–$0.089/watt. *Id*. BOM materials include solar glass, ethyl vinyl

acetate ("EVA"), aluminum frame and junction box. *Id*.

Jinko's modules are functionally equivalent to the n-PERT modules in the USITC Table,[3]

showing the sustainable cost structure for n-PERT modules as follows:

---

[2]    The total material cost of USD [            ] is calculated by adding the cost of cells which capture the upstream cost, aluminum frame, back-sheet, glass, EVA, junction box, other materials, packing materials, and module rework. VE-16 at 113-125 (Cost Reconciliation (R2)).

[3]    Per VE-9–VE-14, Preselected sales and Surprise sales, the cell technology (Field No. 3.3) which was used by Jinko-VN is "Tunnel Oxide Passivated Contact ('TOPCon') + Selective Emitter ('SE')" and for Crystal/Dopant Type (Field No. 3.2), it is "Monocrystalline, N – Type," VE-9 at 7, for the CONNUM build up. For supporting documents, *see* VE-9 at 8-19, 20 (Jinko U.S. brochure, showing that product is N-Type Bifacial).

PUBLIC VERSION

|  | USD/Watt | % |
|---|---|---|
| Module Assembly | 0.019 | 7% |
| BOM Materials | 0.086 | 31% |
| Consumables | 0.015 | 5% |
| Other Cell direct cost | 0.053 | 19% |
| Cell Metallization | 0.017 | 6% |
| April 2019 Wafer pricing | 0.091 | 32% |
| Total cost – n-PERT, Bifacial | 0.281 | 100% |

*Id.* Therefore, USITC's cost model shows that module components (solar glass, ethyl EVA, aluminum frame, back-sheet, and junction box) cost $0.086/watt, representing 31% of total costs.

In contrast, the table below shows that when glass is valued at $4.85/kg (equal to $0.199/Watt), glass alone represents 71% of the total costs of n-PERT modules under the USITC's cost structure ($0.199/Watt of $0.281/Watt). Using Jinko's actual glass cost ($0.5048/kg equal to $0.021/Watt), glass represents 7% of total costs. In contrast, when the $4.85/kg SV is applied to Jinko's cost reconciliation, SDQR Exhibit SD-2R.2, glass represents 95% of total Jinko costs, compared to 9.9% of total costs based on actual Jinko costs.

|  | Petitioner | Jinko-VN |  |
|---|---|---|---|
| SV for glass / ME price in SDQR Exhibit SD-12A (USD/KG) | 4.85 | [ ] | A |
| Weighted average (WA) FOP of glass (KG/Watt) | [ ] | [ ] | B (SDQR Exhibit SD-4A.4) |
| Cost of glass (USD/Watt) | [ ] | [ ] | C=A*B |
| Average cost of module, excluding sales & administrative (USD/Watt)- N Pert, Bifacial | [ ] | [ ] | D (USITC report at I-19) |
| **% of Glass cost to total cost** | 71% | 7% | E=C/D |

JA Final SV Rebuttal Exhibit 4: ITC Report at I-19; SDQR Ex. SD-2R.2 (cost recon)

|  | Petitioner | Jinko-VN |  |
|---|---|---|---|
| SV for glass / ME price in SQR Exhibit SD-12A (USD/KG) | 4.85 | [ ] | A |
| WA FOP of glass (KG/Watt) | [ ] | [ ] | B (SDQR Exhibit SD-4A.4) |
| Cost of glass (USD/Watt) | [ ] | [ ] | C=A*B |
| Average cost of module, excluding sales & administrative (USD/Watt) | [ ] | [ ] | D (SDQR Exhibit SD-2R.2) |
| **% of Glass cost to total cost** | 95% | 9.9% | E=C/D |

11

In sum, these data show that under the USITC's formula, valuing glass at $4.85/kg (equal to $0.199/Watt) results in the cost of glass being 71% of total module costs and 230% greater than all module components ($0.86/Watt) (glass, junction box, EVA, and aluminum frame). Moreover, valuing glass at $19.18/kg (SV for countries other than Malaysia and the U.K.), equal to $0.786/watt, results in glass costs being 270% greater than the total sustainable costs of a module ($0.786/watt compared to $0.281/watt). Finally, valuing glass at $4.85/kg ($0.199/watt) results in glass representing 95% of Jinko's cost of manufacturing ("COM") for a module, when Jinko's actual glass costs ([                    ]) are [    ] of its COM.

### e.    Romania and Turkish Import Data

In the tenth administrative review ("AR10") of the ADD order on *Solar Cells from China* ("*Solar I*"), having the period of review ("POR") December 1, 2021, to November 30, 2022, Petitioner relied on Malaysian imports into Romania to value solar glass. JA Final SV Rebuttal Exhibit 6.  The AUV of tempered glass imported into Romania in 2022 was $1.86/kg, and the AUV of imports from the two largest exporting countries (Bulgaria and Turkey), representing 80% of total imports (7,635,100 kg + 6,184,600 kg = 13,819,700 kg of 17,947,060 kg) were $0.84/kg (Bulgaria) and $1.16/kg (Turkey). *Id*. These data are consistent with data from Indonesia, in which large quantities constitute imports of solar glass used for modules. **Attachment**. Similarly, the Romania data show that high prices were paid for small quantities, which could not possibly be tempered glass used on modules. *See, e.g.,* 50 kg Sweden @ $35.12 kg; 10 kg Spain @ $37.55/kg; 10 kg Israel @ $32.23/kg. JA Final SV Rebuttal Exhibit 6.

Finally, SV data in AR10 of *Solar I* show that 143,411,357 kg were imported into Turkey, at an AUV of $0.98/kg. Jinko Initial SV Rebuttal Exhibit 1-E The largest exporter was

PUBLIC VERSION

Malaysia (133,227,224 kg at $0.958/kg), and there is no evidence that Turkey found that

Malaysian exports were subsidized. *Id*.

      **2.      SOLAR GLASS SHOULD BE VALUED AT $0.59/KG RATHER THAN $4.85/KG**

The record discussed above contains the following data regarding solar glass value.

1. Solar glass panels used by Jinko weigh 12.814 kg each. During the POI, Jinko purchased [    ] panels from [             ] and [    ] panels from China. Each purchase ranged from [  ] panels to [  ] panels, the smallest weight of solar glass on a packing list was [  ] kg, and the average weight on each list was [    ]. Jinko paid [            ], equal to [    ].

2. Monthly HTS import data for Indonesia HTS 7007.19.90, encompassing the subject solar panels and other "toughened (tempered) safety glass," show imports of 264,085 kg, from 15 countries. Imports from Malaysia in February 2014 (250,852 kg @ $0.57/kg) represent 94.99% of this total, and imports from the U.K. in January 2024 (10,469 kg @ $1.07/kg) represent 3.96% of the total. The AUV of imports from Malaysia and the U.K. combined is $0.59/kg ($154,695/ 261,321 kg). The AUV of the remaining 2,764 kg (1.05%) is $19.18/kg, with quantities ranging from one kg to 927 kg, and prices ranging from $2.35/kg to $1,069/kg. The largest shipment in this group (927 kg) could not have been greater than 72 panels, at $14.97/kg. In contrast, each box of solar glass purchased by Jinko contained 150 panels.

3. PV Insights report that the average non-China glass price during the POI was $0.46/kg.

4. In its submission to Commerce in AR10 of *Solar I*, Petitioner did not ask Commerce to exclude import data from Malaysia.

5. The AR10 POR AUV of HTS imports of tempered glass products into Romania was $1.86/kg, with imports from the two largest exporting countries (13,819,700 kg of 17,947,060 kg) was $0.99/kg ($6,450,072 + 7,182,201 = $13,632,273). During that POR, 143,411,357 kg of tempered glass were imported into Turkey, at an AUV of $0.98/kg.

6. The USITC's cost structure of solar modules reveals that the sustainable cost of all module components (solar glass, EVA, aluminum frame, backsheet and junction box) is $0.86/watt. Valuing glass at $4.85/kg ($0.199/watt) results in the cost of glass alone being over twice the cost of all module components; valuing glass at $19.18/kg ($0.78/watt) (SV for countries other than Malaysia and the

13

U.K.), results in glass costs being 270% greater than the total sustainable costs of a complete module ($0.281/watt).

Section IV.A.1, *supra*.

Together these data show that, if Commerce declined to rely on PV Insights data, it should have valued solar glass at $0.59/kg based on HTS imports into Indonesia from Malaysia and the U.K. Relying on these data is appropriate because: (1) Malaysia data should not be excluded from the analysis, for the reasons discussed below; and (2) small quantity shipments in 40-line items should be excluded from the analysis because their miniscule shipment size and high price confirms that they are not solar glass panels.

Moreover, during the POI, Jinko paid an unaffiliated Malaysian producer [      ] for over one million solar glass panels, each of which weighed 12.814 kg. VE 19F (ME Purchases of Glass). Each purchase ranged from [    ] panels to [      ] panels, with the smallest weight of solar glass on a packing list being [    ] kg, and the average weight being [          ]. *Id*. Each package contained 150 panels. Jinko's purchase price is consistent with the $0.46/kg price reported by PV Insights – a publication upon which Commerce has consistently relied to value solar glass in prior proceedings. *Id*. Jinko's price also is consistent with the costs reported by the USITC for all material inputs used to produce n-Pert solar panels. And Jinko's purchase price is consistent with the $0.59/kg, HTS 7007.19.90 data which all parties agree includes solar panel imports into the primary surrogate country, Indonesia.

In contrast, valuing solar glass at $4.85/kg ($0.199/watt) leads to the facially absurd result that Jinko's costs for solar glass will be [   ] of Jinko's total costs ([          ]) and 71% of total costs specified in the USITC's model ($0.281/kg).

Commerce's absurd decision resulted from its removal of Malaysia exports to Indonesia from the HTS data and its decision to instead rely on the value of 2,764 kg of tempered glass

14

with an AUV of $19.18/kg, which by virtue of their small size and high prices could not possibly be solar glass. Longstanding, consistent Department policy, affirmed by reviewing courts, prohibits Commerce from relying on aberrational data to value material inputs. Commerce is required to "adequately address the commercial significance of the quantities underlying its selected {SVs}" and to "reject a proposed {SV} if it determines that the value is aberrational compared to other market values on the record." *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361 (CIT 2018); *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308, 1312 (CIT 2019).

Here, the $19.18/kg AUV for 2,764 kilograms (1% of total) is 32 times greater than the $0.59/kg AUV for 261,321 kg (99% of total) exported from Malaysia and the U.K. The small quantity/ high prices data falls squarely within the definition of aberrational data, as that term has been defined by Commerce and reviewing courts. By failing to follow its established practice, Commerce's *Final Determination* was unsupported by substantial evidence and unlawful.

**3. COMMERCE UNLAWFULLY EXCLUDED MALAYSIAN DATA, REJECTED PV INSIGHTS DATA, AND RELIED ON SMALL QUANTITIES OF HIGH PRICED MERCHANDISE**

**a. Commerce Unlawfully Excluded Malaysian data**

Commerce excluded Malaysia data from its analysis based on the fact that "on December 11, 2020, the Government of India (GOI) published the results of a subsidy investigation concerning imports of 'textured tempered glass whether coated or uncoated from Malaysia' during the {POI} April 2018 - March 2019," and determined that "the sole mandatory respondent, Xinyi Solar (Malaysia) Sdn. Bhd. . . . , received subsidies of 9.71 percent." IDM Comment 1. Commerce reasoned that this determination "goes directly to the basic value of solar glass," because "here we have record evidence that the specific input in question, and as a result, the import data in question, is being subsidized." *Id*. Commerce then rejected Jinko's suggestion

15

that the Department use the Malaysia data with a 9.71% uptick, because "Jinko does not address why its suggested alternative of using the calculated GOI subsidy rate or all-others rate would resolve the reliability concerns that Commerce has." *Id*. As discussed below, Commerce's rationale should be rejected.

Jinko acknowledges that Commerce, by statute: "may disregard price or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order." 19 U.S.C. § 1677b(5). However, the fact that Commerce has the discretion to exclude subsidized data does not mean that it here lawfully excluded the Malaysia data, resulting in reliance on an SV which was 10 times greater than Jinko's ME purchase prices.

First, Commerce has not determined that "broadly available export subsidies exist" with respect to solar glass exported from Malaysia. Rather, Commerce here excluded Malaysia because in 2021 the GOI found that Xinyi Solar received domestic subsidies with respect to four programs, for a total subsidy of less than 10%. As such, these subsidies are akin to specific subsidies provided to specific companies, *i.e.*, subsidies reported in financial statements. In determining whether to rely on a financial statement as an acceptable SV, Commerce has required evidence that the company received countervailable subsidies **during the period in question**. *See Sichuan Changhong Elec. Co. v. United States,* 30 CIT 1481, 1493-96 (2006) ("Commerce has failed to show that the subsidies existed in the supplier countries during the {POI}, as is demanded by prong one."); *Stilbenic Optical Brightening Agents from China*, 77 Fed. Reg. 17,436 (Mar. 26, 2012) (final determination) IDM Comment 2 ("the Department's practice is to review the financial statements to determine whether the evidence indicates that the

16

company received a countervailable subsidy during the relevant period. . . . ”); *Tapered Roller Bearings and Parts Thereof, Finished and Unfished, from China*, 78 Fed. Reg. 3396 (Jan. 16, 2013), IDM Comment 2 (“the Department’s practice is to review the financial statements to determine whether the evidence indicates that the company received a countervailable subsidy during the relevant period”). The instant record does not evidence Malaysian solar glass producers receiving subsidies during the POI. Thus, Department precedent supports reliance on Malaysia data, and Commerce has not provided a valid reason to distinguish its precedent.

Second, in the absence of record evidence that Commerce itself has found the Malaysia programs in issue to be countervailable during the POI, its practice is to analyze whether “the subsidies were distortive with respect to the subject merchandise during the POR.” *Common Alloy Aluminum Sheet from China*, 88 Fed. Reg. 16,589 (Mar. 20, 2023) (final results) (“*CAAS*”), IDM Comment 1-B. In *CAAS*, Commerce reasoned that “{w}hen there is evidence of a potential subsidy, but Commerce has not previously found the particular program to be countervailable, Commerce does not *per se* reject the data in question. *Id*. Commerce’s decision to value Jinko’s solar glass is governed by this policy. Here, there is no record evidence that Malaysia provided “broadly available export subsidies” to solar glass exporters, and no record evidence that Commerce found the Malaysia programs in issue to be countervailable during the POI. The question here is whether there is “there is specific evidence demonstrating that the subsidies were distortive with respect to the subject merchandise during the POR.” *Id*. No such evidence exists.

Third, the GOI found that the mandatory respondent, Xinyi Solar received subsidies of 9.71% and that textured tempered glass exported to India by other Malaysia producers would be subject to a 10.14% rate. Petitioner Final SV Submission Exhibit 38. In its decision, the GOI

17

noted that Xinyi Solar was a "co-operating exporter" and that its decision was based on verified data submitted by Xinyi Solar to the GOI which "corelated with the submissions filed by the Government of Malaysia on modalities of grant and availability of subsidies." *Id*. Exhibit 39 at 35; Jinko Case Brief at 18. The 9.71% rate was based on the landed value of imports into India. Thus, there is no greater than a 9.71% difference between the arm's length price paid by Jinko to [          ] for solar glass and a non-subsidized price. Accordingly, relying on Malaysia import data into Indonesia to value solar glass clearly is not distortive – especially compared to the grossly distortive $4.85/kg price Commerce used.

Finally, in *Mid Continent Steel & Wire, Inc. v. United States*, the Federal Circuit considered the amount of the subsidy in issue to reject respondent's claim that subsidization should result in automatic rejection of surrogate data. 2025 WL 40344 (Fed. Cir. Jan. 7, 2025). The Court reasoned that "{t}he insignificance of the subsidy to any profit calculation means that, even if it was unreasonable for Commerce not to address the subsidy more than it did, that error was harmless: It could not have affected the choice of Sundram over Al Jazeera. *Id*. *3.

Here, the Malaysian subsidy in issue in not an unquantifiable broadly available export subsidy which calls into question the reliability of data. Rather, the subsidy reflects data obtained from a cooperative respondent which the GOI verified as accurate. Thus, Commerce should have adjusted the Malaysia prices by 9.71% to $0.625/kg. Alternatively, Commerce should have relied on the Malaysia data and the PV Insights data to corroborate its selection of that source ($0.46/kg) or U.K. import data into Indonesia ($1.07/kg) as the only reasonable data to calculate the SV for solar glass.

18

PUBLIC VERSION

### b.      Commerce Unlawfully Rejected PV Insights Data

Jinko supports JA Solar's argument concerning why Commerce should rely on PV Insights data as the solar glass SV. Moreover, even if this Court decides that glass should not be valued at $0.46/kg as PV Insights reported, Commerce committed reversible error by failing to consider PV Insights in analyzing the reasonableness of its selection. *See CS Wind Vietnam Co. v. United States*, 971 F. Supp. 2d 1271, 1279 (CIT 2014) (while "Commerce may have some legitimate basis for rejecting the JPC data as a primary source for {SVs}, it was unreasonable for Commerce to reject the data entirely in considering whether the GTA data is aberrational"); *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 37 CIT 308, 317 (2013) ("while the prices might not satisfy the requirements for {SVs}, they are sufficient to call into question the reliability of the GTA data."); *Peer Bearing Co.-Changshan v. United States,* 35 CIT 1626, 1644 (2011) ("The statute contemplates the use of data from countries at a comparable level of development as the {NME} country as the source of a {SV}; it does not prohibit Commerce from considering data from developed countries as evidence to determine which information is the best available."); *Itochu Bldg. Prods. Co. v. United State*, 2017 WL 2703810 *1, *8 (CIT June 22, 2017) ("as the court has explained, 'export data from countries that were not potential surrogates' may be 'sufficient to call into question the reliability of the {selected surrogate} data.' . . . And, Commerce's decision to summarily reject data from non-economically comparable countries as not probative has similarly been rejected by the court.")

Second, Commerce rejection of PV Insights data because it is not publicly available does not negate its use for purposes of corroborating data which is selected as an SV. Indeed, in the past the Department has relied on BPI data as the source of a publicly available SV. *See, e.g.,* JA Final SV Submission Exhibit 5: *Metal Lockers and Parts Thereof from China*, Commerce Preliminary SV Memorandum (Sept. 12, 2024), at 6 (calculating a public SV for ocean freight

19

PUBLIC VERSION

based on information provided entirely confidentially); *Coal. of Am. Manufacturers of Mobile Access Equip. v. United States*, 2024 WL 2796654, *9 (CIT May 31, 2024) ("Commerce provided a reasonable explanation for accepting Dingli's proprietary data here—it was the only means available to the company to "rebut, clarify, or correct the SV information on the record," . . . and "the purpose" of the submission was "to support information . . . already on the record.").

Finally, PV Insights is a reliable source, which Commerce has used in valuing solar glass in multiple prior proceedings. Commerce has reasoned:

> Although the collection methodology for the PV Insights data is not fully transparent, the data appears to be the result of market research intended to provide accurate, for-purchase, benchmarking information to participants in the solar market so that they can effectively conduct business. The PV Insights data, purchased by Trina and placed on the record of this remand, was collected from market surveys and interviews of buyers and sellers of anti-reflective cover glass that "believe price transparency is in the best interest of the market". Moreover, the PV Insights data was independently researched, verified and produced for reasons unrelated to this proceeding and appears to be treated as reliable information by the relevant industry for the POR.

Commerce Redetermination, *Changzhou Trina Solar Energy Co. v. United States*, Consol. Court No. 17-00246, (Mar. 2, 2020), ECF93, at 20.[4]

---

[4] *See also Solar Cells from China*, 88 Fed. Reg. 1355 (Jan. 10, 2023) (preliminary results), IDM at 27 ("Consistent with our practice of seeking to maintain product comparability between the benchmark prices and the products purchased by Jinko and Risen, and relying on data that reflect the narrowest category of products encompassing the input products, we are using the world market prices (tier two) published by PV Insights."); *Solar Cells from China; 2019*, 87 Fed. Reg. 40,491 (July 7, 2022) (final results), IDM Comment 8 ("The information on the record indicates that the PV Insights prices are specific to solar glass and that the UN Comtrade prices are not."); *Solar Cells from China*, 86 Fed. Reg. 21,691 (Apr. 23, 2021) (preliminary results), PDM at 19 ("Because the data published by PV Insights are global monthly prices for the entire POR and are specific to solar glass, we find that it is appropriate to rely on this data source when constructing the solar glass benchmark"); *Solar Cells from China*, 85 Fed. Reg. 79,163 (Dec. 9, 2020) (final results), IDM Comment 7 (Commerce relied on PV Insight and Greentech Media data, rather than European Union trade data).

PUBLIC VERSION

Commerce's claim that reliance on PV Insights data in CVD proceedings is distinguishable, IDM Comment 1, does not apply when deciding whether PV Insights can be used to corroborate other record evidence. Thus, Commerce's recognition that PV Insights data can be used "to determine whether prices are consistent with market principles and reflective of a world-market price," IDM at 14, constitutes an administrative admission that PV Insights data constitutes probative evidence to determine which SV data is the best available information.

In sum, Commerce's refusal to rely on PV Insights data, or alternatively, to consider PV Insights data as corroborating evidence renders its determination unsupported by substantial evidence and unlawful.

### c.      Commerce Unlawfully Relied on Aberrational Data

In its *Final Determination*, Commerce rejected Jinko's high-value argument, reasoning that "we do not select or analyze potential SVs on the basis of their value, whether that value is high, or low, or in some relationship to another value." IDM Comment 1. Commerce similarly rejected Jinko's low quantity argument, reasoning that "Jinko speculates, without evidentiary support or reasoning, that these small shipments cannot possibly be solar glass, imported into Indonesia from multiple countries." *Id*. Commerce continued:

> First, the record shows that the quantity of imports exclusive of Malaysia is a commercial quantity because the remaining data, using respondents' reported solar glass weights, accounts for enough solar glass to produce more than 1000 solar modules. In addition, . . . we agree with the petitioner that the presence of low-quantity or low-weight line items in an HS category does not indicate that the merchandise is unlike the subject merchandise of this case because smaller solar modules can use the exact same type of glass as a large module.

*Id*.

This rationale should be rejected. The Federal Circuit has affirmed Commerce's "longstanding 'administrative practice with respect to aberrational data . . . 'to disregard small-quantity import data {from the primary surrogate country} when the per-unit value is

21

substantially different from the per-unit values of the larger quantity imports of that product from other {potential surrogate} countries.'" *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1357-59 (Fed. Cir. 2020); *see Risen Energy Co. v. United States*, 611 F. Supp. 3d 1384 (CIT 2022) ("Commerce disregards 'small quantity import data . . . when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other potential surrogate countries.'").

In *Best Mattresses International Co. v. United States*, this Court reasoned that "Commerce has acknowledged that aberrational values should not be used" and that "{d}ata is aberrantly high when it is "many times higher than the import values from other countries." 622 F. Supp. 3d 1347, 1379 (CIT 2023). It noted that "{w}hile there is no bright-line rule for what multiple of other price values would qualify as "aberrational," the court has previously affirmed the exclusion of "aberrational values" that were nearly 30 times higher than other values, . . . and 30 and 79 times higher than the average unit value." *Id*. It then concluded that based on the facts in that case, "the record supports Commerce's determination that Romanian GTA data is not sufficiently aberrant to be excluded," because "these multiples are a far cry from the values that courts have affirmed to be 'aberrationally high.'" *Id*. These multiples were: 191 times (*SolarWorld*, 962 F.3d at 1351); 15-30 times (*Jacobi Carbons AB v. United States*, 619 Fed. App'x 992, 1000 (Fed. Cir. 2015)); almost 30 times (*Calgon Carbon Corp v. United States*, 443 F. Supp. 3d 1334, 1350 (CIT 2020)); 30-79 times (*Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1260 (CIT 2009)).

In *Risen Energy Co. v. United States,* this Court held that "Commerce cannot rely upon the Russian import value for silver paste as that value itself represents a small-quantity, large per-unit seemingly aberrational value." 569 F. Supp. 3d 1315, 1329 (CIT 2022). This Court

22

PUBLIC VERSION

reasoned that while "Commerce explains why it declines to value silver paste using each of the benchmark data sets on the record but it does not explain why, when considered collectively, these benchmark data sets do not indicate the Malaysian import value for silver paste is unreliable." *Id*.; *see Hebei Metals & Mins. Imp. & Exp. Corp. v. United States,* 28 CIT 1185, 1197-200 (2004) ("Even if the volume of the imports is ignored, the Swedish value still appears aberrational. The Swedish value is 8.5 times higher than the average import value of 83.02 Rs/Kg."); *Ancientree Cabinet Co. v. United States,* 532 F. Supp. 3d 1241, 1253-55 (CIT 2021) ({SVs} "must be as representative of the situation in the NME country as is feasible. . . . Therefore, Commerce must "adequately address the commercial significance of the quantities underlying its selected {SVs};" *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d at 1312 ("In selecting among available {SVs}, Commerce's practice is to reject a proposed {SV} if it determines that the value is aberrational compared to other market values on the record."); *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp.3d 1329, 1347-49 (CIT 2018) ("the small quantities on which the AUVs for Jordan and Paraguay were based (249 kg. and 53 kg., respectively) would appear to make these AUVs unsuitable for use as {SVs}").

Application of these principles to the facts here establishes that Commerce's decision to include 39-line items of small quantity high value shipments in its analysis resulted in relying on an SV which was unsupported by substantial evidence.

Again, each Jinko solar panel weighs 12.814 kg, thereby clearly precluding 19 data lines of less than 12.814 kg from being used in the SV analysis. **Attachment.** Moreover, 17 data lines are from 14kg to 122kg, which are between one and 10 panels. *Id*. Finally, merely 5 lines show quantities between 128.10 and 927 kg. *Id*. The largest shipment consists of no more than 72 panels (927/ 12.814 = 72.34), which is only one-half of one case containing 150 panels. *Id*.; VE

23

PUBLIC VERSION

19F (ME Purchases of Glass). Thus, even if any of these shipments contained solar panels (which is very unlikely, considering the dimensions of each panel), the shipment would not constitute a commercial quantity which could be shipped internationally.

Commerce contends that "the record shows that the quantity of imports exclusive of Malaysia is a commercial quantity because the remaining data, using respondents' reported solar glass weights, accounts for enough solar glass to produce more than 1000 solar modules." IDM Comment 1. This argument is a red herring. First, these 1,000 modules include 817 modules from the United Kingdom, which Jinko acknowledges may constitute solar glass. **Attachment**. Second, the remaining 183 modules are not sourced from one country in one shipment, which would be required to support Commerce's rationale. *Id*. Rather, they are spread over 13 countries, with 19 line items consisting of glass which could not have constituted more than one panel; 17 line item, from one to ten panels; and 5-line items between 10 and 72 panels (less than one-half of a box).

Moreover, the data upon which Commerce relied consisted of shipments with widely fluctuating, aberrational prices. The record reveals that: (1) Jinko paid its unaffiliated Malaysia vendor $0.49-0.51/kg for solar glass; (2) AUV of Indonesia imports was $0.59/kg for commercial solar glass shipments (U.K. and Malysia) and $0.79/kg for all shipments; (3) Malaysia verified subsidy rate was 9.71%, which would increase the Malaysia price from $0.57/kg to $0.63/kg; and (4) PV Insights sales price was $0.46/kg. These multiple sources corroborate each other.

In contrast, the $19.18/kg AUV for 2,764 kilograms (1% of total) is 32 times greater than the $0.59/kg AUV for 261,321 kg (99% of total) exported from Malaysia and the U.K. **Attachment**. This $19.18/kg value is 270% greater than the total sustainable costs of a complete

module ($0.281/watt). It is 42 times greater than the PV Insights value ($0.46/kg), 37 times greater than the price paid by Jinko for solar glass from market economy sources, and 30 times greater than imports prices from Malaysia increased by a calculated, realistic subsidy ($0.63/kg). In short, including solar glass valued at $19.18/kg in data intended to represent a commercially realistic market price is patently absurd.

In sum, the $19.18/kg price from other countries should be rejected because of the confluence of multiple factors: (1) high values **and** low quantity compared to the value and quantities of solar glass purchased by Jinko from ME sources; (2) dimensions of solar glass and the manner in which it is packed; and (3) market value information (PV Insights and Malaysia data plus 9.71% subsidy). Accordingly, this Court should hold that Commerce's solar glass valuation is unsupported by substantial evidence and unlawful, and should remand this matter to Commerce to value solar glass at a commercially realistic price.

## B.    COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS

In its *Final Determination*, Commerce calculated surrogate financial ratios using the financial statements of Satnusa and PT. Tera Data Indonesia Tbk ("Tera"), and not the financial statement of Jembo, proposed by Jinko. IDM Comment 22. Commerce's decision should be reversed. As discussed below, Commerce should: (1) rely on the financial statements of Jembo and Tera; and (b) reject the financial statement of Satnusa because of its receipt of countervailable subsidies.

### 1.    COMMERCE SHOULD HAVE USED JEMBO'S FINANCIAL STATEMENT

In its *Final Determination*, Commerce did not address Jinko's argument that it should include Jembo's statement in the calculation of the average surrogate financial ratios. While Commerce acknowledges Jinko's argument in the summary of arguments section, IDM at 70-71

25

("*Jinko Case Brief*" section of Comment 22), it never considered these arguments in the

"Commerce's Position" section of Comment 22. *Id*. at 72-77. Consequently, this Court should

find Commerce's *Final Determination* unlawful and order remand.

While remand is required based on Commerce's failure to consider Jinko's argument

alone, record evidence supports using the Jembo statement. Specifically, Commerce

preliminarily excluded Jembo from its financial ratios simple average "based on concerns that

the company's main business line, accounting for the vast majority of its revenue and expenses,

relates to the production and sales of telecommunication cables, fiber optic cables, and electrical

cables, which the record fails to substantiate to be similar to solar cell production." Commerce

Preliminary SV Memorandum (Dec. 2, 2024), PR536, at 13. However, Jinko subsequently

demonstrated that this reasoning was incorrect. *See* Jinko Case Brief at 51-55. Specifically, the

record contained substantial evidence that solar panels and Jembo's products are comparable

merchandise in accordance with Commerce's three-prong test, which focuses on physical

characteristics, end uses, and production processes of the product in question. *See Pure

Magnesium from China*, 75 Fed. Reg. 80,791 (Dec. 23, 2010) (final results), IDM Comment 2;

*Corrosion Inhibitors from China*, 89 Fed. Reg. 82,975 (Oct. 4, 2024) (final results), IDM

Comment 1; *see also* Commerce Policy Bulletin 04.1 (Mar. 1, 2004).[5]

Jembo's products are comparable to subject solar panels based on an evaluation of all

three prongs.

1. **Physical Characteristics** – Jembo produces cables for energy transport and
   storage. It also produces solar modules and panels through its subsidiary, PT
   Jembo Energindo ("Energindo"). The record contains images of Energindo's solar
   panels and their specifications. Jinko Final SV Submission Exhibit 7C-2. Jembo's
   "Public Expose" documents, which summarize its structure and activity, describe

---

[5]    https://access.trade.gov/Resources/policy/bull04-1.html.

26

PUBLIC VERSION

the company as a "manufacturer of electrical cables, telecommunication cables, fiber optic cables and solar panels." *Id.* Exhibit 7B-1. Energindo is a member of the Indonesian Solar Module Manufacturing Association, an organization dedicated to promoting the development of the Indonesian solar industry. *Id.* Exhibit 7B-2.

2. **End uses** – Jembo's cables and solar panels have the same use as Jinko's solar panels: energy storage and energy transport. *Id.* Exhibits 7-C1—7C-5. Cables are used to store and deliver electrical energy for electronic goods, or, in the case of fiber optic cables, are used to transport data signals.

3. **Production process** – Jembo's cable manufacturing machinery is comparable to machinery used in solar manufacturing. The record contains the following information comparing machinery used to produce cables and solar panels:

| *Machine | Product | Task |
|---|---|---|
| Laminating Machine | Solar | Encapsulates cells within protective layers. |
| | Cable | Encapsulates layers of fibers within protective layers. |
| Tape Application Machine | Solar | Secures module components in place. |
| | Cable | Wraps shielding/insulating tapes around cables. |
| Edge Trimming Machine | Solar | Trims excess material from module edges. |
| | Cable | Trims excess material from cables. |
| Testing Equipment | Solar | Measures performance of finished module. |
| | Cable | Measures signal integrity, attenuation, electrical resistance, and other elements of cable performance. |
| Cleaning and Washing Machines | Solar & Cable | Wafers and wires cleaned of impurities using chemicals, particularly Hydrofluoric Acid. |
| Furnaces | Solar | Used to create p-type and n-type layers in solar cells to promote conduction of electricity. |
| | Cable | Used to adjust the ductility and conductivity of metal conductors. |
| Sintering and Curing Furnaces | Solar | Bonds printed metal contacts to wafers to ensure electrical conductivity. |
| | Cable | Hardens insulating materials/coatings for durability and preservation of electrical conductivity. |
| Etching Equipment | Solar | Removes unnecessary layers from wafer, shape surface for optimal processing of sunlight. |

27

| | | |
|---|---|---|
| | Cable | Removes unnecessary layers from metal surfaces, shape surface for optimal processing of electricity. |
| **Coating and Deposition Machines** | Solar | Improves cell efficiency. Chemical Vapor Deposition (CVD) equipment applies passivation and anti-reflection coatings. |
| | Cable | {CVD} used to produce optical fibers for fiber optic cables |
| **Inspection and Sorting Machines** | Solar & Cable | Assess cables or wafers for defects and impurities. |
| **Grinding and Polishing Machines** | Solar | Flatten surface of ingots for easier cutting. |
| | Cable | Prepare metal conductors for adhesion to insulation materials by removing oxides on surface of metal. |

*Id*. Exhibit 7C-2.

Moreover, the production process and raw materials used by Jembo to produce cables are comparable to Jinko's process and materials used to produce solar modules. *See Id*. Exhibit 7C-3 (Datamyne import data).

By failing to consider any of these arguments, remand is necessary because Commerce issued its *Final Determination* "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals*, 132 F.3d at 720. In its remand, Commerce is required to include the Jembo data in the financial ratio analysis because the record clearly demonstrates comparability with Jinko's solar production process.

### 2.    COMMERCE SHOULD HAVE REJECTED THE SATNUSA FINANCIAL STATEMENT BECAUSE OF COUNTERVAILABLE SUBSIDIES

In its *Final Determination*, Commerce rejected Jinko's argument that Commerce improperly relied on Satnusa's financial statement, notwithstanding substantial record evidence establishing that Satnusa received countervailable subsidies. IDM Comment 22. Commerce reasoned that:

1. "we find no specific mention of the Government of Indonesia or the import duty exemption program in Satnusa's financial statements;"

28

PUBLIC VERSION

2. "customs duty exemption programs previously found to be countervailable referenced by Jinko were applicable to companies located in bonded zones, while Satnusa is located in a Free Trade Zone, which is different under Indonesian law;"

3. "Commerce cannot "go behind" the financial statements and ascribe countervailable subsidies to the financial statements;"

4. "it is Commerce's practice to decline to use financial statements for subsidies only when there is "explicit evidence of determined countervailable subsidies;" and

5. "the evidence is not objective, specific or seen in Satnusa's financial statements that Satnusa received countervailable subsidies during the POI."

*Id*.

This rationale should be rejected. Record evidence demonstrates that Commerce had "reason to believe or suspect" that Satnusa received countervailable subsidies. Consequently, this Court should find Commerce's determination unsupported by substantial evidence and unlawful.

In *Jiaxing Brother Fastener Co. v. United States*, 751 F. Supp. 2d 1345, 1352 (CIT 2010), this Court discussed Commerce's "*reason to believe or suspect*" standard as follows.

> The Department's policy is guided by the conference report issued by the Congressional committee charged with reconciling the House and Senate versions of the Omnibus Trade and Competitiveness Act of 1988, which stated, in regard to calculating normal value by the {FOP} method, that "**Commerce shall avoid using any prices which it has reason to believe or suspect may be** . . . **subsidized prices**. . . ."

> In accordance with this statement of legislative intent, **Commerce's established practice is "to disregard financial statements where we have reason to suspect that the company has received** . . . **subsidies, and where there is other usable data on the record**."

*Id*. (emphases added).

> In 2015, the Trade Preferences Extension Act ("TPEA") codified Department policy:

> (5) DISCRETION TO DISREGARD CERTAIN PRICE OR COST VALUES - In valuing the {FOPs} under paragraph (1) for the subject merchandise, the administering authority may disregard price or cost values without further investigation if the administering authority has determined that broadly available

29

export subsidies existed or **particular instances of subsidization** occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order.

19 U.S.C. § 1677b(c) (emphasis added)

The Congressional mandate that Commerce should not rely on a financial statement when it has reason to believe or suspect that the statement may be tainted by dumping or subsidization is driven by its concern that such price data or financial statements are distorted and do not properly reflect fairly traded ME prices or financial performance. In its 2014 *Shenzhen Xinboda Industrial Co. v. United States* ruling, this Court reasoned:

> By authorizing Commerce to disregard financial statements if the agency merely has "reason to . . . suspect" a countervailable subsidy, the legislative history reflects a clear policy of erring on the side of *rejecting* financial statements—as opposed to establishing an irrebuttable presumption that a company did not benefit from . . . subsidy if no such subsidy is evident on the face of the company's financial statement (which, based on the existing record, appears to be Commerce's practice). *Cf. Zhejiang Mach. Import & Export Corp. v. United States,* 31 CIT 159, 169, . . . (2007) (emphasizing that "{t}he 'reason to believe or suspect' standard is . . . a relatively 'low threshold,'" in rejecting challenge to agency's use of surrogate prices for material inputs where actual market prices paid were suspected of reflecting subsidies). **Ignoring evidence that a company has been the beneficiary of a subsidy program** . . . **unless the proof appears on the face of the company's financial statement arguably guts Congress' reason to believe or suspect" standard, by reading the phrase "or suspect" right out of it.**

976 F. Supp. 2d 1333, 1372-76 (CIT 2014) (emphasis added). *See Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265, 1305-15 (CIT 2017) ("Congress' principal concern was ensuring that Commerce avoids the use of {SVs} (including surrogate financial ratios derived from surrogate financial statements) where there is any "reason to . . . suspect" that those values "may be" subsidized.); *Shenzhen Xinboda Indus. Co. v. United States*, 361 F. Supp. 3d 1337, 1364 (CIT 2019) ("Contrary to Commerce's assertions, the 'reason to believe or suspect' standard cannot be read to require Commerce to disregard a company's financial statements (or, for that matter, any other {SV}) only where the evidence establishes that a subsidy was, in fact,

30

received. To be sustained, any interpretation must give effect to Congress' use of the phrase 'reason to . . . suspect' and other similar language. Commerce's interpretation fails to do so.").

In its 2020 *Shenzhen Xinboda Industrial Co. v. United States* ruling, this Court reached the same conclusion for the same reason:

> Commerce has not adequately explained why its choice of Tata Tea's financial statements to calculate surrogate financial ratios is reasonable in light of record evidence that suggests that the company is or may be the beneficiary of subsidies. Instead, Commerce focuses narrowly on the financial statements' line items and fails to address record evidence indicating subsidization. Specifically, Xinboda placed on the record loan documents filed with the {GOI} that show the company's receipt of packing credits and export credits.

456 F. Supp. 3d 1272, 1290 (CIT 2020). After Remand, this Court sustained Commerce's redetermination that the reason to believe or suspect standard had not been satisfied. *Shenzhen Xinboda Indus. Co. v. United States*, 494 F. Supp. 3d 1347, 1352 (CIT 2021). That decision was because the record did not contain substantial evidence that a subsidy had been received.

> Commerce explains . . . that, pursuant to its practice, Commerce looks to its past countervailing duty ("CVD") findings as evidence that a company received a countervailable subsidy. . . . If the financial statements **or other documents refer to "a specific subsidy program found to be countervailable in a formal CVD determination,"** only then will Commerce exclude the company's financial statements from consideration.

*Id.* (emphasis added).

These decisions demonstrate that an express statement in a financial statement that a company received subsidies is not required to establish that Commerce has reason to believe or suspect that subsidies have been received. Indeed, given the 2015 TPEA, Commerce is statutorily required to reject a financial statement when  Commerce has reason to believe or suspect that the company received a subsidy benefit during the reporting period based on any record evidence (*i.e.*, "other documents").

Commerce's rationale for using Satnusa's financial statement focuses solely on the fact

31

that there is no specific mention of a subsidy program in the statement itself. While Commerce acknowledges that it is required to rely on a "reason to believe or suspect" standard, it then relies on circular reasoning by stating that the standard "still requires that "the agency point{} to substantial, specific, and objective evidence in support of its suspicion," and is only a lower threshold than "what is required to support a firm conclusion." *Id.* Commerce then states that "since the evidence is not objective, specific or seen in Satnusa's financial statements that Satnusa received countervailable subsidies during the POI (*e.g.*, the name of the export and import subsidy program for Indonesian companies in bonded zones that Commerce determined was countervailable), we do not have reason to believe or suspect that the company received countervailable subsidies." *Id*. Commerce reverts to stating that there is no evidence in the Satnusa **financial statement itself** to justify rejection and does not consider the **other documents** in this proceeding.

Simply stated, Commerce accepted the Satnusa's financial ratios because the countervailable subsidy which Satnusa received is not explicitly mentioned – *e.g.*, we received a grant of $$$ – within its financial statement. And Commerce justified its decision by stating that it cannot "go behind" the financial statements, without considering whether there was "reason to believe or suspect" the company received subsidies by "other documents" on the record.

In reaching its decision, Commerce disregarded the fact that the record included direct communication with Satunusa confirming its use of the countervailable benefit, and direct communication with Batam Free Trade Zone Administrators confirming that the benefit was in effect during the POI. The table below summarizes the evidence:

| | |
|---|---|
| **Statement of Sub Head of Investor Relations of the Batam Free Trade Zone and Free Port Authority** | **Batam Free Trade Zone Sub Head for Investor Relations**: **"All companies that are established in Batam** for their production needs, free import/export duties on raw materials and equipment, if imported and export from abroad . . . ." |
| **Satnusa Statement Confirming Exemption from Import Duties** | **Yohanes Lim, Project Manager, PT Satnusa**: "Regarding Import Duty Exemptions: **Yes,** it is correct that **our company does not pay import duties on raw materials, machinery, or equipment used in manufacturing. This exemption has indeed been applicable over the past two years, as noted on our company website**." |
| **Satnusa Website** | **Company in Brief**: "We are located in **Batam Island** of Indonesia which is very near Singapore. Batam Island is a hub for some of the global electronic manufacturers such as Sony, Panasonic, Kenwood, Epson and others. Our **Company enjoys certain incentives from the government** specifically in the areas of Value Added Tax and **Duty Free import and export** for our products. . . ." |
| **Satnusa Sustainability Report (2023)** | "**Being located in a free trade zone area** offers our company several key advantages. It provides us with easier access to global markets, enabling smoother import and export processes. This **helps us in efficiently sourcing raw materials and components** from international suppliers and delivering our products to customers worldwide." |

Jinko SV Rebuttal Exhibits 2N at 2, 2G at 2, 2H at 2, 2J at 5 (emphases added).

This evidence confirms that Satnusa received certain benefits from the Government of Indonesia during the POI because its production facility is in Batam Island Free Zone Area. The express statements by the company – in response to an email, on its website and in its sustainability report – are direct and unequivocal. Thus, there is nothing else that Commerce needs to know to determine the existence of such benefits.

Notwithstanding these direct and unequivocal statements, Commerce summarily concluded that the "evidence is not objective, specific or seen in Satnusa's financial statements that Satnusa received countervailable subsidies during the POI." IDM Comment 22. That conclusion is false. The record evidence is objective and specific. Therefore, Commerce's

33

rationale is unsupported by record evidence.

Moreover, Commerce has expressly concluded, in a 2024 decision on *Mattresses from Indonesia*, that the identical benefits received by Satnusa constitute countervailable subsidies (*i.e.*, the benefits of exemption from import duties on capital goods, and duty exemptions within free trade and special economic zones):

> The {Government of Indonesia} reported that imports of capital goods and equipment that stay within the bonded zone are not subject to import duties, but subsequently processed goods that are sold domestically in Indonesia are charged import duties. However, the above explanation does not account for the capital goods, machinery, and equipment imported into the bonded zone and used to produce goods sold both domestically and for export. Imported equipment can be used to produce finished goods sold domestically, but such equipment is never subject to import duties if it does not leave the bonded zone within four years. Furthermore, the operation of this bonded zone program resembles a duty drawback scheme, whereby export-oriented companies can be exempted from import duties on inputs consumed in the production of subsequently exported products. However, exemptions on inputs not consumed (i.e., capital goods, equipment, and machinery) are excessive, and thus, provide a financial contribution and benefit).

89 Fed. Reg. 57 (Jan. 2, 2024) (preliminary determination), PDM at 11-12, unchanged, *Mattresses from Indonesia*, 89 Fed. Reg. 59,050 (July 7, 2024) (final determination).[6]

Commerce here concluded that "the customs duty exemption programs previously found to be countervailable referenced by Jinko were applicable to companies located in bonded zones, while Satnusa is located in a Free Trade Zone {('FTZ')}, which is different under Indonesian law." IDM Comment 22. This rationale should be rejected. Its source is unclear, and it is unreasonable to suggest that a bonded warehouse would be treated differently than an FTZ; representatives of the FTZ and Satnusa have expressly acknowledged that subsidies were

---

[6]     Nearly identical language can be found in *Aluminum Extrusions from Indonesia*, 89 Fed. Reg. 17,405 (Mar. 11, 2024) (preliminary determination), IDM at 23-25, unchanged *Aluminum Extrusions from Indonesia,* 89 Fed. Reg. 80,536 (Oct. 3, 2024) (final determination).

34

received. Moreover, even if an FTZ were to be treated differently that a warehouse, the "reason to believe or suspect" standard has been satisfied.

Finally, Commerce abuses its discretion when it administers a standard in a manner which creates an impossibility of compliance. *NEC Home Elecs., Ltd. v. United States*, 54 F.3d 736, 745 (Fed. Cir. 1995) ("PETs standard is practically impossible to meet in the case of a manufacturer . . . who makes no sales to an unrelated distributor. As for the third method—which would require that a manufacturer obtain its competitors' cost information—we agree with the Silver Reed court that this method too is unreasonable, and may be 'almost inherently impossible to satisfy.'"). Here, the "impossibility" arises because requiring that there be a line item in a financial statement to establish that there is a reason to believe or suspect that the company receives subsidies creates a standard which is impossible to satisfy when the subsidy programs in issue – like those in this case – are not normally reported in line items of financial statements.

In sum, the record in this case is clear: Satnusa expressly and unambiguously confirmed that its production facility is in the Batam Island Free Zone Area. Jinko SV Rebuttal Exhibits 2N, 2G, 2H, 2J. Satnusa also confirmed that during the POI, it received benefits from the Government of Indonesia such as exemption from import duties on capital goods, and duty exemptions within free trade and special economic zones, such that it does not pay import duties on raw materials, machinery, or equipment used in manufacturing merchandise in that zone. *Id.* Satnusa receives incentives from the government relating to the Value Added Tax and Duty Free import and export for products. At the same time, Commerce has previously concluded that the benefits Satnusa received from constitute countervailable subsidies. *Mattresses from Indonesia*, 89 Fed. Reg. 57 (Jan. 2, 2024) (preliminary determination), PDM at 11-12

For these reasons, Commerce's decision in the *Final Determination* is unsupported by

substantial evidence, is contrary to law, and must be reversed.

### C.    COMMERCE UNLAWFULLY VALUED POLYSILICON AND WAFERS BASED ON HTS DATA RATHER THAN BLOOMBERG DATA

Commerce preliminarily valued Jinko's monopolysilicon wafer FOPs

(C_MWAFER_PUR) and polysilicon FOPs (P_POLYSILICON,

P_RE_POLYSILICON,P_POLY_SEED_CRYSTAL), at $8.84/ kg, based on Bloomberg market

data, rather than Indonesia HTS data, as proposed by Petitioner. Commerce Preliminary SV

Memorandum (Dec. 2, 2024), PR 537, at 8. Commerce justified this decision as follows:

> While the HTS categories submitted by the petitioner reflect usable, reasonably-specific information to value the inputs, sourced from the primary surrogate country, we determine the highly-FOP-specific nature of the Bloomberg report (which reflects broad market averages of solar grade polysilicon and monocrystalline silicon wafer prices identical to the inputs in question) to reflect the best information on the record to value the FOPs.

*Id.*

In its *Final Determination*, Commerce reversed course, and valued polysilicon based on

Indonesia HS 2804.61 data at $127.89/kg (quantity: 48,231 kg; value: $6,168,401). Final SV

Memo Attachment. Imports under HS 2804.61 consist of "Silicon, Containing By Weight Not

Less Than 99.99% Of Silicon." *Id*. Commerce valued wafers based on Indonesia HS 3818.00

data at $564.47/kg. (quantity: 9563 kg; value: $5,398,066). *Id*. Imports under HS 3818.00 consist

of "Chemical Elements Doped For Use In Electronics, In The Form Of Discs, Wafers Or Similar

Forms; Chemical Compounds Doped For Use In Electronics: Size: length 182.3mm*width

182.3mm*thickness 120-125um)." *Id*. In replacing the Bloomberg data with HTS data,

Commerce reasoned that the "Bloomberg data does not reflect an appropriate SV source and, as

a result, the Indonesian import prices under the HS subheadings identified by the petitioner

reflect the most-specific and best available sources to value the FOPs in question consistent with

36

PUBLIC VERSION

Commerce's SV methodology." IDM at 39.

This Department decision is unsupported by substantial evidence and is unlawful. First, the relevant facts in the Vietnam investigation are identical to the facts in the prior investigations in which Commerce relied on Bloomberg data. For example, in the first administrative review of the ADD order on *Solar I*, Commerce reasoned:

> To value polysilicon, we used world market prices from Bloomberg New Energy Finance and GTM Research. . . . In the solar cells investigation, the Department determined that solar grade polysilicon requires purity levels as high as 99.999999% and electronics grade silicon requires even higher purity levels. Also, in the solar cells investigation, numerous articles were placed on the record testifying to the large costs of refining polysilicon resulting in dramatic price differences between different purities of silicon.

Commerce SV Memorandum (July 7, 2015) (ACCESS Barcode 3290515),[7] at 2-3.

Commerce has consistently followed these principles in all subsequent Annual Reviews of the *Solar I* ADD Orders. *See, e.g.,* JA Initial SV Rebuttal (Oct. 22, 2024), PR 376-78, at 3, Attachment IV. This Department practice has been affirmed by this Court. *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292, 1313 (CIT 2019) (affirming finding "that the world market price for raw polysilicon constituted the best available information for valuing respondents' semi-finished polysilicon ingots and blocks").

Commerce similarly has a longstanding practice of valuing wafers based on market prices, rather than HTS data. For example, in the second administrative review of the *Solar I* ADD Order, Commerce reasoned that "consistent with the Department's valuation of polysilicon in the previous review of this proceeding where we relied on GTM data as well as BNEF data in

---

[7]    Because Commerce documents on ACCESS "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," they can and are judicially noticed. Fed. Rule Evid. 201(b)(2); *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327 (CIT 2016).

valuing polysilicon inputs, we continue to value polysilicon inputs by averaging the world-market prices from both BNEF and GTM." *Solar Cells from China*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results), IDM at 45-46. In the eighth administrative review of that ADD Order, Commerce rejected Petitioner's argument that international market prices should be adjusted:

> While Commerce will disregard subsidized and distorted prices that do not reflect market prices when calculating SVs, the prices that we used to value wafers are the average prices set by the entire international market. We did not base the SV on a subset of prices that may differ from, and be atypical when compared to, market prices; rather, we based the SV on the average wafer price for the entire international market. Because our SV is the market price for the entire international market, we find no basis for concluding that it does not represent a market price. Adjusting these prices, as the petitioner suggested, may introduce unintended distortions. There is no record evidence to support that making such an adjustment would result in a price that more accurately reflects the value of wafers than the average international price set by market participants.

*Solar Cells from China*, 87 Fed. Reg. 38,379 (June 28, 2022) (final results), IDM at 28.

In these decisions, Commerce correctly valued polysilicon and wafers based on commercially reasonable prices for these inputs, rather than HTS average unit values which included products other than solar grade polysilicon and wafers. Indeed, in this investigation, Commerce acknowledged the existence of this practice and the reasons why it was inappropriate to value wafers and polysilicon using HTS data:

> Commerce has indeed previously explained that the constituent imports within the HS subheadings at issue significantly differ from the silicon purity level required for wafers used to manufacture solar cells and has used market price sources in the alternative.

IDM at 41.

Yet, Commerce decided to rely on these data, claiming that "notably absent" from Department precedent is "any finding which identifies the use of import data from the HS subheadings as an inappropriate or non-specific source." *Id*. Commerce continued that "indeed, Jinko makes no claim that HS 2804.61 and 3818.00 are not appropriate or specific sources,

38

instead only asserting that the AUVs are not commercially reasonable prices, but lacking any further information substantiating that the data are not representative or distortive." *Id*. Commerce is wrong. Commerce's fifth administrative review of the *Solar I* ADD Order ("AR5"), which Jinko cited at length in its Rebuttal Brief, discusses the factual predicate for the Department's longstanding practice of rejecting HTS data to value wafers as follows.

> We valued wafers and monocrystalline rods using international prices from Bloomberg New Energy Finance. There are a number of factors, which when considered together, weigh in favor of valuing wafers using international prices rather than Thai import values. . . . The Thai HTS category covering silicon wafers – HTS 3818 (chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics) – is not further itemized and covers a wide range of products that may not specifically reflect the cost of solar-grade wafers. Second, wafers for solar cells are primarily made of polysilicon. . . . {I}n the investigation and first four administrative reviews of this proceeding, we found that differences in silicon purity levels can result in significant price differences. Given the wide range of products covered by the Thai HTS number covering wafers, it is more likely that the Thai imports include products with a silicon purity level that significantly differs from the silicon purity level required for wafers used to manufacture solar cells. By contrast, the international prices are specific to wafers used in solar products because they are from a publication that covers the solar industry.

*Solar Cells from China*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) (preliminary results), PDM at 25; unchanged, *Solar Cells from China*, 84 Fed. Reg. 36,886 (July 30, 2019) (final results); Jinko Rebuttal Brief at 18.

The facts in this Vietnam investigation are no different than the facts upon which Commerce relied in the *Solar I* AR5 decision cited above. By relying on Commerce's longstanding factual findings, Jinko relied on a "finding which identifies the use of import data from the HS subheadings as an inappropriate or non-specific source." IDM at 41. And Jinko, "claim{ed} that HS 2804.61 and 3818.00 are not appropriate or specific sources," relying on "information substantiating that the data" should not be used. *Id*. The "finding" and the

39

"information" were definitive decisions by Commerce. *Id*. The Department has not claimed that these decisions were incorrect. And this Court should conclude that Commerce is a reliable source whose rationale can be relied upon in subsequent proceedings.

Commerce justifies its departure from longstanding, consistent and commercially realistic precedent on the fact that the record in this case left the Department with no choice but to rely on HTS data. According to Commerce, "if the respondents fail to provide data for Commerce to adequately determine an SV, as is the case here, Commerce has no choice but to make its ultimate decision based on a limited record." *Id*. at 41.

The problem with this analysis is the same as that with Commerce's acceptance of the HTS data. There is no difference between the Bloomberg data upon which Commerce preliminarily relied (and subsequently rejected in its *Final Determination*) and the Blomberg data upon which the Department had consistently relied in prior proceedings. Commerce has not claimed that these prior decisions were incorrect. And this Court should conclude that Commerce is a reliable source whose rationale can be relied upon in subsequent proceedings.

Moreover, contrary to Commerce's reasoning, the record contains substantial additional information as to why relying on Bloomberg data conforms to commercial reality while relying on the HTS data does not. In its briefing, Jinko compared the $127.89/kg value for polysilicon and the $564.47/kg value for wafers to two sets of costs, those reported by the USITC and those reported by Jinko in its DQR. Jinko Case Brief at 9-12.

Jinko's modules are functionally equivalent to the n-PERT modules in the USITC Table below,[8] showing the sustainable cost structure for n-PERT modules as follows:

---

[8]    *See* note 3, *supra*.

PUBLIC VERSION

|  | USD/Watt | % |
|---|---|---|
| Module Assembly | 0.019 | 7% |
| BOM Materials | 0.086 | 31% |
| Consumables | 0.015 | 5% |
| Other Cell direct cost | 0.053 | 19% |
| Cell Metalization | 0.017 | 6% |
| April 2019 Wafer pricing | 0.091 | 32% |
| Total cost – n-PERT, Bifacial | 0.281 | 100% |

JA Final SV Rebuttal Exhibit 4, at I-19.

This USITC cost structure shows that the cost of wafers ($0.091/watt) equals 32% of the total cost of modules ($0.281/watt). Valuing wafers at $564.47/kg, equal to $0.650/watt, results in purchased wafer costs being 2.3 times greater than total costs of a module, and seven times greater than the sustainable costs of wafers. The $0.650/watt valuation similarly results in purchased wafer costs being three times greater than Jinko's cost of production for a module. The $564.47/kg wafer value also is 10 times Jinko's cost of production ("COP") of self-produced wafers.[9] Similarly significant is the fact that Jinko consumed [      ] kg of wafers during the POI, over [  ] times greater than the [     ] kg purchased, and over [   ] times greater than the 9563 kg used to calculate the SV.

Relying on Petitioner's $127.89/kg value for polysilicon leads to similarly absurd results. This valuation results in polysilicon costs ($0.199/watt) being 70% of the total costs of a module under the USITC cost structure. Relying on Jinko's cost structure, SDQR Exhibit SD-2R.2, results in the $0.199/watt polysilicon costs being approximately 95% of Jinko's total costs ([         ]). Moreover, Jinko purchased [       ] kg of polysilicon from ME countries at [                                        ] of polysilicon from China. Thus, the $127.89/kg

---

[9]     The COP of Jinko's self-produced wafers is [         ], calculated as follows: Total production cost [                                                      ] conversion factor [   ]. SDQR Exhibit SD-2.R2.

41

($0.199/watt) valuation, representing merely 48,231 kg, (merely [     ] of Jinko's ME purchases) is [   ] times greater than Jinko's ME purchase price.

These dramatic differences between wafer/polysilicon costs reported in the HTS data and wafer/polysilicon costs reported by Jinko and the USITC – coupled with the miniscule quantity of high priced SVs which increased Jinko's ADD margin by 14.9 percentage points due to the wafer SV and by 38.2 percentage points due to the polysilicon SV – constitute substantial evidence that the HTS data are commercially unrealistic.

Commerce ignored these data. It instead relied on its belief that "Jinko makes no claim that HS 2804.61 and 3818.00 are not appropriate or specific sources, instead only asserting that the AUVs are not commercially reasonable prices, but lacking any further information substantiating that the data are not representative or distortive." IDM at 41. This Court should reject such rationale. Jinko's assertion of commercial unreasonableness was supported by longstanding Department practice, USITC analysis, and Jinko ME purchase prices. In light of these facts, Commerce should have relied on its longstanding, consistent practice, rather than reverse that practice at this time.

Finally, it is axiomatic that "antidumping laws intend to calculate {ADDs} on a fair and equitable basis." *SNR Roulements v. United States,* 402 F.3d 1358, 1363 (Fed. Cir. 2005); *see U.S. Steel Grp. v. United States*, 225 F.3d 1284, 1290 (Fed. Cir. 2000) ("antidumping laws strive 'to calculate {ADDs} on a fair and equitable basis'") (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994)). Here, Commerce did not rely on a scintilla of evidence to support its selection of HTS data to value wafers/polysilicon, merely relying on its conclusion that Jinko had not met its burden of discrediting the Department's choice. As discussed, Jinko submits that this rationale is unsupported by record evidence, especially considering that

42

Commerce departed from its longstanding, consistent practice – after having followed that practice in the preliminary results. Given these facts, Commerce should not have relied on previously discredited HTS data merely because, in its opinion, there was no other choice. Rather, Commerce should have reopened the record after it had decided to reject the Bloomberg data, to give parties the opportunity to present further evidence on this important issue. By so proceeding, Commerce would have followed the teachings of the Federal Circuit that: "If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1380 (Fed. Cir. 2013).

In sum, for the reasons discussed above, this Court should reject Commerce's valuation of modules and polysilicon and should compel use of the Bloomberg data to value these inputs.

## V.    **CONCLUSION**

Based on the foregoing, Jinko respectfully requests that this Court remand for Commerce to reconsider its *Final Determination*.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*
Jordan C. Kahn
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022
212-557-4000

43

PUBLIC VERSION

*Counsel for Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc.*

Dated: April 6, 2026

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law in Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 13,599 words, less than the 14,000 word limit.

*/s/ Jordan C. Kahn*
Jordan C. Kahn

*Counsel for Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc.*

Dated: April 6, 2026

15204751_1