## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JA SOLAR USA INC, JA SOLAR VIETNAM CO. LTD. AND JA SOLAR PV VIETNAM CO. LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| BOVIET SOLAR TECHNOLOGY CO., LTD., | ) ) |
| Consolidated Plaintiff, | ) ) |
| JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED, JINKOSOLAR (U.S.) INC., AND JINKO SOLAR (U.S.) INDUSTRIES INC., | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, | ) Ct. No. 25-00158 ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) ) ) |
| Defendant-Intervenor. | ) |

## ORDER

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of Plaintiffs JA Solar USA Inc., JA Solar Vietnam Co. Ltd. and JA Solar PV Vietnam Co. Ltd., and all other pleadings, papers and proceedings herein, it is hereby

**ORDERED**, that the Rule 56.2 Motion is GRANTED, and it is further

2

**ORDERED**, that the Final Determination of the antidumping investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam is remanded to the U.S. Department of Commerce with instructions to revise its analysis and final results in accordance with the Court's Opinion; and it is further

**ORDERED**, that the U.S Department of Commerce shall provide the Court and parties with revised findings within 60 days of this order.  Parties shall have 30 days to submit briefs on the revised results to the Court.  Responses to those briefs shall be filed within 15 days.


Dated: _____                              _____
       New York, New York                              Jennifer Choe-Groves, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| JA SOLAR USA INC, JA SOLAR VIETNAM CO. LTD. AND JA SOLAR PV VIETNAM CO. LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| BOVIET SOLAR TECHNOLOGY CO., LTD., | ) ) |
| Consolidated Plaintiff, | ) ) |
| JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED, JINKOSOLAR (U.S.) INC., AND JINKO SOLAR (U.S.) INDUSTRIES INC., | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, | ) Ct. No. 25-00158 ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) ) ) |
| Defendant-Intervenor. | ) |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**
**OF PLAINTIFFS JA SOLAR USA INC, JA SOLAR VIETNAM CO. LTD. AND JA**
**SOLAR PV VIETNAM CO. LTD.**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs JA

Solar USA Inc., JA Solar Vietnam Co. Ltd. and JA Solar PV Vietnam Co. Ltd. (collectively "JA

Solar") hereby move for judgment on the agency record. Plaintiffs contest certain aspects of the

Final Determination of the antidumping investigation of Crystalline Silicon Photovoltaic Cells,

Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam conducted by the U.S. Department of Commerce ("Commerce").  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 90 Fed. Reg. 17,388 (Dep't of Commerce Apr. 25, 2025) ("Final Determination") (P.R. 639); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 26,786 (Dep't of Commerce June 24, 2025) ("AD Order") (P.R. 673); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders; Correction, 90 Fed. Reg. 29,843 (Dep't of Commerce July 7, 2025) ("Am. AD Order") (P.R. 678).

Specifically, as discussed in the Memorandum of Points and Authorities in support of this motion, the Plaintiffs seek judgment on the agency record because Commerce's Final Determination were not supported by substantial evidence and were otherwise not in accordance with law with respect to its determinations on surrogate values for 1) solar glass, and 2) financial ratios.  First, Commerce erred by using Indonesian import data under HTS subheading 7007.19 exclusive of the Malaysian imports as the surrogate value for solar glass, instead of the input-specific PVinsights data provided by JA solar.  Commerce was required to use the PVinsights data as the best available information on the record.  PVinsights was not only specific to solar glass,

2

but even more specific to the 2.0 mm thickness of solar glass consumed by JA Solar.  In contrast, Indonesian HTS 7007.19 covered a range of glass products not specific to solar module production, such as ice rink glass.  Second, Commerce wrongly excluded the Malaysian imports from the Indonesian HTS 7007.19 data without record support, when the Indian CVD determination issued before the period of investigation ("POI") that was not subject to an administrative review provides no particular evidence for subsidization during the POI.  This decision improperly excluded 95 percent of the import data from Indonesian HTS 7007.19, resulting in a basket of aberrational values based on tiny volumes of trade not representative of solar glass pricing and inflating the average unit value from $0.79/kg to $4.85/kg.

Second, Commerce's decision to use the surrogate financial statements of Satnusa was also not supported by substantial evidence and was otherwise in accordance with law.  Commerce wrongly constructed the surrogate financial ratios partially using financial statements of PT Sat Nusapersada Tbk ("Satnusa") because Satnusa was not a producer of comparable merchandise, and was merely an assembler of unrelated products and only actually produced metal stampings and injection molded components – merchandise totally unlike solar products.

Plaintiffs, therefore, respectfully request that this Court:

(1) find that Commerce's actions as described above were not supported by substantial evidence or were otherwise not in accordance with law;

(2) order Commerce to recalculate the antidumping duty margin assigned to JA Solar in the administrative review by correcting the errors set forth above;

(3) order Commerce to publish amended Final Determination and Order in the Federal Register in accordance with a final decision by this Court in this matter;

3

(4) order Commerce to issue liquidation instructions to U.S. Customs and Border Protection consistent with this Court's decision; and

(5) provide such other relief as this honorable Court deems proper.

Respectfully submitted,

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com

Date: April 6, 2026

*Counsel to JA Solar USA Inc., JA Solar Vietnam Co. Ltd. and JA Solar PV Vietnam Co. Ltd.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| JA SOLAR USA INC, JA SOLAR VIETNAM CO. LTD. AND JA SOLAR PV VIETNAM CO. LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| BOVIET SOLAR TECHNOLOGY CO., LTD., | ) ) |
| Consolidated Plaintiff, | ) ) |
| JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED, JINKOSOLAR (U.S.) INC., AND JINKO SOLAR (U.S.) INDUSTRIES INC., | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, | ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) ) ) |
| Defendant-Intervenor. | ) |

Ct. No. 25-00158
NONCONFIDENTIAL
VERSION

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**
**OF PLAINTIFFS JA SOLAR USA INC, JA SOLAR VIETNAM CO. LTD. AND JA**
**SOLAR PV VIETNAM CO. LTD.**

Jeffrey S. Grimson
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to JA Solar USA Inc., JA Solar Vietnam Co. Ltd. and JA Solar PV Vietnam Co. Ltd.*

Date: <u>April 6, 2026</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ................................................... 1

ISSUES PRESENTED ............................................................................................................... 1

I.    Whether Commerce's decision to reject the input-specific PVinsights data and instead use the Indonesian broader basket and low-volume import data under HTS subheading 7007.19, with Malaysian data excluded, as the surrogate value for solar glass, was supported by substantial evidence and was otherwise in accordance with law. ............................................... 1

II.   Whether Commerce's decision to use the surrogate financial statements of Satnusa, a company that did not produce identical or comparable merchandise, and with no adjustment for tolling and assembly services, was supported by substantial evidence and was otherwise in accordance with law. .......................................................................................................... 2

STATEMENT OF FACTS .......................................................................................................... 2

SUMMARY OF THE ARGUMENT ........................................................................................... 5

STANDARD OF REVIEW ......................................................................................................... 6

ARGUMENT .............................................................................................................................. 7

I.    COMMERCE'S REJECTION OF THE PVINSIGHTS DATA AND SELECTION OF THE INDONESIAN IMPORT DATA EXCLUSIVE OF MALAYSIAN IMPORTS AS THE SURROGATE VALUE FOR SOLAR GLASS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ....................................................................................................... 7

A.    Commerce's Refusal to Use PVinsights Data Violates the Best Available Information Statutory Mandate ................................................................................. 8

B.    Commerce's Exclusion of Malaysian Imports from Indonesian Data Under HTS 7007.19.90 Based on a Pre-POI Countervailing Duty Determination Was Unsupported by Substantial Evidence ...................................................................... 16

C.    Commerce's Reliance on the Tiny Volume of Remaining Indonesian Import Data Was Unsupported by Substantial Evidence .................................................... 20

II.   COMMERCE'S DECISION TO USE THE SURROGATE FINANCIAL STATEMENTS OF SATNUSA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ........................................................................................................................ 28

CONCLUSION ........................................................................................................................ 37

TABLE OF AUTHORITIES

**Cases**

Al Tech Specialty Steel Corp. v. United States,
    575 F. Supp. 1277 (Ct. Int'l Trade 1983) ................................................................. 18

Canadian Solar, Inc. v. United States,
    918 F.3d 909 (Fed. Cir. 2019)................................................................................. 7

Catfish Farmers of America v. United States,
    No. 21-00380, 2024 Ct. Intl. Trade LEXIS 67 (June 5, 2024)...................................... 9

Changzhou Trina Solar Energy Co. v. United States,
    975 F.3d 1318 (Fed. Cir. 2020) ........................................................................... 6, 7

China Nat'l Mach. Imp. & Exp. Corp. v. United States,
    264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) ............................................................ 18

Consol. Edison Co. v. NLRB,
    305 U.S. 197 (1938)............................................................................................ 7

CS Wind Viet. Co. v. United States,
    832 F.3d 1367 (Fed. Cir. 2016) ....................................................................... 30, 33

Dorbest Ltd. v. United States,
    30 CIT 1671, 462 F. Supp. 2d 1262 (2006) ............................................................ 30

Fuyao Glass Indus. Group Co. v. United States,
    30 CIT 165 (2006) ............................................................................................ 18

Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,
    366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005)............................................................. 9

Huayin Foreign Trade Corp. v. United States,
    322 F.3d 1369 (Fed. Cir. 2003).............................................................................. 7

Jinko Solar Co. v. United States,
    229 F. Supp. 3d 1333 (Ct Int'l Trade).................................................................... 36

ii

Jinko Solar Imp. and Exp. Co., Ltd., et. al v. United States,
    701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ......................................................... 13, 14

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ............................................................................................. 7

Nation Ford Chem. Co. v. United States,
    985 F. Supp. 133 (Ct Int'l Trade1997) .............................................................. 18, 19

NMB Sing. Ltd. v. United States,
    557 F.3d 1316 (Fed. Cir. 2009) ......................................................................... 7, 30

NTSF Seafoods Joint Stock Co. v. United States,
    487 F. Supp. 3d 1310 (Ct Int'l Trade 2020) ........................................................ 35

Olympia Indus., Inc. v. United States,
    22 CIT 387, 7 F. Supp. 2d 997 (1998) ............................................................... 30

Qingdao Sea-Line Trading Co. v. United States, 7
    66 F.3d 1378 (Fed. Cir. 2014) ........................................................................... 9, 29

Rhone Poulenc, Inc. v. United States,
    899 F.2d 1185 (Fed. Cir. 1990) ......................................................................... 8

RHP Bearings v. United States,
    288 F.3d 1334 (Fed. Cir. 2002) ......................................................................... 7, 25

SeAH Steel VINA Corp. v. United States,
    269 F. Supp. 3d 1335 (Ct Int'l Trade 2017) ....................................................... 29

Shanghai Foreign Trade Enters. Co. v. United States,
    318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ...................................................... 21, 22

Shenzhen Xinboda Indus. Co. v. United States,
    279 F. Supp. 3d 1265 (Ct. Int'l Trade 2017) ...................................................... 18, 19

SolarWorld Ams., Inc. v. United States,
    910 F.3d 1216 (Fed. Cir. 2018) ......................................................................... 7

SolarWorld Ams., Inc. v. United States,
    910 F.3d 1216 (Fed. Cir. 2018) .................................................................................. 7

Taian Ziyang Food Co. v. United States,
    783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ............................................................ 9

Weishan Hongda Aquatic Food Co. v. United States,
    917 F.3d 1353 (Fed. Cir. 2019) .................................................................. 17, 29, 36

Xinjiamei Furniture (Zhangzhou) Co. v. United States,
    37 CIT 308 (2013) ............................................................................... 21, 22, 25, 27

Zhejiang Dunan Hetian Metal Co. v. United States,
    652 F.3d 1341 (Fed. Cir. 2011) .............................................................................. 29

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................... 6
19 U.S.C. § 1677b(c)(1).......................................................................................... 29
19 U.S.C. § 1677b(c)(1)(B) ................................................................................. 9, 13
19 U.S.C. § 1677b(c)(4).......................................................................................... 13

**Regulations**

19 C.F.R § 351.408(c)............................................................................................. 14

**Other Authorities**

Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308 (Dep't Commerce Feb. 27,
    1996) ....................................................................................................................... 14

Certain Brake Drums From the People's Republic of China: Preliminary Affirmative
    Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 8,383 (Dep't of Commerce Jan.
    29, 2025) ................................................................................................................. 10

Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of
    Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and
    Final Determination of Targeted Dumping, 75 Fed. Reg. 20,335 (Dep't of Commerce Apr. 19,
    2010) .................................................................................................................. 22, 24

Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe Final Determination
    of Sales at Less Than Fair Value and Critical Circumstances, in Part, 2010 ITA Unpub LEXIS
    48 (Dep't of Commerce Sept. 10, 2010)................................................................. 22

Certain Tungsten Shot From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 9,890 (Dep't of Commerce Feb. 19, 2025) ................................................................................................................................ 9

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 26,786 (Dep't of Commerce June 24, 2025) ................................................................... 1, 5

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 90 Fed. Reg. 17,388 (Dep't of Commerce Apr. 25, 2025) ............................................................................... 1

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Postponement of Final Determination and Extension of Provisional Measures, 89 Fed. Reg. 96,219 (Dep't of Commerce Dec. 4, 2024) ................................................................................. 3

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations, 89 Fed. Reg. 34,268 (Int'l Trade Comm'n April 30, 2024) ...................................................................................... 2

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 89 Fed. Reg. 43,809 (Dep't of Commerce May 14, 2024) ..... 2

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and Vietnam; Determinations, 89 Fed. Reg. 50,633 (Int'l Trade Comm'n June 14, 2024) ...................................................................................................... 2

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) ............................................................................................. 34

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Results of No Shipments, 83 Fed. Reg. 35,616 (Dep't of Commerce July 27, 2018)..... 34

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Amended Preliminary Determination of Less-Than-Fair-Value Investigation, 90 Fed. Reg. 85 (Dept' of Commerce Jan. 2, 2025)............................................. 3

Laminated Woven Sacks from the People's Republic of China Final Affirmative Countervailing Duty Determination, and Final Determination, in Part, of Critical Circumstances, 73 Fed. Reg. 35,639 (Dep't of Commerce Jun. 24, 2008) ............................................................... 15

Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part, 84 Fed. Reg. 56,761 (Dep't of Commerce Oct. 23, 2019)......................................... 15

Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R.3, H.R. Rep. No. 576, 100th Cong., 2nd Sess. (1988).......................................................... 17

**ADMINISTRATIVE DETERMINATION UNDER REVIEW**

Plaintiffs contest certain aspects of the Final Determination of the antidumping investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules ("Solar Cells"), from the Socialist Republic of Vietnam conducted by the U.S. Department of Commerce ("Commerce"). See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 90 Fed. Reg. 17,388 (Dep't of Commerce Apr. 25, 2025) ("Final Determination") (P.R. 639), and accompanying Issues and Dec. Mem. ("I&D Mem.") (P.R. 636); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 26,786 (Dep't of Commerce June 24, 2025) ("AD Order") (P.R. 673); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders; Correction, 90 Fed. Reg. 29,843 (Dep't of Commerce July 7, 2025) ("Am. AD Order") (P.R. 678).

**ISSUES PRESENTED**

I.    Whether Commerce's decision to reject the input-specific PVinsights data and instead use the Indonesian broader basket and low-volume import data under HTS subheading 7007.19, with

Malaysian data excluded, as the surrogate value for solar glass, was supported by substantial evidence and was otherwise in accordance with law.

II.  Whether Commerce's decision to use the surrogate financial statements of Satnusa, a company that did not produce identical or comparable merchandise, was supported by substantial evidence and was otherwise in accordance with law.

## STATEMENT OF FACTS

On April 24, 2024, the American Alliance for Solar Manufacturing Trade Committee ("Petitioner") consisting of First Solar, Inc., Hanwha Q CELLS USA, Inc., and Mission Solar Energy LLC. filed a petition for the imposition of antidumping duties on imports of solar cells from Cambodia, Malaysia, Thailand, and Vietnam, as well as the imposition of countervailing duties on imports of solar cells from the same countries. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 89 Fed. Reg. 43,809 (Dep't of Commerce May 14, 2024) (P.R. 80).  On May 14, 2024, Commerce published notice of the initiation of a less-than-fair value investigation on solar cells from the Socialist Republic of Vietnam.  See id.  The International Trade Commission ("Commission") simultaneously conducted its investigation.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations, 89 Fed. Reg. 34,268 (Int'l Trade Comm'n April 30, 2024).  On June 14, 2024, the Commission published notice of its affirmative preliminary injury determination.  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and Vietnam; Determinations, 89 Fed. Reg. 50,633 (Int'l Trade Comm'n June 14, 2024).

On July 3, 2024, Commerce selected JA Solar Vietnam Co. Ltd. and Jinko Solar (Vietnam) Industries Company Limited ("Jinko") as mandatory respondents in the investigation. Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Postponement of Final Determination and Extension of Provisional Measures, 89 Fed. Reg. 96,219 (Dep't of Commerce Dec. 4, 2024) ("Prelim. Determination") (P.R. 545), and accompanying Dec. Mem. at 3 ("Prelim. Dec. Mem.") (P.R. 527). In August and September 2024, JA Solar submitted timely responses to Section A of Commerce's antidumping questionnaire, i.e., the section relating to general information, and to sections C, and D of Commerce's antidumping questionnaire, i.e., the sections relating to U.S. sales and factors of production ("FOPs"). See id. at 4. From October through November 2024, JA Solar submitted timely responses to Commerce's supplemental questionnaires, as well as surrogate value ("SV") submissions. See id. at 4–5.

On December 4, 2024, Commerce published its affirmative preliminary determination of sales at less-than-fair-value. See Prelim. Determination, 89 Fed. Reg. 96,219. On January 2, 2025, Commerce published an amended preliminary determination to revise the dumping margins for Jinko and the non-individually examined companies. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Amended Preliminary Determination of Less-Than-Fair-Value Investigation, 90 Fed. Reg. 85 (Dept' of Commerce Jan. 2, 2025) (P.R. 573). In the Preliminary Determination, Commerce calculated normal value ("NV") using Indonesia data to value the respondents' FOPs. See Prelim. Dec. Mem. at 12. Commerce ignored the more product-specific PVinsights data and instead preliminarily used Indonesian import data, with Malaysian data removed, under Harmonized Tariff Schedule

3

("HTS") subheading 7007.19 to value respondents' solar glass inputs. See Mem. from Laurel LaCivita and Deborah Cohen to the File re: Less-Than-Fair-Value Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam: Preliminary Surrogate Value Memorandum at 7–8 (Nov. 27, 2024) ("Prelim. SV Mem.") (P.R. 536). Commerce removed the Malaysian import data, which constitute 95 percent of the total Indonesia import data, based on a 2020 countervailing duty determination issued by the Government of India ("GOI") on certain tempered glass exported from Malaysia to India. See id. After removing almost all trade under the applicable HTS code, the volume of the remaining Indonesian data relied upon by Commerce amounts to less than one full 20-foot container load and contains inapplicable and aberrational data. Commerce nevertheless erroneously deemed it to be the best information available.

Commerce preliminarily used a simple average of the overhead, selling, general and administrative expenses and profit for PT Sat Nusapersada Tbk ("Satnusa") and PT Tera Data Indonusa Tbk ("Tera Data") companies as the surrogate financial ratios, even though Satnusa is not a producer of comparable merchandise and is merely an assembler of unrelated products such as cell phones. See id. at 12–13.

From December 2, 2024 through December 6, 2024, Commerce conducted a verification of JA Solar's FOPs in Hanoi, Vietnam. Commerce conducted a verification of JA Solar's constructed export price sales at its U.S. headquarters in San Jose, California from January 22, 2025, through January 24, 2025. See I&D Mem. at 2–3 (P.R. 636).

On March 7, 2025, JA Solar submitted a case brief arguing that Commerce made the wrong preliminary determination regarding the solar glass SV and the surrogate financial ratios. See Letter on Behalf of JA Solar to Commerce re: Case Br. (Mar. 7, 2025) (Public Version) ("Case Br.")

4

(P.R. 606).   Specifically, JA Solar contended that Commerce should use the PVinsights data specific to JA Solar's glass input, that Commerce's exclusion of the Malaysian data was unsupported and that the resulting scant remaining data Commerce relied on were aberrational. See id. at 5–23.   For the surrogate financial ratios, JA Solar contended that Commerce should exclude Satnusa's financial statements because Satnusa is not a producer of comparable merchandise and is merely an assembler of unrelated products.  See id. at 24–28.  On March 19, 2025, JA Solar submitted a rebuttal case brief.  See Letter on Behalf of JA Solar to Commerce re: Rebuttal Br. (Mar. 19, 2025) (Public Version) (P.R. 621).  On March 24, 2025, JA Solar participated in a public hearing conducted by Commerce.

On April 25, 2025, Commerce published the Final Determination.  See Final Determination, 90 Fed. Reg. 17,388.  In the Final Determination, Commerce continued to use the Indonesian import data with Malaysian data removed as the SV for solar glass input instead of the product-specific PVinsights report.  See I&D Mem. at Cmt. 1, p. 12 (P.R. 636).  In addition, Commerce continued to use Satnusa and PT Tera's financial data to calculate respondents' SV financial ratios. Id. at Cmt. 22, p. 77.  On May 19, 2025, Commerce issued an analysis of ministerial error allegations in the Final Determination and revised JA Solar's dumping margin to 62.31 percent. AD Order, 90 Fed. Reg. at 26,787 n. 5.  On June 24, 2025, Commerce published the AD order in the Federal Register.  See id.  On July 7, 2025, Commerce published the Amended AD Order in the Federal Register.  See Am. AD Order, 90 Fed. Reg. 29,843.

## SUMMARY OF THE ARGUMENT

Commerce's decision to use Indonesian import data under HTS subheading 7007.19, with Malaysian data excluded, as the SV for solar glass was not supported by substantial evidence and was otherwise not in accordance with law.  First, Commerce was required to use PVinsights data

5

as the best available information on the record. PVinsights was not only specific to solar glass, but even more specific to the 2.0 mm thickness of solar glass consumed by JA Solar. In contrast, Indonesian HTS 7007.19 covered a range of glass products not specific to solar module production. Second, Commerce wrongly excluded the Malaysian imports from the Indonesian HTS 7007.19 data, when the Indian CVD determination issued before the period of investigation ("POI") that was not subject to an administrative review provides no particular evidence for subsidization during the POI. This decision improperly excluded 95 percent of the import data from Indonesian HTS 7007.19, resulting in a basket of aberrational values based on a tiny leftover volume of trade not representative of solar glass pricing, thereby distorting the average unit value ("AUV") from $0.79/kg to $4.85/kg.

Commerce's decision to use the surrogate financial statements of Satnusa was also not supported by substantial evidence and was otherwise in accordance with law. Commerce wrongly constructed the surrogate financial ratios partially using financial statements of Satnusa because Satnusa was not a producer of comparable merchandise, and was merely an assembler of certain electronic components and only actually produced metal stampings and injection molded components – totally unlike solar products.

### STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence requires "more than a mere scintilla," e.g., Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Substantial evidence supporting an agency determination must be based on the whole

record, and the Court shall take into account not only the information that supports the agency's

decision but also whatever in the "record... fairly detracts from {its weight}." Changzhou Trina,

975 F.3d at 1326 (quoting SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir.

2018)).  Although Commerce does not have to provide perfect explanations, "the path of

Commerce's decision must be reasonably discernable." NMB Sing. Ltd. v. United States, 557 F.3d

1316, 1319 (Fed. Cir. 2009).

Commerce's determination must be overturned if it is "arbitrary, capricious, {or} an abuse

of discretion."  5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard requires that

"Commerce's determination is the product of reasoned decision making" or "a reasoned

explanation." Canadian Solar, Inc. v. United States, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)).

Further, "{a}n agency action is arbitrary when the agency offers insufficient reasons for treating

similar situations differently." RHP Bearings v. United States, 288 F.3d 1334 (Fed. Cir. 2002).

### ARGUMENT

I.  **COMMERCE'S REJECTION OF THE PVINSIGHTS DATA AND SELECTION OF THE INDONESIAN IMPORT DATA EXCLUSIVE OF MALAYSIAN IMPORTS AS THE SURROGATE VALUE FOR SOLAR GLASS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

In the Final Determination, Commerce rejected the PVinsights data covering specifically

solar glass pricing of the specific thickness actually utilized by JA Solar and instead used the

overbroad Indonesian import data under HTS subheading 7007.19.90, with Malaysian imports

excluded based on an Indian countervailing duty ("CVD") determination.  See I&D Mem. at Cmt.

7

1 (P.R. 636).  Commerce's decision was unsupported by substantial evidence for two reasons: 1) the "best available information" statutory mandate dictates that Commerce must select the product-specific PVinsights data and 2) Commerce's exclusion of the Malaysian imports from the Indonesian import data was not only unsupported but also rendered the remaining five percent data – less-than-a-container volume of data – commercially insignificant, and full of aberrational and inapplicable values.  Commerce's exclusion of 95 percent data of the import dataset, the Malaysian imports, gutted the data pool, resulting in tiny leftover transactions that drastically distorted the glass AUV from $0.79/kg to $4.85/kg.  The PVinsights solar glass pricing, at $0.46/kg for actual transactions of solar glass, provides further evidence of the unreasonableness of Commerce's massively manipulated and aberrational figure.

### A. Commerce's Refusal to Use PVinsights Data Violates the Best Available Information Statutory Mandate

Commerce wrongly rejected the PVinsights data that are specific to the solar glass input used by the mandatory respondents and instead used the overinclusive Indonesian import data covering glass products irrelevant to solar cell and module manufacturing.  As a result, Commerce relied on severely distorted Indonesian import data with an AUV of $4.85/kg, over six times the $0.46/kg AUV reflected in the input-specific PVinsights data, undermining its obligation to calculate dumping margins "as accurately as possible."  See I&D Mem. at Cmt. 1, at 9, 21 (P.R. 636); Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  As detailed below, Commerce did not rely on best available information on the record as required by the statute when rejecting the more product-specific PVinsights data.  In addition, none of Commerce's reasons given for rejecting PVinsights has merit.

The statute mandates that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or

8

countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1)(B).

The statute's emphasis on "such factors" shows that Commerce must first determine the

respondent's factors of production and then determine the values that are specific to those factors.

Id.  When evaluating the best available information on the record of a proceeding to value an FOP,

"Commerce generally selects, to the extent practicable, surrogate values that are publicly available,

are product-specific, reflect a broad market average, and are contemporaneous with the period of

review."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

Of these criteria, product specificity is paramount, as recognized by the Court of International

Trade ("CIT").  See Taian Ziyang Food Co. v. United States, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l

Trade 2011).  In Taian Ziyang Food, the CIT held that "'product specificity' logically must be the

primary consideration in determining 'best available information'" and that "{i}f a set of data is

not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other

criteria."  Id. (citing Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 366 F. Supp.

2d 1264, 1273-74 (Ct. Int'l Trade 2005)); see also Catfish Farmers of America v. United States,

No. 21-00380, 2024 Ct. Intl. Trade LEXIS 67 (June 5, 2024) (remanding Commerce's

determination for Commerce to explain why it used certain less specific information over the more

specific Indonesian labor data).  Numerous determinations from Commerce support the emphasis

on the importance of specificity articulated by the courts.  See, e.g., Certain Tungsten Shot From

the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair

Value, 90 Fed. Reg. 9,890 (Dep't of Commerce Feb. 19, 2025), and accompanying Dec. Mem. at

7 ("Commerce must weigh the available information with respect to each input value and make a

product-specific and case-specific decision as to what constitutes the 'best' available SV for each

input.");  see Certain Brake Drums From the People's Republic of China: Preliminary Affirmative

Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 8,383 (Dep't of Commerce Jan. 29, 2025), and accompanying Dec. Mem. at 9 (same).  Placing primary importance on the specificity of the surrogate value source makes eminent sense because a surrogate value that is publicly available, reflective of a broad market average, and contemporaneous is nevertheless useless if it does not represent the respondent's factor of production.

Here, the PVinsights market report provided by JA Solar clearly represents the most specific record information with which to value solar glass inputs, far superior to the highly manipulated Indonesian import data Commerce selected in the Final Determination.  PVinsights is a premier international solar research firm that issues solar glass pricing reports specifically for the solar industry.  See Letter on Behalf of JA Solar to Dep't of Commerce re: Submission of New Factual Information at 3-4 and Ex. 3 (Nov. 6, 2024) (Public Version) ("JA Solar Final SV Submission") (P.R. 454 and 461); id. at Ex. 3 (Business Proprietary Document) (C.R. 495). Specifically, the PVinsights data captures pricing for the "anti-reflection glass market" focused narrowly on solar photovoltaic components.  Id. at Ex. 3 (Public Version) (P.R. 461).  In contrast, the Indonesian import data under HTS 7007.19.90 selected by Commerce cover Safety glass, consisting of toughened (tempered) or laminated glass: Toughened (tempered) safety glass: Other." See Letter on Behalf of JA Solar to Commerce re: Surrogate Value Comments at Ex. SV-3 (Oct. 11, 2024) (Public Version) (providing the Indonesian HTS schedule) (P.R. 347) ("JA Solar SV Comments").  This HTS code consists of a broad collection of glass types beyond glass of the type used for solar module producers.  Indeed, the Customs and Border Protection's rulings indicate that HTS 7007.19.90 is not limited to solar glass, but also includes glass of multiple sizes and uses. See, e.g., Customs Ruling N336478 (March 4, 2024), https://rulings.cbp.gov/ruling/n336478 ("The merchandise under consideration is a glass screen protector for the iPhone 14 cell phone,

'Insignia model NS-14ARGLS2', and a glass screen protector for the iPad Pro 12.9-inch iPad/tablet, 'Insignia model NS-iP18129GLS2'")[1]; see also Customs Ruling HQ 958525 (Feb. 2, 1996), https://rulings.cbp.gov/ruling/958525("The merchandise in issue consists of various components that provide a safety shield or barrier system for ice arenas and rinks.").  As anyone who has observed a professional hockey game knows, the kind of ice rink glass violently pounded on by players (and fans) is a far cry from 2 mm thick solar glass mounted in a stationary solar field that must withstand bird droppings or, at worst, a hailstorm.  Yet Commerce relied on this HTS code to value the respondent's solar glass.  The PVinsights data are therefore superior to overbroad the HTS data because the PVinsights data specifically represent solar glass pricing.

Not only is the PVinsights data specific to solar glass, these data are even more specific to the thicknesses of solar glass actually used by the respondents in this case.  Virtually all modules sold by JA Solar during the POI utilized solar glass of a thickness of 2.0mm.  See Letter on Behalf of JA Solar to Commerce  re: JA Solar Supp. C-D QR at Ex. SD-4 (Business Proprietary Document) (providing specification sheets confirming the 2.0mm thickness of the glass utilized by JA Solar) (C.R. 396-97); Letter on Behalf of JA Solar to Commerce re: Verification Exhibits at Ex. 25, pp.

---

[1] Even though this ruling is for iPhone screen protector under the six-digit HTS code 7007.19 because there are no subcodes under the six-digit code in the HTS of the United States, it still supports that the eight-digit Indonesian HTS code 7007.19.90 is overbroad.  There are two Indonesian eight-digit codes under HTS code 7007.19:

| 7007.19 | - - Other : |
| 7007.19.10 | - - - Suitable for machinery of heading 84.29 or 84.30 |
| 7007.19.90 | - - - Other |

See JA Solar SV Comments at Ex. SV-3 (Public Version) (P.R. 347).  7007.19.10 is a narrow category for glass used in certain machines unrelated to solar cells and modules and 7007.19.90 is a catchall category for all other glass uses that would encompass solar glass and other uses including iPhone screen protector.  Thus, the cited CBP rulings, although technically speaking on HTS code 7007.19, still prove the overbreadth of Indonesian HTS code 7007.19.90.

11

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

36, 50 (Dec. 13, 2024) (Business Proprietary Document) (providing information requested by Commerce at verification confirming the 2.0mm thickness of the solar glass utilized by JA Solar) ("Verification Exhibits") (C.R. 638-39); JA Solar Supp. C-D QR at Ex. SD-13 (Business Proprietary Document) (providing sample input inventory schedule showing that virtually all [

] solar glass purchase was 2.0mm thick)[2] (C.R. 385). The PVinsights solar glass market report data provided by JA Solar is specific to solar glass of 2.0mm thickness. See JA Solar Final SV Submission at Ex. 1 (Public Version) (P.R. 455). In contrast, HTS 7007.19.90 contains no thickness parameters. See JA Solar SV Comments Ex. SV-3 (Public Version) (P.R. 347). Thus, based on the information available on the record of this proceeding, HTS 7007.19.90 is plainly not limited to merchandise specific to the inputs utilized by JA Solar. The best available information for valuing the solar glass input is the product-specific PVinsights data.

Moreover, Commerce's bases for rejecting PVinsights data are unreasonable for the following reasons. First, Commerce did not dispute that PVinsights data are "specific to the input in question" but stated that "it does not provide data for the countries that are economically comparable to Vietnam, *i.e.*, Indonesia, Jordan, the Philippines, Egypt, Morocco, or Sri Lanka . . . . {or} identify the economically comparable countries that represent significant producers of the subject merchandise, i.e., Indonesia, Morrocco, and the Philippines." I&D Mem. at Cmt. 1, p. 14 (P.R. 636). Commerce's fixation on selecting data from economically comparable countries is

---

[2] In addition, the [      ] bifacial models that constitute almost all of JA Solar's database only use 2.0mm solar glass. See JA Solar Supp. C-D QR at Ex. SD-17 (Business Proprietary Document) (showing that the bifacial models constitute virtually all of JA Solar's POI module production) (C.R. 392); see also Letter on Behalf of JA Solar to Commerce re: Section A Response at Ex. A-48 (Aug. 9, 2024) (Public Version) (The specification sheet for model JAM72D30 MB states that the front glass and back glass are 2.0mm thick) (P.R. 251); Verification Exhibits at Ex. 9, p. 28 (Business Proprietary Document) (showing the same for [                          ]) (C.R. 611-12).

12

misplaced. The statue only directs Commerce to use pricing information from economically comparable countries "to the extent possible." 19 U.S.C. § 1677b(c)(4). In other words, Commerce is not required by the statute to use data from only economically comparable countries. Commerce, however, is required by the statute to use valuation information for "<u>such</u> factors {of valuation}" as surrogate values, which mandates Commerce to use data specific to the inputs used by mandatory respondents. <u>Id.</u> § 1677b(c)(1)(B).

Commerce further baselessly rejected PVinsights data on the grounds that the data are not publicly available, claiming that "'publicly available' reasonably means 'on the public record.'" I&D Mem. at Cmt. 1, p. 14 (P.R. 636). First, although the underlying monthly data are treated as confidential information for the protection of PVinsights' intellectual property rights for producing a seasoned industry report on solar glass pricing, the AUV for the POI is on the public record. JA Solar SV Comments at Ex. 1 (Public Version) (P.R. 463) (showing that the AUV for POI solar glass from non-China countries is $0.46/kg). Notably, the AUV of the surrogate values is the actual value that Commerce uses in calculating the normal value, not the underlying monthly data; the AUV, therefore, provides sufficient transparency and notice to the public on the level of solar glass pricing JA Solar proposes for Commerce to use and no party was prejudiced by the confidential treatment of the underlying data.

Second, even with regard to the underlying confidential data, Commerce's citation to a remand redetermination in a different case in claiming that only information on the public record is "publicly available" information, is misleading and shows the lack of support for this "public record" theory. I&D Mem. at Cmt. 1, p. 14 n. 55 (P.R. 636) (citing Final Results of Redetermination Pursuant to Court Order (Aug. 29, 2024), <u>Jinko Solar Imp. and Exp. Co., Ltd., et. al v. United States</u>, 701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024)). Contrary to Commerce's claim,

13

publicly available information means information that is available to the general public even though obtained through paid subscription, which does not necessarily mean information on the public record. In the court opinion that ordered the remand redetermination cited by Commerce, the court rejected the very same reasoning that public available information must be on the public record. See Jinko Solar, 701 F. Supp. 3d at 1387-8 ("Given the nature of the administrative proceeding in which Commerce assesses data to determine whether it is the best information available, it is unclear from Commerce's explanation why the information must not only be publicly available, albeit through a subscription, but also on the public record."). In reaching that conclusion, the court dug into the regulatory history of the requirement of "publicly available" for surrogate values under 19 C.F.R § 351.408(c). Id. at 1387. The court found that the 1996 modification to the regulation from a preference of "published information" to "publicly available information" was meant for Commerce to "achieve greater accuracy when information on the specific factor can be derived outside of published sources" and to "reflect the {Commerce's} preference for input specific data over the aggregated data that frequently appear in published statistics." Id. (citing Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,344 (Dep't Commerce Feb. 27, 1996)). The court then rejected Commerce's "public record" theory for publicly available information and suggested that information, albeit obtained through a subscription and submitted as confidential information, can be used by Commerce as publicly available information.[3] Thus, Commerce's narrow interpretation of the publicly available information is unsupported and must be rejected by this Court as well.

---

[3] The court on remand sustained Commerce's remand redetermination on a different ground and did not affirm Commerce's "public record" theory for publicly available information. Jinko Solar Imp. & Exp. Co. v. United States, 789 F. Supp. 3d 1275, 1285 (2025) ("There is no information {concerning the IATA data collection} on either the public or confidential record that would provide the source data for IATA to detract from Commerce's determination.").

14

To the contrary, Commerce has previously concluded that information on the confidential record can be considered publicly available, as long as any entity can obtain the data. For example, Commerce has indicated that it considers information publicly available where that information "has intentionally been made available, through paid subscription or otherwise, to the general public by its publisher." Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part, 84 Fed. Reg. 56,761 (Dep't of Commerce Oct. 23, 2019), and accompanying Issues and Dec. Mem. at Cmt. 7 (internal citations and quotations omitted). Conversely, Commerce "would consider information to be not publicly available in instances where only a select limited group is permitted to have access to this information by its publisher." Id. Similarly, Commerce has reiterated that "{w}e consider the appropriate indication of public availability to be whether any entity can obtain the data." Laminated Woven Sacks from the People's Republic of China Final Affirmative Countervailing Duty Determination, and Final Determination, in Part, of Critical Circumstances, 73 Fed. Reg. 35,639 (Dep't of Commerce Jun. 24, 2008), and accompanying Issues and Dec. Mem. at Cmt. 15. Commerce has further stated that "at the very least, public availability should enable any interested party to obtain the same information." Id.

Anyone can access PVinsights data. The underlying PVinsights monthly data, although obtained through subscription and treated as confidential, are available to the general public and can be obtained by any interested party. If Commerce's concern for "publicly available" is based on the idea that public source information is not capable of being "cherry picked", in contrast with data that is not available to the public and therefore cannot be critiqued or tested by parties other than the submitter, then Commerce is misplaced. Commerce itself relies on Global Trade Atlas

15

or Trade Data Monitor import data that is subscription-based but is available <u>to any purchaser</u>. The PVinsights data, therefore, are publicly available information.

In sum, Commerce's rejection of the product-specific PVinsights data and reliance on overinclusive Indonesian import statistics was unsupported by substantial evidence and not in accordance with law. The record demonstrates that PVinsights provides the most product specific, contemporaneous, and publicly available information for valuing the solar glass input actually used by the mandatory respondents. By contrast, HTS 7007.19.90 captures a broad universe of non-solar glass products with no meaningful nexus to solar cell and module manufacturing. Commerce's stated reasons for rejecting PVinsights, i.e., lack of data from economic comparable countries and purported lack of public availability, are unsupported by the statute, inconsistent with judicial precedent and Commerce's own determinations recognizing that subscription-based data <u>available to any interested party</u> are publicly available. Because product specificity is paramount in identifying the best available information, Commerce's decision cannot be sustained. Accordingly, the Court should remand Commerce's determination and instruct Commerce to value the solar glass input using the PVinsights data.

## B. Commerce's Exclusion of Malaysian Imports from Indonesian Data Under HTS 7007.19.90 Based on a Pre-POI Countervailing Duty Determination Was Unsupported by Substantial Evidence

Not only did Commerce use the non-specific Indonesian import data under HTS 7007.19.90 instead of the specific PVinsights data to value solar glass, Commerce also excluded the Malaysian imports – accounting for 95% of the Indonesia import data – without support of substantial evidence. Relying on a pre-POI CVD determination without specific indication that subsidization occurred during the POI does not meet the "reason to believe or suspect" standard

16

used by Commerce to disregard subsidized values. As a result, the ultimate data Commerce selected not only suffer from non-specificity, but also from highly aberrational and distorted values.

When calculating normal values, Commerce has discretion to disregard price or cost values that are dumped or subsidized. See 19 U.S.C. § 1677b(c)(5). Specifically, the statute states that Commerce "may disregard price or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order." Id. With regard to subsidized values, the statute directs Commerce to consider two scenarios: one is when "broadly available export subsidies existed" and the other is when "particular instances of subsidization occurred." Id. Since Commerce here did not claim to have found broadly available export subsidies for the Malaysian prices it excluded, Commerce must find "particular instances of subsidization." See I&D Mem. at Cmt. 1, p. 17 (P.R. 636) (only relying on the Indian CVD determination in excluding Malaysian prices). As detailed below, a pre-POI CVD determination by the Government of India with respect to Malaysia does not arise to the standard of "particular" instance.

The "reason to believe or suspect" standard Commerce uses to determine existence of particular instances of subsidization does not encompass a CVD determination showing no evidence of subsidization **during the particular POI**. Commerce has a longstanding practice of excluding prices which "it has reason to believe or suspect may be dumped or subsidized." See Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R.3, H.R. Rep. No. 576, 100th Cong., 2nd Sess., at 590–91 (1988); see also Weishan Hongda Aquatic Food Co. v. United States, 917 F.3d 1353, 1365 n.9 (Fed. Cir. 2019) (quoting the same). Courts have long interpreted the "reason to believe or suspect" standard as requiring a "particularized and

17

objective basis for suspecting" the presence of subsidies.  See China Nat'l Mach. Imp. & Exp. Corp. v. United States, 264 F. Supp. 2d 1229, 1239 (Ct. Int'l Trade 2003) (quoting Al Tech Specialty Steel Corp. v. United States, 575 F. Supp. 1277, 1280 (Ct. Int'l Trade 1983)).  Courts have also stated that the alleged subsidies must exist in the supplier countries during the period of investigation to meet the "reason to believe or suspect" standard.  See Fuyao Glass Indus. Group Co. v. United States, 30 CIT 165, 171 (2006).  The CIT has explained that "subsidy findings are fact-specific, and circumstances often change" and concluded, therefore, that "factual findings in past determinations, while often relevant, are not binding in subsequent cases." Nation Ford Chem. Co. v. United States, 985 F. Supp. 133, 138 (1997).  Commerce has also explained that "mere mention of a subsidy, without information that the company actually received the subsidy . . . . is not enough for {Commerce} to exclude the {surrogate values.}" Shenzhen Xinboda Indus. Co. v. United States, 279 F. Supp. 3d 1265, 1309 (Ct. Int'l Trade 2017) (citing Commerce's remand results).  In fact, Commerce itself acknowledged in the Final Determination of this case, when explaining its decision on surrogate financial statement, that Commerce will only disregard financial statements if "objective, specific" evidence showing receipt of subsidies during the POI. See I&D Mem. at Cmt. 22, p. 76 (P.R. 636).  Commerce, therefore, must find that a subsidy indeed occurred during the POI in order to have "reason to believe or suspect" for a "particular instance{} of subsidization."  19 U.S.C. § 1677b(c)(5).

In this case, Commerce, without support of substantial evidence, relied on a CVD determination based on pre-POI information in concluding that the Malaysian prices were subsidized, when no record information suggests that subsidization occurred during the POI or with respect to Malaysian exports to any country other than India.  The POI in the Indian CVD investigation is from April, 2018 to March, 2019, five years prior to the POI of this investigation

18

from October 2023 to March 2024. See Letter on Behalf of Petitioner to Commerce re: Final Submission of Surrogate Values at Ex. 39, p. 4 (Nov. 6, 2024) (Public Version) ("Pet'r Final SV Submission") (P.R. 452-53). Commerce, however, incorrectly equated the effectiveness of the CVD rate during the POI with the actual finding of subsidy occurrences during that period. I&D Mem. at Cmt. 1, p. 16 (P.R. 636) ("{T}he GOI finding was dated December 11, 2020, and was in effect for five years after its issuance, and therefore, covers the POI of this investigation."). Even though a CVD rate was imposed during the POI of this investigation by GOI on Malaysian tempered glass imports, there is no evidence of actual subsidies received by the Malaysian exporters. As explained above, Commerce must find evidence of subsidies received during the POI before excluding the subsidized data. Shenzhen Xinboda, 279 F. Supp. 3d 1265, 1309 (Commerce emphasizes on the company's actual receipt of the subsidies before Commerce decides to exclude subsidized information.). The fact that India does not conduct the same administrative reviews conducted by the U.S. to review whether the Malaysian exporters received subsidies during October 2023 to March 2024, the POI in this case, means that Commerce did not have "particular, specific, and objective evidence" that the POI Malaysian tempered glass exports were subsidized.

In fact, Commerce in the Final Determination quoted CIT's explanation of how administrative reviews provide whether actual subsidies occurred during a specific period of time:

> Commerce may conclude that a program conferred different levels of benefit during different administrative reviews, even among reviews of the same countervailing duty order. In some reviews, it may conclude that the program conferred no countervailable benefit at all. For that reason, factual findings in past determinations, while often relevant, are not binding in subsequent cases.

I&D Mem. at Cmt. 1, p. 18 (P.R. 636) (citing Nation Ford Chem., 985 F. Supp. at 138). Accordingly, Commerce assesses whether a countervailable benefit was conferred during the

19

specific relevant period even under its own CVD orders, much less on the basis of a CVD determination issued by another country. Nothing on the record suggests that Malaysian glass producers received subsidies during the POI. Commerce, therefore, concluded without record support that Malaysian exports were subsidized during the POI of this case based on a pre-POI CVD determination that was never subject to a subsequent administrative review. Moreover, there is no evidence at all that the Indian government's subsidy findings on Malaysian glass had any impact on Malaysian exports to a country other than India. This pre-POI CVD determination without administrative review for the POI does not rise to the level of "particular instances of subsidization" mandated by the statute. 19 U.S.C. § 1677b(c)(5). The Court must then remand Commerce's decision to exclude the Malaysian prices as unsupported by substantial evidence.

### C. Commerce's Reliance on the Tiny Volume of Remaining Indonesian Import Data Was Unsupported by Substantial Evidence

Commerce's unsupported exclusion of the Malaysian imports created another issue – Commerce's unreasonable reliance on the remaining Indonesian import data worth less than a container of tempered glass, 13,217 KG, with a highly aberrational AUV of $4.85/kg. See Mem. From Laurel LaCivita to The File re: Final Surrogate Values Mem. at Attach., "S Glass (Ex Malaysia Unchange)" tab (Apr. 18, 2025) (Public Document) ("Final SV Mem.") (P.R. 646). Commerce's reliance on the 5% remaining data left in the Indonesian dataset was also not supported by substantial evidence and must be remanded because the remaining data involve commercial insignificant quantity and aberrational prices. As a result, the PVinsights data are superior to the Indonesian import data and are the "best available information" on the record.

The CIT has held that when faced with a small amount of import volume, Commerce must first examine whether the small import volume is commercially significant and then examine whether the import data are aberrational. See Shanghai Foreign Trade Enters. Co. v. United States,

20

318 F. Supp. 2d 1339, 1352-53 (Ct. Int'l Trade 2004); Xinjiamei Furniture (Zhangzhou) Co. v. United States, 37 CIT 308, 316-17 (2013). In Shanghai Foreign Trade, the Court remanded Commerce's decision to use the import data with a small volume of 1,132 metric tons. See 318 F. Supp. 2d at 1350-53. The Court found that the volume of 1,132 metric tons is not commercially significant and that Commerce failed to address whether the price based on such small import volume was aberrational. Id. at 1352-53. Similarly, in Xinjiamei Furniture, the Court remanded Commerce's reliance on the Global Trade Atlas ("GTA") import data with a small import volume of 716.882 metric tons, reasoning that "Commerce skipped a critical step by failing to explain why . . . . its GTA data would not produce an aberrational surrogate value." 37 C.I.T. at 317 ("{A} very small relative quantity of imports triggers an obligation for Commerce to explain why the data is not aberrational"). The Court then stated that "the Department points to no evidence, let alone market evidence, that the GTA data yields a value within a reasonable range, and has chosen to disregard evidence that the value is outside of this range." Id. The Court further pointed out that the GTA price was significantly higher than other data on the record and concluded that "while the {other data sources on the record} might not satisfy the requirements for surrogate values, they are sufficient to call into question the reliability of the GTA data." Id. Thus, the Court in Shanghai Foreign Trade and Xinjiamei Furniture provided persuasive instructions on Commerce's obligation when faced with a small import volume, namely, that Commerce must determine whether the small volume is commercially significant and whether the price is aberrational compared to other available data on the record.

Contrary to Commerce's decision in this case, Commerce itself has also rejected import data when the import volumes are small. See Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe Final Determination of Sales at Less Than Fair Value and Critical

21

Circumstances, in Part, 2010 ITA Unpub LEXIS 48, at *111, 116-17, 130, 134 (Dep't of Commerce Sept. 10, 2010) (rejecting Indian import data under HTS subheading 7207.20.30 with a volume of 5 metric tons and Indian import data under HTS subheading 2601.11.90 with a volume of 11 metric tons); Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping, 75 Fed. Reg. 20,335 at Cmt. 20 (Dep't of Commerce Apr. 19, 2010) (rejecting Indian import data with a volume of 15 metric tons) ("OCTG From China").  Commerce in both cases concluded that the small import volumes were not representative of a broad range of prices within the POI and thus not commercially significant. See id.

Here, like in Shanghai Foreign Trade and Xinjiamei Furniture, the small import volume of 13,217 KG, i.e., about 13 metric tons, is commercial insignificant and the $4.85/kg AUV is aberrational as contrasted with other available data on the record.  See Final SV Mem. at Attach., "S Glass (Ex Malaysia Unchange)" tab (P.R. 646).  The quantity here is drastically smaller than the import volumes of 1,132 metric tons and 716.882 metric tons in Shanghai Foreign Trade and Xinjiamei Furniture respectively where the Court found that the small import volumes triggered Commerce's obligation to explain whether the data are commercially significant and not aberrational.  See Shanghai Foreign Trade, 318 F. Supp. 2d at 1352-53; Xinjiamei Furniture, 37 C.I.T. at 316-17.  The 13 metric tons here are also smaller than the 15 metric tons in Certain Oil Country Tubular Goods and is near to the 11 metric tons in Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe and where Commerce itself rejected the data for not being commercially significant.

Commerce incorrectly concluded that there is no adequate record for it to analyze the commercial significance and whether the data are aberrational. I&D Mem. at Cmt. 1, pp. 22-23 (P.R. 636). Commerce stated that "{t}ypically, Commerce will evaluate commercial significance {sic} by analyzing whether the small quantity import data leads to an aberrational AUV compared to other potential surrogate countries" and then concluded that it could not perform the analysis because there is no import data from other potential surrogate countries. Id. at Cmt. 1, p. 22. The fact that Commerce's dataset cannot be compared to any other data is not a feature but rather a flaw of that tiny dataset, confirming that it cannot be representative of trade in high-volume solar products inputs.

Despite that there is no comparative import data to test whether Commerce's highly manipulated dataset is aberrational, Commerce is wrong that the record contains no such information. In fact, there is ample record information confirming that Commerce's adjusted data are too small to be representative for the respondents' input. First, the very fact that Commerce's "adjustment" gutted 95 percent of the reported import data on its face should lead Commerce to question the usability of the leftover 5 percent. As noted above, the 13,217 KG volume of import is less than half of a full container load. See JA Solar SV Comments. at SV-5 (Public Version) (P.R. 339) (showing that the full container load for a 40 feet container is 28,750 KG). For context, such shipping containers are frequently observed being driven on highways and city streets by tractor trailers. Commerce used less than half of one truckload to evaluate the glass input used by the entire Vietnamese solar manufacturing industry.

Commerce unpersuasively stated that the remaining data account for enough solar glass to produce more than 1000 solar modules and thus are commercially significant. I&D Mem. at Cmt. 1, p. 23 (P.R. 636). It failed to, however, acknowledge that that quantity is extremely minimal

23

compared to the overall combined export of [            ][4] solar modules by the two mandatory respondents, i.e. [        ] %, and cannot be seen as commercially significant.  Commerce unreasonably concluded that less than a container worth of tempered glasses in the remaining database, only enough to make [        ] % of mandatory respondents' exports, are robust surrogate value data.  Commerce also failed to acknowledge that the 13 metric tons are minimal and negligible compared to the [        ] metric tons of solar glass JA Solar alone purchased during the POI; the tiny volume of 13 metric tons is only about [      ]% of JA Solar's POI glass purchase. See Letter on Behalf of JA Solar to Commerce re: Section D Resp. at Ex. D-7 (Business Proprietary Document) (showing the total POI glass purchase as [            ] KG) (C.R. 286). Commerce, therefore, cannot reasonably claim that 13 metric tons are commercially significant. Moreover, Commerce's now claimed standard of considering the number of finished products can be made from the minimal trade volume of the material input contradicts Commerce's consideration of absolute trade volumes in Certain Oil Country Tubular Goods and Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe.  Again, the 13 metric tons in this case is less than the 15 metric tons that Commerce found to be commercially insignificant in Certain Oil Country Tubular Goods.  OCTG From China, 75 Fed. Reg. 20,335 at Cmt. 20. Commerce's decision to treat the 13 metric tons volume here as sufficient and robust data was arbitrary and capricious and must be remanded.  RHP Bearings, 288 F.3d at 1347 ("An agency

---

[4] The combined number of solar modules exported by the mandatory respondents is calculated by adding the numbers from sales databases. See Letter on Behalf of JA Solar to Commerce re: Suppl. Section C-D Questionnaire Resp. at Ex. SC-1 (Oct. 28, 2024) (Business Proprietary Document) (C.R. 362, 364) (providing that the total piece count is [            ]); Letter on Behalf of Jinko Solar (Vietnam) Industries Company Limited (Jinko Solar (Vietnam) Industries Co., Ltd.), JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries Inc. re: Jinko Sections A and C First Suppl. Questionnaire Resp. at SA-Q7 (Nov. 8, 2024) (Business Proprietary Document) (C.R. 514, 562) (providing that the total piece count is [            ]).

24

action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.")

Not only is the volume of 13 metric tons commercial insignificant, but the data are also aberrational. In reaching the opposite conclusion, Commerce ignored a wealth of record evidence suggesting that the remaining 5 percent Indonesian dataset is extremely aberrational and distorted. See I&D Mem. at Cmt. 1, p. 23 (P.R. 636). First, Commerce ignored PVinsights data providing a drastically lower AUV for solar glass input of $0.46/kg than the AUV of the 13 metric tons data, $4.85/kg, citing the same reasons for which it rejected PVinsights as SV. Id. The CIT, however, has ruled that even if Commerce decides to reject certain data on the record as unsuitable as SV, Commerce cannot ignore those data that call into question of the data Commerce selects. Xinjiamei Furniture, 37 C.I.T. at 317. Commerce, therefore, cannot blanketly disregard PVinsights data that report on the specific solar glass input and show a significantly lower price, one tenth of the import price Commerce selected. Commerce unreasonably ignored the first clue indicating that the tiny volume of trade data it selected is aberrational and not representative of a broad range of prices within the POI.

Second, Commerce ignored how unreliable the underlying data are within the 5 percent remaining data themselves. A plain observation of the data composition reveals that the data are aberrational. At the outset, the data are composed of Indonesian import data under HTS subheading 7007.19.90 from 15 countries, after excluding Malaysia and other countries that Commerce normally considers as unusable due to broadly available export subsidies. Nearly 80 percent of the data are import prices from the United Kingdom with an AUV of $1.07/kg. The rest of the data consists of mainly small quantities of imports with a wide range of AUV, with the highest AUV being $333/kg. Commerce unreasonably concluded that the remaining less-than-a-

25

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

container data, with a wide range of quantities (as low as 1 KG) and AUV (as high as $333/kg) from 15 countries, are reliable and not aberrational.

| Country | Quantity (KG) | Value (USD) | AUV ($/KG) |
|---|---|---|---|
| Canada | 1.00 | 145.00 | 145.00 |
| Czech Republic | 5.00 | 74.00 | 14.80 |
| Denmark | 17.00 | 216.00 | 12.71 |
| Finland | 27.00 | 3,389.00 | 125.52 |
| France | 18.00 | 3,414.00 | 189.67 |
| Hong Kong | 774.00 | 5,887.00 | 7.61 |
| Italy | 20.00 | 47.00 | 2.35 |
| Japan | 272.00 | 6,620.00 | 24.34 |
| Malta | 6.00 | 28.00 | 4.67 |
| Poland | 2.00 | 5.00 | 2.50 |
| Singapore | 1,341.00 | 18,630.00 | 13.89 |
| Slovenia | 1.00 | 333.00 | 333.00 |
| Sweden | 9.00 | 2,374.00 | 263.78 |
| United Kingdom | 10,469.00 | 11,238.00 | 1.07 |
| United States | 255.00 | 11,727.00 | 45.99 |
| **Grand Total** | **13,217.00** | **64,127.00** | **4.85** |

See Final SV Mem. at Attach., "S Glass (Ex Malaysia Unchange)" tab (aggregating the monthly data for each country during the POI) (P.R. 646).

Third, the remaining import data contain inapplicable glass data to JA Solar's glass consumption, further proving the aberrational and unreliable nature of the import data. The minimum weight of a single piece glass that JA Solar consumed is 12.81 KG. See Verification Exhibits at Ex. 25, pp. 37, 51 (Business Proprietary Document) (average unit weight calculated by dividing net weight of [         ] KG per container by total pieces per container of [      ] pieces, or alternatively net weight of [      ] KG per pallet by total pieces per pallet of [    ] pieces) (C.R. 638-39). Among the data remaining after the exclusion of Malaysian import data, 18 of the 40 remaining entries in the remaining dataset represent shipments of less than 12.81 KG, with some transactions involving only 1 KG, meaning these entries cannot possibly be applicable

26

to the solar glass utilized by JA Solar.  See Final SV Mem. at Attach., "S Glass (Ex Malaysia Unchange)" tab (aggregating the monthly data for each country during the POI) (P.R. 646); see also Letter on Behalf of Jinko to Commerce re: Jinko's Case Brief in the Less-Than-Fair-Value Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from Vietnam (A-552-841) at 12-13 (Mar. 7, 2025) (Public Version) (P.R. 608).  These inapplicable data points within the remaining import data reinforce the necessity of relying on a more accurate data source like PVinsights.

The final piece of record evidence indicating that the data Commerce selected are aberrational is the Indian CVD determination.  The Indian CVD finding would not have barred Malaysian exports to India but rather would only have resulted in the addition of the countervailing duties at the rates specified in that old inquiry, when imported into India. The low CVD rates of 9.71 percent and 10.14 percent in that case suggest that the remaining data after exclusion of Malaysian imports are aberrational.  See Pet'r Final SV Submission at Exs. 38-39 (Public Version) (P.R. 452-53); see also Xinjiamei Furniture, 37 C.I.T. at 317 (stating that even if Commerce decides to reject certain data on the record as unsuitable as SV, Commerce cannot ignore those data that call into question of the data Commerce selects).  Yet by removing all Malaysian imports into Indonesia, the "non-subsidized" remaining data inflated the AUV from $0.79/kg to $4.85/kg, a six-fold increase.  Compare JA Solar SV Comments at Ex. SV-1 (Public Version) (P.R. 339) with Final SV Mem. at Attach., tab "S Glass (Ex Malaysia Unchange)" (Public Version) (P.R. 646).  Logically, one would expect the "correction" of the subsidized prices to stay within the range of the Indian CVD rates.  To the contrary, the effect of Commerce's "correction" inflated the AUV by six times, a significant contrast with the subsidization levels determined by GOI (a 600% increase versus 10% which would be the impact of the Indian CVD finding).  This highlights that the remaining imports

after exclusion of Malaysia are not representative since they vary so wildly from the Malaysia trade data, even when assuming, arguendo, that Malaysian prices are 10% too low. Commerce, therefore, failed to adequately consider the low subsidy rates which called into question of the remaining import data Commerce ultimately relied on.

In conclusion, there is ample record evidence that calls into question the reliability of the reduced Indonesian import data. The PVinsights data, although wrongly rejected by Commerce as an SV, can still provide insight into whether the Indonesian import data is aberrational or not. Specifically, the $0.49/kg price from PVinsights suggests that the $4.85/kg price from the Indonesian import data is aberrational. The remaining import data consist of less than a single container's worth of data full of small quantities and a wide range of AUV prices from the remaining 15 countries, suggesting that the data are aberrational. Lastly, the low subsidy rates Commerce relied on in excluding the Malaysia data suggest that the resulting AUV is not representative of the kind of glass used by the respondents or investigated by the Indian government.

As illustrated above, PVinsights remains a usable source that is more specific than the import data, and is, thus, superior data to the commercially insignificant and aberrational import data. The Court should remand Commerce's reliance on the flawed Indonesian import data as unsupported by substantial evidence.

## II.   COMMERCE'S DECISION TO USE THE SURROGATE FINANCIAL STATEMENTS OF SATNUSA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

JA Solar and Jinko produced "wafers" from polysilicon and made solar cells and modules from them in Vietnam. Semiconductors are also produced from polysilicon wafers and the production of semiconductors into more advanced components is analogous to the production of solar modules. Commerce used a surrogate financial statement from Satnusa which did not

28

produce its own semiconductors (or any similar high-tech inputs) but instead was a mere assembler of such goods purchased from third parties, with its only in-house production being unrelated products like injection molds and metal stamping.   Satnusa is not a producer of "comparable merchandise" as required by the statute as explained below.

Satnusa's financial statements did not represent the best available information because Satnusa was not a producer of identical or similar merchandise and thus was not the best available surrogate financial information.   The statute requires Commerce to value FOPs using the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate."   19 U.S.C. § 1677b(c)(1).   Because "best available information" is a standard involving comparison of record evidence, Commerce was required to have weighed the financial statements on the record and determined which financial statements are "best."   Weishan Hongda, 917 F.3d at 1356.   In selecting the best available information, "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."   Qingdao Sea-Line, 766 F.3d at 1386.   There is no hierarchy for applying such factors and Commerce must weigh available information and make case-specific decisions based on the best available information.   See SeAH Steel VINA Corp. v. United States, 269 F. Supp. 3d 1335, 1349 (Ct Int'l Trade 2017).

In reviewing Commerce's SV determination, the "court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."   Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).   Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable."

NMB Sing. Ltd., 557 F.3d at 1319. "For the court to conclude that a reasonable mind would support Commerce's selection of the best available information, Commerce needs to justify its selection of data with a reasoned explanation." Dorbest Ltd. v. United States, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1302 (2006). "Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable." Olympia Indus., Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998). Commerce must consider all evidence in the record, including that which fairly detracts from its decision. See CS Wind Viet. Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Commerce has not done so here. No reasonable mind could review the record of this proceeding and determine that the financial statements of Satnusa are an appropriate source for surrogate financial ratios, let alone the best available information. Furthermore, Commerce failed to provide a "reasonably discernable" path to explain its decision because Commerce's justification for the selection of Satnusa's financial statements misapprehends parties' arguments and fails to consider record information confirming the inapplicability of Satnusa's financial statements. NMB Sing., 557 F.3d at 1319.

In this case, no reasonable mind could conclude that Commerce chose the best available information to value surrogate financial ratios. In the final determination, Commerce used an average of the financial ratios of Satnusa and PT. Tera Data Indonesia Tbk ("Tera Data"), stating that the financial statements of these companies "comprise the best available information" with which to construct surrogate financial ratios for JA Solar. See I&D Mem. at Cmt. 22, p. 72. (P.R. 636). No party disputes Commerce's use of Tera Data as a source of SV for financial ratios. Id. at Cmt. 22. Despite multiple submissions by JA Solar stressing the lack of evidence of any high-tech production by Satnusa, Commerce stated that "Jinko and JA Solar argue that Satnusa is a

30

'high technology' <u>manufacturer</u> that produces printed circuit boards, electronic components, semiconductors, and final assembly of 'hi-tech' devices, which are not merchandise comparable to subject merchandise." <u>Id.</u>, at Cmt. 22, p. 73 (citing to Letter on Behalf of Pet'r to Dep't of Commerce re: First Submission of Surrogate Values at Ex. 16-B and 16-D (Oct. 11, 2024) (Public Version) ("Pet'r First SV Submission") (P.R. 353-56)) (emphasis added).    Commerce misrepresented what JA Solar had been arguing during the entire investigation – that Satnusa is not a manufacturer of comparable merchandise.  <u>See</u> Letter on Behalf of JA Solar to Commerce re: Surrogate Value Rebuttal Comments at 32-36 (Oct. 22, 2024) (P.R. 376); <u>see</u> <u>also</u> Letter on Behalf of JA Solar to Commerce re: Pre-Preliminary Comments at 9 (Nov. 7, 2024) (Public Document) (P.R. 469); <u>see</u> <u>also</u> Case Br. at 24-28 (Public Version) (P.R. 606).

Commerce's Final Determination ignored information in Satnusa's financial statements and company website, as well as direct statements on the record from Satnusa's company officials confirming that Satnusa was not a manufacturer of merchandise comparable to subject merchandise.  Record information confirms beyond any doubt that Satnusa did not produce printed circuit boards ("PCBs"), chips, or any other high-tech componentry comparable to solar panels. Satnusa's financial statements describe the scope of Satnusa's production activities as established in the company's articles of association as compared to the actual current production operations of the company, stating that "{a}ccording to Article 3 of the Company's Articles of Association, the Company's scope of activities comprises engineering equipment from plastics, semi-conductors, wireless communication equipment, battery, computers and recording equipment.  <u>Currently</u>, the Company's activities comprise <u>assembling</u> electronic components."  Pet'r First SV Submission at Ex. 16-B (Public Version) (P.R. 353-55) (emphasis added).  In fact, the financial statements does not list production of PCBs or other comparable electronic goods as a business activity, but rather

31

list "Surface Mount Technology," "Plastic Injection Molding," "Metal Stamping," "Final Assembly" and "Direct Shipment" as the company's business activities.  <u>Id.</u> p. 42.  Thus, Satnusa's financial statements describe its current business activities as comprising "assembling electronic components," and not production of semi-conductors or high-tech components.  <u>Id.</u>

Other factual information on the record further confirms Satnusa's lack of production of high-tech components comparable to JA Solar's solar panels.  Specifically, in the rebuttal factual information submission, Jinko provided direct communication with a member of the Business Department at Satnusa, Mr. Yohanes Lim, confirming the lack of production of any high-tech materials such as chips or PCBs.  Counsel to Jinko posed the following question to Mr. Lim regarding the production capabilities of Satnusa:

> The description of the {Surface Mount Technology ("SMT")} department on your website discusses a variety of complex production operations using chips and PCB materials.  Does your company produce any of the chips or PCBs incorporated into the merchandise, or do you externally source the chips/PCBs?

Letter on Behalf of Jinko to Commerce re: Jinko 30-Day Rebuttal Factual Information at Ex. FIN-3A (Nov. 13, 2024) (Public Document) ("Jinko's Rebuttal NFI Submission") (P.R. 484).  In response, Mr. Lim provided direct confirmation that Satnusa "do{es} not manufacture chips or PCBs," stating:

> We would like to inform you that we have the capability to perform mounting on our machines.  However, please note that **we do not manufacture chips or PCBs ourselves.**  Typically, our customers provide the components to us on a consignment basis for the mounting process.

<u>Id.</u> (emphasis added).  Despite JA Solar's repeated citations to the above-quoted communications, including in JA Solar's administrative case brief, Commerce's Final Determination made no reference to the specific communications in Exhibit FIN-3A of Jinko's Rebuttal NFI Submission, nor did Commerce address Satnusa's self-admitted lack of production of chips or PCBs.  I&D Mem. at Cmt. 22 (P.R. 636).  Commerce's disregard of Mr. Lim's statements represents an obvious

32

failure to fulfill Commerce's obligation to consider all record information, even that which fairly detracts from its decision.  See CS Wind, 832 F.3d at 1373.

Commerce further defended its selection by claiming that "Satnusa's website describes the production of printed circuit boards and the manufacture of hi-tech products from components." I&D Mem. at Cmt. 22, p. 73 (P.R. 636) (citing Petitioner's First SV Submission at Ex. 16-C (Public Version) (P.R. 355-356)).  The record does, however, contain screenshots of all business units listed on Satnusa's website, which include only the following categories: "SMT DEPARTMENT," "ACCUMULATED ENGINEERING KNOW-HOW", "FINAL ASSEMBLY", "METAL STAMPING", "FABRICATION" and "PLASTIC MOLDING".  Letter on Behalf of JA Solar to Commerce re: Surrogate Value Rebuttal Cmts. at Ex. SVR-17 (Oct. 22, 2024) (P.R. 377); see also Pet'r First SV Submission at Ex. 16-B, p. 42 (Public Version) (including the financial statements stating the similar business activities without mentioning of production) (P.R. 353-55).  Review of the descriptions of the activities of each of these business units reveals no production of PCBs or manufacture of other high-tech components.  In fact, the company websites information in Exhibit 16-C of Petitioner's First SV Submission that Commerce cited to in claiming that Satnusa produces PCBs proves the opposite.  In particular, Satnusa lists "PCB & FLEXIBLE PCB" under the "Final Assembly" page on the website, proving that the company does not actually produce PCBs but merely provides assembling services for PCBs.  See Petitioner's First SV Submission at Exhibit 16-C (Public Version) (P.R. 353-356).  Satnusa's financial statements further confirms that the company is involved in the assembling business when it describes the activities under "Printed Circuit Board Assembly."  Petitioner's First SV Submission at Ex. 16-B, p. 42 (Public Version) (emphasis added) (P.R. 353-355).  Again, as discussed above, counsel to Jinko reached out directly to Satnusa to determine whether the "SMT department" engaged in any production of high-tech

33

components, and confirmed that Satnusa performed no such production.  See Jinko's Rebuttal NFI Submission at Ex. FIN-3A ("{P}lease note that we do not manufacture chips or PCBs ourselves") (P.R. 484).

Thus, based on the actual screenshots from the Satnusa website, Satnusa's financial statements and the direct confirmation of Satnusa officials, no reasonable mind could agree with Commerce's determination that "Satnusa's website describes the production of printed circuit boards and the manufacture of hi-tech products from components."  I&D Mem. at Cmt. 22, p. 73 (P.R. 636).  Commerce's decision to use Satnusa's financial statements as SV for financial ratios was unsupported by substantial evidence.

Commerce's citation to previous cases in Solar Cells from China cannot cure the fact that Satnusa does not produce comparable merchandise.  See id. at Cmt. 22, p. 73 nn. 290-291 (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Results of No Shipments, 83 Fed. Reg. 35,616 (Dep't of Commerce July 27, 2018), and accompanying Issues and Dec. Mem. at Cmt. 10 and Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012), and accompanying Issues and Dec. Mem. at Cmt. 2).  Commerce's cited decisions merely support the assertion that, as the excerpt of the decision cited by Commerce states, production of circuit boards and production of solar panels are similar because "both circuit boards and merchandise under consideration are manufactured from similar processes, which involve putting together a variety of sensitive components onto a single base or board using both robotics and manual labor, using similar inputs (i.e., silicon base materials

34

and various types of joining parts)." I&D Mem. at Cmt. 22, p. 73 (P.R. 636). The key factual distinction in this case, however, is that Satnusa is not a producer of PCBs. JA Solar does not dispute that Commerce can use financial statements of producers of comparable merchandise such as PCB; JA Solar disputes that such financial statements must come from true producers of comparable merchandise, and Satnusa is not one. Thus, Commerce's inclusion of Satnusa's financial statements in the margin calculations as best available information cannot be supported by substantial evidence.

For the same reasons, Commerce's citation to NTSF Seafoods Joint Stock Co. v. United States, 487 F. Supp. 3d 1310 (Ct Int'l Trade 2020) was equally inapposite. Id. at Cmt. 22, p. 74 & n. 294 ("{T}he CIT has stated that Commerce is not required under the law to select financial statements from a producer that primarily produces comparable merchandise, but is required only to gather information from producers of identical or comparable merchandise in the surrogate country."). Again, the issue here is that Satnusa is not a producer of comparable merchandise, much less the percentage of its comparable merchandise production. In NTSF Seafoods, the companies in dispute were both producers of comparable merchandise and plaintiffs in that case argued that Commerce should not use financial statements of a company that did not primarily produce comparable merchandise. 487 F. Supp. 3d at 1318. The court then rejected plaintiffs' argument and stated that Commerce was not required to "select financial statements from a producer that *primarily* produces comparable merchandise, but rather is required only to gather information from producers of identical or comparable merchandise in the surrogate country." Id. The court still stated that Commerce must select information from "producers." Id. Commerce's citation to NTSF Seafoods, therefore, was misleading and misplaced because the issue here is that

35

Satnusa is not a producer at all and Commerce did not cite to any record evidence proving Satnusa's producer status of comparable merchandise.

Commerce also claims that the use of multiple financial statements to determine surrogate financial ratios "allows Commerce to average the factory overhead, SG&A, and profit ratios and, thus, to normalize any potential distortions that may arise from using financial statements of a single producer." Id. at Cmt. 22, p. 77. Blending distorted data with good data, however, only yields a larger volume of distorted data and is unreasonable where, as here, Commerce had another acceptable financial statement without any such distortion on the record. As noted above, "best available information" is a standard involving comparison of record evidence, and Commerce was required to have weighed the financial statements on the record and determined which financial statements are "best." Weishan Hongda, 917 F.3d at 1356. As such a comparison does not preclude the selection of multiple financial statements, two sources cannot both be considered "best" when one satisfies all stated criteria whereas another does not. Whereas Tera Data's financial statements represent a true producer of comparable products, Satnusa's financial statements do not and must be excluded. See Letter on Behalf of Jinko to Commerce re: Jinko's Final 30-Day Surrogate Value Comments in the Less-Than-Fair-Value Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from Vietnam (A-552-841) at Ex. 5B (Nov. 6, 2026) (Public Document) (providing Tera Data's financial statements confirming that "{Tera Data} is engaged in manufacturing and wholesale trading of computers and computer parts.") (emphasis added) (P.R. 434-35); see also Jinko Solar Co. v. United States, 229 F. Supp. 3d 1333, 1349-50 (Ct Int'l Trade) (sustaining Commerce's selection of a computer assembly company over a circuit board assembly company as SV for financial ratios in the investigation of Solar Cells from China). Satnusa's financial statements are clearly inferior to those of Tera Data in that Satnusa's financial

36

statements do not meet the criteria outlined in Qingdao Sea-Line, namely the "product-specific" criterion, whereas as parties agree that the financial statements of Tera Data meet all of the criteria outlined in Qingdao Sea-Line. After all, how can Satnusa's financial statements be considered product-specific when Satnusa does not produce the PCBs considered by Commerce to be specific and comparable enough? Given the obvious flaws in the Satnusa financial statements and the presence of the acceptable Tera Data financial statements, Commerce's decision to include Satnusa's financial statements and average both datasets was unsupported by substantial evidence.

In sum, Commerce ignored ample evidence on the record supporting that Satnusa as not a producer comparable merchandise and merely an assembler of PCBs and other high-tech components. Satnusa's in-house production, such as plastic injection molds, also has nothing to do with comparable merchandise. The Court must remand Commerce's inclusion of Satnusa's financial statements as unsupported by substantial evidence.

CONCLUSION

The Court should grant this Rule 56.2 Motion for Judgment on the Agency Record because Commerce's selection of SVs for solar glass and financial ratios was not supported by substantial evidence or otherwise not in accordance with law. Accordingly, the Court should remand the Final Determination to Commerce for a remand determination in accordance with the points of fact and law discussed above.

Respectfully submitted,

Dated: April 6, 2026

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Yixin (Cleo) Li
*Counsel to JA Solar USA Inc., JA Solar Vietnam Co. Ltd. and JA Solar PV Vietnam Co. Ltd.*

37

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and the Scheduling Order to this case.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 11,663 words.

Respectfully submitted,

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Yixin (Cleo) Li
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, Suite 810
Washington, DC 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to JA Solar USA Inc., JA Solar Vietnam Co. Ltd. and JA Solar PV Vietnam Co. Ltd.*

Date: April 6, 2026