UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM CO. LTD., ET AL.,<br> Plaintiffs,<br>    and<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD.,<br>JINKO SOLAR(VIETNAM) INDUSTRIES CO<br>LTD., ET AL.,<br>        Consolidated Plaintiffs,<br>    and<br><br>TRINA SOLAR ENERGY DEVELOPMENT CO.<br>LIMITED,<br>    LTD.        Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br>        Defendant,<br>    and<br><br>AMERICAN ALLIANCE FOR SOLAR<br>MANUFACTURING TRADE COMMITTEE,<br>        Defendant-Intervenor. | Consol. Court No. 25-0158 |

**CONSOLIDATED PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("USCIT R."), Plaintiff Boviet Solar Technology Co., Ltd. ("Boviet"), respectfully moves this Court for an order granting movants judgment on the agency record against Defendant, the United States (representing the U.S. Department of Commerce), including, but not limited to the following relief:

- Declaring that the Department's selection of the surrogate value to value glass is not supported by substantial evidence and is otherwise not in accordance with the law;

1

and

- Declaring that the Department's refusal to select Boviet as a voluntary respondent was not supported by substantial evidence and is otherwise not in accordance with the law; and

- Remanding to the Department to recalculate Consolidated Plaintiff's margin in accordance with the law.

WHEREFORE, for the reasons described in this Motion, Consolidated Plaintiff respectfully requests that this Court enter judgment in their favor.  A proposed order is attached for the Court's consideration.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*

C. Kevin Marshall
Henry J. Dickman
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com
*Co-Counsel to Boviet Solar Technology Co., Ltd.*

Date: April 6, 2026

2

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM CO. LTD., ET AL.,<br>    Plaintiffs,<br>  and<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD.,<br>JINKO SOLAR(VIETNAM) INDUSTRIES CO<br>LTD., ET AL.,<br>    Consolidated Plaintiffs,<br>  and<br><br>TRINA SOLAR ENERGY DEVELOPMENT CO.<br>LIMITED,<br> LTD.   Plaintiff-Intervenor,<br><br>  v.<br><br>UNITED STATES,<br>    Defendant,<br>  and<br><br>AMERICAN ALLIANCE FOR SOLAR<br>MANUFACTURING TRADE COMMITTEE,<br>    Defendant-Intervenor. | Consol. Court No. 25-0158 |

**ORDER**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade

("USCIT R."), Consolidated Plaintiff Boviet Solar Technology Co., Ltd., in support of its Rule

56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings had

herein, it is hereby

ORDERED that said motion is GRANTED, and it is further

ORDERED that this case is remanded to Department of Commerce with instructions that

the Department redetermine aspects of its investigation as instructed by this Court in its

accompanying slip opinion.

DATED: _____    _____
  New York, New York       Jennifer Choe-Groves, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM CO. LTD., ET AL.,<br>     Plaintiffs,<br>  and<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD.,<br>JINKO SOLAR(VIETNAM) INDUSTRIES CO<br>LTD., ET AL.,<br>     Consolidated Plaintiffs,<br>  and<br><br>TRINA SOLAR ENERGY DEVELOPMENT CO.<br>LIMITED,<br> LTD.    Plaintiff-Intervenor,<br><br> v.<br><br>UNITED STATES,<br>     Defendant,<br>  and<br><br>AMERICAN ALLIANCE FOR SOLAR<br>MANUFACTURING TRADE COMMITTEE,<br>     Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Consol. Court No. 25-0158 |

**CONSOLIDATED PLAINTIFF'S BOVIET SOLAR TECHNOLOGY CO., LTD.'S
RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

C. Kevin Marshall
Henry J. Dickman
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com
*Co-Counsel to Boviet Solar
Technology Co., Ltd.*

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*

Dated: April 6, 2026

**TABLE OF CONTENTS**

I.     **Rule 56.2 Statement** ...................................................................................1

     A.     **Administrative Determination Subject to Appeal** .........................1

     B.     **Issues Presented** .........................................................................1

II.    **Standards of Review** .................................................................................2

III.   **Commerce's Surrogate Value Selection for Glass is Not Supported by Substantial Evidence and is Otherwise Not in Accordance with the Law** ...................................4

     A.     **Commerce Improperly Removed the Malaysia Data from the Indonesian Glass Import Value** .................................................................5

     B.     **Alternatively, Commerce Should Have Relied Upon the PV-Insights Data to Value Glass** ..............................................................10

IV.   **Commerce Should Have Accepted Boviet as a Voluntary Respondent and Calculated a Margin for Boviet** ...........................................................17

V.    **Conclusion and Prayer for Relief** ...........................................................23

i

**TABLE OF AUTHORITIES**

**CASES**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316 (Fed. Cir. 2010) ..............14

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367 (Ct. Int'l Trade 2013) ........................................................................................................................ 21-22

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (2006)..............................3

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)..........................................2

*China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) ..............................................................................................................................7

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (2003) ...........................................................2, 11

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938)) ................................................2

*Consol. Bearings Co. v. United States*, 348 F.3d 997  (Fed. Cir. 2003). ........................................4

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983)...........................................2

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)...................................3, 17

*Grobest & I-Mei Indus. (Viet.) Co. v. United States*, 853 F. Supp. 2d 1353 (Ct. Int'l Trade 2012) ........................................................................................................................ 20-21

*Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006). ..............................................................................................................................3

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ........8

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ..................................12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................4

*Luoyang Bearing Factory v. United States*, 259 F. Supp. 2d 1357 (Ct. Int'l Trade 2003).............8

*Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (January 28, 2011) .............................................................................................................................8, 14

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)........................14

*Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ................................................................................................................11

*Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 59 F.

Supp. 2d 1354 (1999)......................................................................................................14

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).....................................4

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................2

**STATUTE**

19 U.S.C. § 1516a(b)(l)(A) ..............................................................................................4

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................................2

19 U.S.C. § 1673d (c)(1)(B) ...........................................................................................18

19 U.S.C. § 1677f-1 ........................................................................................................18

19 U.S.C. § 1677m.................................................................................................... 18-19

**ADMINISTRATIVE DECISIONS**

*Certain Glass Wine Bottles From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 76 (Dep't Comm. January 2, 2025).......................9

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2019–2020*, 86 Fed. Reg. 72,923 (December 23, 2021) ...........16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 1,046 (January 6, 2023) ...................16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2021–2022*, 89 Fed. Reg. 457 (January 4, 2024) ......................17

*Laminated Woven Sacks Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008) ........................................................................................................................15

*Notice of Final Determination of Sales at Less Than Fair Value: Barium Carbonate From the People's Republic of China*, 68 Fed. Reg. 46,577 (Dep't Commerce 2003) .............................8

## I.    Rule 56.2 Statement

Pursuant to Rule 56.2 (c)(1), Plaintiff Boviet Solar Technology Co., Ltd. ("Boviet"), hereby states the administrative decision subject to appeal and the issues of law presented:

### A.    Administrative Determinations Subject to Appeal

The U.S. Department of Commerce published the contested final determination in the Federal Register on April 25, 2025. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 26,786 (June 24, 2025) ("Order"); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 17,388 (Apr. 25, 2025) ("Final Determination") *incorporating* Issues and Decision Memorandum ("IDM")*,* **PR636**. Boviet also supports and incorporates by reference the arguments raised by JA Solar Vietnam Company Limited and Jinko Solar (Vietnam) Industries Company Limited in their R56.2 briefs.

### B.    Issues Presented

1.    Whether Commerce's glass surrogate value was supported by substantial evidence or in accordance with the law?

2.    Whether Commerce's decision not to select Boviet as a voluntary respondent was supported by substantial evidence or in accordance with the law?

## II.    Standards of Review

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law."[1]  Different standards of review are applicable to the issues in this case.

### A.  Substantial Evidence Standard for Non-Market Economy Cases

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."[3]  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"[4]

In cases involving non-market-economy ("NME") countries, although "the standard of review precludes the court from determining whether Department's choice of surrogate value was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."[5]  While the statute "'grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. §

---

[1] 19 U.S.C. § 1516a(b)(1)(B)(i).
[2] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).
[3] *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).
[4] *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).
[5] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).

1677b(c)]; to obtain the most accurate dumping margins possible.[6]  "'This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.'"[7]

The courts have elaborated on the meaning of "best available" in the NME normal value statute.  The *Dorbest* court wrote a seminal opinion summarizing the law:

> The term "best available" is one of comparison, i.e., the statute requires Commerce to select, from the information before it the best data for calculating an accurate dumping margin.  The term "best" means "excelling all others."  II Oxford English Dictionary 139 (2d ed. 1989); Webster's II new Riverside University Dictionary 168 (1988) ("{e}xceeding all others in excellence, achievement, or quality").

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (Ct. Int'l Trade 2006) (citing *Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006)).  The *Dorbest* Court thus concluded that "{o}n factual issues, the court's role 'is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  *Dorbest*, 462 F. Supp. 2d at 1269 (citations omitted).

According to *Dorbest*, "Commerce needs to justify its selection of data with a reasoned explanation."  *Id.* at 1269 (citation omitted).  The *Dorbest* Court further cautioned that "{i}n doing so, Commerce must 'conduct a fair comparison of the data sets on the record' with regard to its announced method or criteria."  *Id*. (citing *Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1313-14 (2006)).

---

[6] *Id. at* 365, n.12 (citations omitted).
[7] *Id.* (citations omitted).

### B. Arbitrary & Capricious Standard

This Court will hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted). Thus, when the administering agency's actions are internally inconsistent and self-contradictory, and the agency treats similarly situated parties differently or fails to consider an important aspect of a problem, the agency's decisions are arbitrary and capricious and subject to reversal.

### III. Commerce's Surrogate Value Selection for Glass is Not Supported by Substantial Evidence and is Otherwise Not in Accordance with the Law.

In the Final Determination, Commerce valued Respondents' glass inputs using Indonesian import data for HTS 7007.19.90.00. However, Commerce improperly removed Malaysian imports of glass into Indonesia from the surrogate value calculation due to supposed subsidization by the Government of Malaysia. This decision is contrary to Commerce practice

4

and unsupported by record evidence.  Commerce should have followed its normal surrogate methodology and relied upon the Indonesian import value for glass, *including* the Malaysian imports.  Alternatively, if excluding Malaysian imports was reasonable and supported by the record, then the PV-insights data, which is the most specific information on the record to value glass, constitutes the best available information to value this input.

A.    **Commerce Improperly Removed the Malaysia Data from the Indonesian Glass Import Value.**

While relying on the Indonesian imports under HTS 7007.19.90.00 to value glass, Commerce removed the Malaysia import data for this HTS claiming "record evidence reflects that Malaysia production thereof to be subsidized" and thus removing the data is consistent with its practice not to rely upon data it has "reason to believe or suspect" is subsidized.  Prelim. IDM at 7, **PR527**; IDM at 12, **PR636**.  However, this finding is not consistent with Commerce practice and the record does not support a finding of subsidization.

First, the "proven, hard facts" on this record that the Malaysian import data was tainted by subsidization, is anything but.  IDM at 17.  Commerce's finding that it has reason to believe or suspect the Indonesian glass import data from Malaysia is subsidized is based solely on the 2020 decision from the India Directorate General of Trade Remedies placing countervailing duties on glass from Malaysia.  Commerce claims this is "proven, hard facts" because it is a "final determination, not a preliminary determination." *Id*.  But this is a third country's (critically not Indonesia's) finding based on information and findings not even on this record.

The evidence on this record is not specific or objective that Malaysian exports of glass to Indonesia are subsidized.  Neither the United States nor Indonesia, the relevant countries at play in the surrogate values for this investigation, have found that Malaysian glass exports are subsidized.  The Indian investigation is disconnected from this U.S. investigation and

5

disconnected from imports into Indonesia.  The fact that the Indian government found Malaysian glass exported *to India* was subsidized *five years ago* is not "particular, specific, and objective evidence" that Malaysian glass exported to Indonesia in the POI was subsidized.  Indeed, the fact that India does not review subsidies from year to year, makes this all the more disconnected from this POI.  The Indian government made the subsidy decision in 2020 based on even older information and those rates remain in effect until 2025, when they will expire.  While it is true that the end of this five year period overlaps with the POI of this case (2023-2024), it is not based on any updated contemporaneous information or finding since the 2020 determination. There has been no review of whether Malaysian exports of glass to India were subsidized in 2023-2024 (the POI of this case).  The fact that one country finds an industry is subsidized also does not entail that another country, such as the United States or Indonesia, would find that the same industry is subsidized.  If that was the case, then we would see substantially overlapping countervailing duty orders across countries, but such is not the case.

Further, information from PV Insights corroborates that the Malaysian glass value into Indonesia is not artificially low—i.e. there is no objective evidence that the exports were actually subsidized.  The Malaysian import value into Indonesia closely mirrors the PV Insights solar glass prices for the POI for all countries/regions. The Malaysian import value was $0.57/kg, PV Insights has prices ranged lower than this with a non-China price of $0.46/kg.  JA Solar Final SVs (November 6, 2024) at Exhibit 2, **CR491-494 PR454-455.**  Even assuming it was reasonable to reject PV Insights as a surrogate value itself, as discussed further below, Commerce has found PV Insights is a reliable benchmark for solar glass in numerous reviews and thus by Commerce's own finding this source is reliable to at a minimum corroborate that the Malaysian price into Indonesia is not lower than world average prices or subsidized as shipped to

Indonesia.  The PV Insights Malaysian price even shows that the domestic Malaysian solar glass price was lower than the Malaysia export price into Indonesia of $0.57/kg—undermining Commerce's finding that Malaysian exports are subsidized.  No "particular, specific, and objective evidence" on this record supports a finding that Malaysian glass exports into Indonesia were subsidized.  *China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) (Finding the "'reason to believe or suspect' standard at issue here must be predicated on particular, specific, and objective evidence.").

Second, as evidenced by the lack of any citation to the same circumstance in its decision memos, Commerce has never rejected import values for a finding in a third country proceeding as it did in this investigation.  Accordingly, Commerce's statements that its finding in this case was consistent with past practice simply is not accurate.  Commerce merely cites the general principle that Commerce is to avoid prices that it has reason to believe are dumped or subsidized, but ignores its actual practice in this regard.  IDM at 17.  In fact, Commerce has always required a high threshold of evidence before rejecting import statistics for subsidization or distortion, and the facts of this investigation do not meet this threshold.

There is no U.S. finding that the Malaysian glass industry or exports are subsidized.  There is no Indonesian finding that the Malaysian glass industry or exports are subsidized. As Commerce explained in this investigation, Commerce *does exclude* prices under this standard for certain countries, such as India, Indonesia, Thailand, and the Republic of Korea (Korea), because Commerce determined that "these countries maintain broadly available, non-industry specific export subsidies" "based on the existence of these subsidy programs that were generally available to all exporters and producers in these countries at the time of the POR."  Prelim. IDM at 4.  But this is based on Commerce's own findings in its own countervailing investigations and

7

reviews. *Id*. at n.9 (citing to Commerce finding in Commerce countervailing reviews in Korea, Thailand, and Indonesia). Similarly, Commerce will exclude prices when the surrogate country has an antidumping order against a particular country for a particular HTS. But, this is a very particular, specific finding that is totally absent here. *See*, e.g., *Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (Ct. Int'l Trade 2011) (Based on specific, objective finding in Commerce's own proceedings and investigations that significant generally available subsidies were available in a supplier's country, such that all exports from that country were considered subsidized); *Luoyang Bearing Factory v. United States*, 259 F. Supp. 2d 1357 (Ct. Int'l Trade 2003) (Commerce declined to rely upon import prices from a supplier in a country that it had determined maintains generally available subsidies.) Indeed, Indonesia does not have an antidumping or countervailing duty order against Malaysia for the glass HTS.

Indeed, outside of these particular circumstances—i.e. Commerce making a specific finding of generally available export subsidies in the exporting country or Commerce finding a specific AD/CVD Order in the surrogate country against the exporting country and HTS—Commerce has declined to find import prices are subsidized or distorted. For example, Commerce declined to disregard imports as subsidized when based on a preliminary Commerce affirmative subsidy finding. *Notice of Final Determination of Sales at Less Than Fair Value: Barium Carbonate From the People's Republic of China*, 68 Fed. Reg. 46,577 (Dep't Commerce 2003) and accompanying IDM at Comment 1. Commerce also explained that "a decision to disregard prices from a particular country in determining a surrogate value for factor inputs has in the past been based on a reason to believe or suspect that exporters in that country may be subsidized. In such cases, we have relied on information generally available to the Department at the time. That information has typically been the result of final countervailing duty

determinations." *Id*.  In another case, Commerce declined to find import statistics were distorted even when numerous U.S. government agencies had reported that a country's import statistics are artificially inflated, finding it was not specific and objective evidence.  *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1357 (Ct. Int'l Trade 2019).

Even in considering surrogate financial statements, Commerce has required detailed findings before rejecting a financial statement for reason to believe or suspect they were subsidized.  Specifically, Commerce will only disregard a statement as subsidized if the statement shows actual receipt of the same exact subsidies that Commerce itself has found are countervailable in that country. *See*, e.g.  *Certain Glass Wine Bottles From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 76 (Dep't Comm. January 2, 2025) and accompanying IDM at (Rejecting petitioner's argument that a Bulgarian statement was subsidized because Commerce itself had not made a finding that the program was countervailable in Bulgaria).  Thus, this practice too does not support Commerce's approach in this investigation.

Commerce rejects these considerations, explaining that the circumstances of *Jiaxing Brother* and surrogate financial statements are different than here.  IDM at 19-20.  However, the point is that there is no situation that Commerce has made a similar finding of subsidization.  The examples raised by Boviet support that Commerce has required more specific findings before finding it has reason to believe or suspect that a surrogate value is subsidized.  No practice supports that the facts on this record—an Indian government finding that Malaysian imports of solar glass into India are subsidized—are "reason to believe or suspect" in this U.S. proceeding that Malaysian imports of glass into Indonesia are subsidized.

9

Further, we note that if this was to become Commerce's new consideration for subsidization, i.e. relying on third country CVD measures to find a country's exports to any country are subsidized, Commerce is opening the door to a new and burdensome practice. This would mean the interested parties and Commerce would need to search for all possible third country CVD measures of all inputs at issue in order to determine if imports to particular countries are potentially subsidized. There are easily 50 partner countries per HTS, meaning with numerous inputs, there are thousands of potential datasets to check. This is an unreasonable amount of work for all interested parties and Commerce, and would entail a significant change in normal surrogate valuation procedures in U.S. investigations and reviews. Commerce's normal methodology of only considering AD/CVD Orders in the actual surrogate country and U.S. is controlling and connected to the proceedings by particular specific evidence of subsidization or distortion.

Commerce has departed from its normal practice in disregarding the Malaysia export values of glass into Indonesia. Commerce cannot cite to a single precedent taking this approach; rather, it is contrary to Commerce's normal practice of requiring specific, particular findings of subsidization or distortion. The record does not establish a reason to believe or suspect that Malaysian glass exports into Indonesia during the POI were subsidized. Therefore, Commerce's decision to exclude the Malaysian glass imports into Indonesia is not supported by substantial evidence and is contrary to well-established practice.

## B.    Alternatively, Commerce Should Have Relied Upon the PV-Insights Data to Value Glass.

In the Final Determination, Commerce removed the Malaysian imports from the Indonesian glass import value. During the POI, Indonesia imported 250,868 kg of glass from Malaysia. Pet. Final SVs at Exhibit 3E, **PR444**. After removing this dataset, Indonesia only

imported 13,217 kilograms.  *Id*.  This is not a commercial quantity, as explained below.  If the Court upholds the removal of the Malaysian data from the Indonesian dataset, then it should find that the remaining Indonesian import value is still not the best available information on the record to value solar glass.  After removing the Malaysian import data, the resulting Indonesian surrogate value is non-commercial, aberrant, and not the most specific information on the record.  Instead, the record supports relying upon PV Insights as the best available information for the valuation of solar glass.

13,217 kg is not a commercial quantity.  *Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) (Where Commerce erred in failing to establish that the import value relied on was based on a statistically or commercially significant quantity).  A normal container load is 20,000 kg, which is a standard commercial unit.  The import quantity during the entire POI was less than a container load. Typically such small loads would be consolidated with other goods to maximize use of the container and at a premium for the "less than full load".  This fractional amount cannot reasonably be considered commercial.  This also cannot possibly sustain even a single hypothetical Indonesian solar panel manufacturer for any commercial production activity.  Indeed, JA Solar and Jinko purchased many times more of glass than this during POI. Jinko Sec D (August 30, 2024) at Exhibit D-5, **CR243 PR281**; JA Solar Sec D (August 30, 2024) at Exhibit D-6, **CR283 PR282**.

Although the Department is given discretion in selecting factors of production, that discretion is constrained by the underlying objective to calculate the most accurate dumping margins possible and "[t]his objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct.

11

Int'l Trade 2003).  Accordingly, relying on imports into Indonesia that could not be used in commercial production does not fulfill this objective.  *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (discussing that while Commerce does not have to perfectly duplicate the production experience of the Chinese manufacturer, Commerce should rely on the surrogate value that "most accurately represents the fair market value of [the respective input] in a hypothetical market-economy.").

The lack of commercial quantity in this pared down dataset is even more striking when considering it on a monthly basis by exporter:

| Quantity (KG) | Value (USD) | USD/KG | Exporter | Year | Month |
|---|---|---|---|---|---|
| 1 | 145 | $ 145.00 | Canada | 2023 | 10 |
| 1 | 14 | $ 14.00 | Czech Republic | 2024 | 3 |
| 1 | 55 | $ 55.00 | Finland | 2023 | 10 |
| 1 | 1069 | $ 1,069.00 | Finland | 2023 | 12 |
| 1 | 26 | $ 26.00 | France | 2023 | 10 |
| 1 | 333 | $ 333.00 | Slovenia | 2023 | 11 |
| 2 | 28 | $ 14.00 | Czech Republic | 2023 | 11 |
| 2 | 32 | $ 16.00 | Czech Republic | 2023 | 12 |
| 2 | 136 | $ 68.00 | Finland | 2024 | 2 |
| 2 | 5 | $ 2.50 | Poland | 2024 | 1 |
| 3 | 3064 | $ 1,021.33 | France | 2023 | 12 |
| 5 | 133 | $ 26.60 | Hong Kong | 2023 | 11 |
| 6 | 207 | $ 34.50 | Hong Kong | 2023 | 10 |
| 6 | 28 | $ 4.67 | Malta | 2023 | 12 |
| 8 | 1071 | $ 133.88 | Finland | 2024 | 1 |
| 8 | 356 | $ 44.50 | Hong Kong | 2023 | 12 |
| 9 | 2374 | $ 263.78 | Sweden | 2024 | 3 |
| 11 | 262 | $ 23.82 | Japan | 2024 | 2 |
| 14 | 324 | $ 23.14 | France | 2023 | 11 |
| 15 | 1058 | $ 70.53 | Finland | 2023 | 11 |
| 17 | 216 | $ 12.71 | Denmark | 2024 | 2 |
| 20 | 47 | $ 2.35 | Italy | 2023 | 12 |
| 21 | 470 | $ 22.38 | United States | 2023 | 12 |
| 26 | 2748 | $ 105.69 | Japan | 2024 | 3 |
| 29 | 384 | $ 13.24 | Japan | 2023 | 12 |
| 31 | 957 | $ 30.87 | United States | 2024 | 3 |
| 33 | 605 | $ 18.33 | Japan | 2024 | 1 |
| 45 | 3587 | $ 79.71 | United States | 2024 | 2 |
| 46 | 1137 | $ 24.72 | United States | 2023 | 10 |
| 55 | 3672 | $ 66.76 | United States | 2024 | 1 |
| 57 | 1904 | $ 33.40 | United States | 2023 | 11 |
| 80 | 444 | $ 5.55 | Singapore | 2024 | 2 |
| 113 | 791 | $ 7.00 | Singapore | 2024 | 3 |
| 122 | 786 | $ 6.44 | Hong Kong | 2024 | 2 |
| 167 | 960 | $ 5.75 | Hong Kong | 2024 | 1 |
| 173 | 2621 | $ 15.15 | Japan | 2023 | 11 |
| 221 | 3521 | $ 15.93 | Singapore | 2024 | 1 |
| 466 | 3445 | $ 7.39 | Hong Kong | 2024 | 3 |
| 927 | 13874 | $ 14.97 | Singapore | 2023 | 11 |
| 10,469.00 | 11238 | $ 1.07 | United Kingdom | 2024 | 1 |

Imports of a mere 1 or 2 kilogram or even a couple hundred kg cannot be glass that is being used in the commercial solar industry. The widely varying import values associated with these tiny quantities also underscore the fact that this is not a commercial surrogate value for a hypothetical solar manufacturer in Indonesia. The resulting AUV for this pared down dataset is also aberrant compared to the other glass values on the record. The AUV into Indonesia after excluding Malaysia is $4.85. The PV Insights data contains six different country or region prices, all ranging under $0.50/kg, i.e., the Indonesian value is approximately 1,000% higher.

13

*Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354, 1360 (Ct. Int'l Trade 1999) (Commerce's "administrative practice with respect to aberrational data is 'to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries.'"); *Peer Bearing Company-Changshan v. United States*, 752 F. Supp. 2d 1353 (Ct. Int'l Trade 2011) (finding that substantial evidence did not support relying upon a value 60% higher than other record sources, including countries that were less economically comparable).

As such, Commerce's reliance on the Indonesian glass import value after removing the Malaysian imports is not reasonable and cannot constitute the best available information. The resulting value is not based on a commercial quantity and is aberrantly high. We submit that the non-China, Thailand, or Malaysia PV Insights prices are each reliable alternative surrogate values for this input.

PV Insights is specific to the precise solar glass used by Respondents. Commerce does not dispute this. IDM at Comment 1; *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than other criteria); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of "product-specific data" as "best available information"). Instead, in this particular case Commerce maintains it cannot rely upon PV Insights because it is not publicly available and because the source includes values from non-economically comparable countries. IDM at 14-15. However, PV Insights is publicly available and Commerce has relied on a similar world price for surrogate values when it was the best available information.

14

PV Insights is publicly available according to Commerce's practice.  If a surrogate value can be obtained for a fee by anyone, this fulfills the Department's requirements and policy interests in relying on publicly available information.  The Department has explained that "[w]e consider the appropriate indication of public availability to be whether any entity can obtain the data. At the very least, public availability should enable any interested party to obtain the same information." *Laminated Woven Sacks Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008) and accompanying IDM at 75.  Indeed, the import data Commerce relied upon in this investigation and every review and investigation is from a subscription purchased for a fee. However, due to the terms of the subscription, JA Solar could not make the entire PV Insights dataset public, but this does not change the fact that it is publicly available.  Further, JA Solar did make the POI average public, and thus Commerce could still make the surrogate value itself public in its decision.  Commerce has relied upon this dataset and others in the same manner in the countervailing reviews, relying on the public average despite the detailed underlying data being confidential due to the subscription terms.  Thus, PV Insights fulfills Commerce's practice of relying on public surrogate values.

Next, with respect to the country coverage, PV Insights reports solar glass pricing separately for non-China, China, Malaysia, Thailand, Vietnam, and Worldwide.  Thus, the Thailand and Malaysia prices at a minimum can be relied upon as they are not NME countries and the prices are not impacted by any Commerce's decision[8] regarding export subsidies in these

---

[8] Commerce has found that Thailand provides widespread generally available export subsidies such that it does not rely upon Thai export prices, but Commerce will rely on Thai import or domestic prices as surrogate values.  While we dispute Commerce's position in this investigation that Malaysia solar glass exports are subsidized as it is based on an Indian government finding, even that position by Commerce in this investigation does not entail that a Malaysian domestic or import price is subsidized.

15

countries, since PV Insights is not an export price.

Commerce could also rely on the non-China price, consistent with Commerce's practice in all of the China solar reviews with Bloomberg.  Commerce has consistently relied upon an international price, specifically a "non-China" price, from a benchmarking source, Bloomberg, to value solar cells, solar wafers, and/or solar blocks in antidumping reviews for many years. Commerce found it was reliable and most specific to the input:

> Consistent with each of the prior segments of this proceeding, we valued monocrystalline blocks and wafers using international prices from Bloomberg New Energy Finance.  As explained below, there are a number of factors, which when considered together, weigh in favor of valuing polysilicon inputs using international prices, rather than Malaysian import prices.
> Wafers that are used to produce solar cells are primarily made of polysilicon. Solar grade polysilicon has purity levels as high as 99.999999 percent, while electronics grade silicon has even higher purity levels.  Malaysian imports related to polysilicon – HTS 2804.61 (silicon, containing by weight not less than 99.99 percent of silicon) – can include silicon with a purity level as low as 99.99 percent. In contrast, the international prices on the record are specific to the solar-grade wafers used by Jinko and Risen to produce subject merchandise. Differences in silicon purity levels can result in significant price differences. Given this unique combination of facts, we preliminarily find, for purposes of this administrative review, and consistent with all prior segments of this proceeding, that it is appropriate to value polysilicon, including wafers, using international wafer prices.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2019–2020*, 86 Fed. Reg. 72,923 (December 23, 2021) and Prelim. IDM at 25 (unchanged in final); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 1,046 (January 6, 2023)

16

and Prelim. IDM at 26 ("Consistent with each of the prior segments of this proceeding, we valued solar cells and wafers using international prices from *Bloomberg New Energy Finance.*")(unchanged in final); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2021–2022*, 89 Fed. Reg. 457 (January 4, 2024) and Prelim. IDM at 27 (relying on BNEF to value solar cells) (unchanged in final). Thus, relying on PV Insights non-China prices for solar glass follows the same precedent as relying on Bloomberg non-China prices for other solar inputs. According to Commerce itself, an international benchmarking source for particular solar inputs is a reliable surrogate value source and even the best available information.

In sum, the Indonesian import value of glass after removing Malaysia is not reliable. Commerce was required to properly consider which glass surrogate value constitutes the best available information. The only rational decision on this record, if excluding Malaysian data into Indonesia, is that the PV Insights is the best available information: it is most specific to solar glass, reliable, publicly available, and otherwise best fulfills Commerce's requirements for a surrogate value. *Dorbest*, 462 F. Supp. 2d at 1268.

## IV.    Commerce Should Have Selected Boviet as a Voluntary Respondent and Calculated an Individual margin for Boviet.

On June 13, 2024, Boviet requested that Commerce select Boviet as a mandatory respondent. Boviet Resp. Selection Cmts (June 13, 2024), **CR54 PR137**. On July 3, 2024, Commerce only selected the top two exporters of subject merchandise as respondents, JA Solar and Jinko. Dep't Resp. Selection Memo (July 3, 2024), **CR168 PR204**. Commerce explained that it only has "the resources to examine individually two mandatory respondents." *Id*. at 5. On

July 12, 2024, Boviet submitted a request to be a voluntary respondent.  Boviet was the first and only company to request to be a voluntary respondent, and was also the next largest exporter of subject merchandise after the selected mandatory respondents.  *See* Boviet Request (July 12, 2024), **PR216**.  Boviet also timely filed all questionnaire responses.  *See* Boviet Section A (August 9, 2024), **PR253**; Boviet Section C (August 30, 2024), **PR285**; Boviet Section D (September 3, 2024), **PR289**; Boviet Double Remedy (October 31, 2024), **PR420**.  Boviet also filed surrogate values and ensured the record contained all surrogate values to calculate a margin for Boviet.  Boviet Prelim. SVs (October 11, 2024), **PR250**.  Commerce agreed that Boviet timely submitted voluntary questionnaire responses.  Prelim. IDM at 16.

The antidumping duty law requires the Department to establish an antidumping duty margin rate for each exporter.  19 U.S.C. § 1673d(c)(1)(B)(i) specifically requires that:  "The administering authority shall (I) determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and (II) determine, in accordance with paragraph (5), the estimated all-others rate for all exporters and producers not individually investigated…."

The Department's obligation to investigate each known exporter is tempered by 19 U.S.C. § 1677f-1 when the number of exporters subject to review may be too "large" and burdensome for individual review of all of them.  The statute provides further that the Department may limit its examination to: (1) a statistically valid sample of exporters, producers or types of products; or (2) "exporters and producers accounting for the largest volume of the subject merchandise . . . that can reasonably be examined."  19 U.S.C. § 1677f-1(c)(2).  Commerce explained that there was a large amount of exporters and it was reasonable to limit review.  IDM at Comment 28.  Boviet does not dispute this finding.

18

However, even if mandatory respondents are limited, the Department has a separate legal obligation to subject "voluntary" respondents to individual review under 19 U.S.C. § 1677m (treatment of voluntary respondents). 19 U.S.C. § 1677m holds that even when the Department has limited the number of respondents examined, the Department shall establish an individual margin for any exporter or producer not initially examined if the company timely files questionnaire responses and "the number of exporters or producers subject to the investigation or review is not so large that any additional individual examination of such exporters or producers would be unduly burdensome to the administering authority and inhibit the timely completion of the investigation or review." *Id*.

In considering whether individual examination would be unduly burdensome, the statute holds that the Department may consider the following:

> (A) The complexity of the issues or information presented in the proceeding, including questionnaires and any responses thereto.
> (B) Any prior experience of the administering authority in the same or similar proceeding.
> (C) The total number of investigations under part I or II and reviews under section 1675 of this title being conducted by the administering authority as of the date of the determination.
> (D) Such other factors relating to the timely completion of each such investigation and review as the administering authority considers appropriate.

19 U.S.C. § 1677m(a)(2).

The statute provides Commerce with flexibility to select respondents but nonetheless Commerce cannot address the voluntary respondent statute in such a way as to render it a nullity. Commerce stated that it analyzed the statutory examples for not selecting a voluntary respondent. However, the analysis was minimal and conclusory in the Preliminary Determination. Prelim. IDM at 16. Likewise in the Final Determination, Commerce added very little explanation. IDM

19

at Comment 28.  The record facts, even in light of these reasons, do not amount to a reasonable decision that reviewing Boviet would have been unduly burdensome.

In the Preliminary Determination, Commerce referred to "the volume and complexity of the information" without explaining any particularities of this supposed complexity.  Prelim. IDM at 16.  In the Final Determination, Commerce generally stated that it is complex to calculate a margin and "novel issues may arise."  IDM at Comment 28.  These are general facts true of any review or investigation, such that if these were adequate reasons to reject a voluntary respondent, then no voluntary respondent would *ever* be selected.  Indeed, that has generally been the situation in the last fifteen years of practice.

Further, Boviet had argued that while this is an investigation, the product is not at all new to Commerce.  At the time of this investigation, Commerce was in the twelfth review of the China Order of the precise products: solar cells and panels.  In addition, Commerce has reviewed Boviet before.  Boviet was a mandatory respondent in the recent antidumping circumvention inquiry of Vietnam under the China Order.  While a circumvention investigation is not the same as a normal antidumping investigation, the inquiries substantially overlap.  Commerce examined, for example, Boviet's affiliations.  Commerce examined Boviet's production process. Commerce calculated the normal value of Boviet's production, comparing Chinese-added value to Vietnamese-added value and sales value.  Commerce conducted a value and sales reconciliation for Boviet.  Commerce verified Boviet.  Thus, Commerce was very familiar with not only this product, but with the very company, Boviet, requesting individual review of the same product as a voluntary respondent in the antidumping duty investigation.  Commerce casually dismissed these close parallels, stating that calculating a margin is always a significant

20

amount of work, even if Commerce is familiar with the company or product.  IDM at Comment 28.

With respect to the volume of information and complexity, Commerce also stated "supporting documentation for this case, an especially complex one given the numerous FOPs, covered over a thousand pages, resulting in hundreds of pages of briefs identifying over 30 distinct issues."  *Id*.  As explained above, the need for more rounds of questionnaires would reasonably have been significantly lessened due to Commerce's familiarity with Boviet's production in a very recent time period to this investigation.  Moreover, Commerce only issued one supplemental questionnaire each to JA Solar and Jinko during this investigation.  JA Solar Section ACD Supplemental (October 3, 2024); Jinko Section ACD Supplemental (October 10, 2024).  There were in fact not "multiple rounds of supplemental questionnaires."  Further, these two companies were not even investigated in the recent Vietnam circumvention inquiry, so Commerce was less familiar with these companies compared to Boviet and there reasonably would have been less need for supplemental questions.

Indeed, the "30 distinct issues" in the IDM were primarily surrogate value issues that would have been common to all mandatory respondents—i.e. did not require unique consideration by including Boviet.  Further Commerce had already determined a significant amount of surrogate values applicable to Boviet in the circumvention proceeding, which generally do not change from proceeding to proceeding.

Lastly, Commerce references the deadlines in the investigation and the number of investigations generally before Commerce as to why it would be unduly burdensome to review Boviet.  The Court of International Trade has been critical of the Department relying on other caseload to decline to examine respondents.  Specifically, the Court has found that "the usual

21

burden of conducting a thorough review" is insufficient to decline to review a voluntary respondent. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367, 1371 (Ct. Int'l Trade 2013), *discussing Grobest & I-Mei Indus. (Viet.) Co. v. United States*, 853 F. Supp. 2d 1353, 1362-65 (Ct. Int'l Trade 2012) ("When Commerce can show that the burden of reviewing a voluntary respondent would exceed that presented in the typical antidumping or countervailing duty review, the court will not second guess Commerce's decision on how to allocate its resources."). Indeed, Commerce always has many investigations and reviews, such that these facts are present in any case. To allow this reality to justify refusing to review a voluntary respondent would nullify any meaning to the statutory opportunity to such voluntary respondents.

Accordingly, the Department's explanation as to why it could not examine a voluntary respondent was not supported by substantial evidence. Moreover, essentially, Commerce's interpretation of the voluntary respondent statute rendered it a nullity in this case. Commerce should have individually examined Boviet as a voluntary respondent and should have calculated a margin based upon its submissions and lawfully selected surrogate values.

22

**V.     Conclusion and Prayer for Relief**

In light of the foregoing, Commerce's *Final Determination* was not supported by substantial evidence or in accordance with the law. Consolidated Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*

C. Kevin Marshall
Henry J. Dickman
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com
*Co-Counsel to Boviet Solar Technology Co., Ltd.*

Date: April 6, 2026

23

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **6,264** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**Inter-Global Trade Law Group**

24