**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| JA SOLAR USA INC., JA SOLAR VIETNAM CO. LTD, JA SOLAR PV VIETNAM CO. LTD, <br><br> Plaintiffs, <br><br> BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED, JINKOSOLAR (U.S.) INC., JINKO SOLAR (U.S.) INDUSTRIES INC., <br><br> Consolidated Plaintiffs, <br><br> TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> AMIERCAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Court No. 25-00158 |

**ORDER**

Upon consideration of the plaintiffs' Rule 56.2 motions for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.

Dated: _____                    _____

New York, New York                                        JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JA SOLAR USA INC., JA SOLAR VIETNAM CO. LTD, JA SOLAR PV VIETNAM CO. LTD, <br><br> Plaintiffs, <br><br> BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED, JINKOSOLAR (U.S.) INC., JINKO SOLAR (U.S.) INDUSTRIES INC., <br><br> Consolidated Plaintiffs, <br><br> TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> AMIERCAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Court No. 25-00158 |

**DEFENDANT'S RESPONSE TO THE MOTIONS FOR
JUDGMENT ON THE AGENCY RECORD FILED BY PLAINTIFFS,
<u>CONSOLIDATED PLAINTIFFS, AND THE PLAINTIFF-INTERVENOR</u>**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

COLLIN T. MATHIAS
JULIUS A. HALSTEAD
Trial Attorneys
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0315
collin.t.mathias@usdoj.gov

OF COUNSEL:

FEE PAUWELS
Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
United States Department of Commerce

August 7, 2026

*Attorneys for Defendant United States*

# TABLE OF CONTENTS

**PAGE**

DEFENDANT'S RESPONSE TO THE MOTIONS FOR  JUDGMENT ON THE AGENCY RECORD FILED BY PLAINTIFFS, CONSOLIDATED PLAINTIFFS, AND THE PLAINTIFF-INTERVENOR .................................................................................................. 1

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    Administrative Determination Under Review ....................................... 2

    II.    Issues Presented For Review ................................................................ 3

STATEMENT OF FACTS ......................................................................................... 3

    I.    Initiation of Less-Than-Fair-Value Investigation and Surrogate Value Comments 3

    II.    Preliminary Determination..................................................................... 5

    III.    Final Determination .............................................................................. 6

SUMMARY OF THE ARGUMENT .......................................................................... 8

ARGUMENT ............................................................................................................. 9

    I.    Standard of Review................................................................................ 9

    II.    Non-Market Economy Legal Framework............................................. 10

        A. Surrogate Country Selection........................................................... 11

        B. Selection of Surrogate Values for Factors of Production ............... 12

    III.    Commerce's Surrogate Value Selections Are Supported by Substantial Evidence ................................................................................................. 14

        A. Commerce Selected the Indonesian AUV as the Surrogate Value for Solar Glass Because It Was the Best Available Information ................................... 15

            1. Commerce's Decision Not to Rely on PVInsights Data Was Reasonable and Supported by Substantial Evidence .......................... 17

                a. The PVInsihgts Data Did Not Pertain to Countries at a Comparable Level of Economic Development as Vietnam that Are Significant Producers of Subject Merchandise ........................... 18

i

b. Commerce Reasonably Determined that the PVInsights Data Was Not Publicly Available............................................................. 21

2. Commerce Reasonably Found That Indonesian AUV Data Were The Best Available Information on the Record to Value Solar Glass……24

a. Commerce's Decision to Exclude Malaysian Import Data Was Reasonable and Supported by Substantial Evidence .......................... 25

b. Commerce Reasonably Selected Indonesian AUV Data with Malaysian Imports Excluded as the Best Available Information ....... 29

B. Substantial Evidence Supports Commerce's Selection of Indonesian Import Data as the Surrogate Values of Polysilicon and Wafers ................................ 37

1. Commerce's Finding that Indonesian Import Data Represents the Best Available Information on the Record for Valuing Polysilicon and Polysilicon Wafers Is Supported by Substantial Evidence ................. 39

2. Commerce Reasonably Selected Indonesian Import Data Over Bloomberg Data to Value Polysilicon and Polysilicon Wafers ........... 41

IV.    Commerce Reasonably Selected Satnusa's Financial Statement to Value Surrogate Financial Ratios ..................................................................................... 45

A. Commerce Reasonably Concluded that Satnusa Is a Producer of Comparable Merchandise .................................................................................................... 47

B. Record Evidence Supports Commerce's Determination that There Was No Reason to Believe or Suspect that Satnusa Received Countervailable Subsidies ............................................................................................... 49

C. Commerce's Decision Not to Rely on Jembo's Financial Statement Was Reasonable and Supported by Substantial Evidence ..................................... 51

V.    Commerce Reasonably Declined to Individually Examine Boviet as a Voluntary Respondent in Accordance with 19 U.S.C. § 1677m(a) ...................................... 52

A. Legal Framework for Selection of Voluntary Respondents ........................... 52

B. Commerce Reasonably Exercised Discretion in Declining to Review Boviet ............................................................................................. 54

CONCLUSION............................................................................................................. 59

...

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
618 F.3d 1316 (Fed. Cir. 2010) ................................................ 13

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
925 F. Supp. 2d 1367 (Ct. Int'l Trade 2013) ................................ 58, 59

*Albemarle Corp. & Subsidiaries v. United States*,
821 F.3d 1345 (Fed. Cir. 2016) ................................................ 53

*Ancientree Cabinet Co. v. United States*,
532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021) .......................... 29, 30, 32

*Baoding Mantong Fine Chem. Co. v. United States*,
222 F. Supp. 3d 1231 (Ct. Int'l Trade 2017) ...................... 30, 31, 32, 33

*Best Mattresses International Co. Ltd. v. United States*,
622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ................................ 36

*Bio-Lab, Inc. v. United States*,
433 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ................................ 48

*Calgon Carbon Corporation v. United States*,
443 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ................................ 26

*Canadian Solar International Limited v. United States*,
378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) ................................ 42

*Catfish Farmers of Am. v. United States*,
641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ................................ 14

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ................................................ 20

*Coal. for Fair Trade in Hardwood Plywood v. United States*,
610 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) ................................ 14

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ................................................ 9

iii

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ............................................................................................... 10, 48

*Diamond Sawblades Manufacturers' Coalition v. United States*,
219 F. Supp. 3d 1368 (Ct. Int'l Trade 2017) ............................................................. 40

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010) ........................................................................... 19, 41

*Ellwood City Forge Company v. United States*,
582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022) ....................................................... 48, 49

*FMC Corp. v. United States*,
27 CIT 240 (Ct. Int'l Trade 2003) ............................................................................ 47

*FMC Corp. v. United States*,
87 F. Appx. 753 (Fed. Cir. 2004) .............................................................................. 47

*Fujian Lianfu Forestry Co., Ltd. v. United States*,
638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009) ............................................................. 11

*Fujian Yinfeng Imp & Exp Trading Co., Ltd. v. United States*,
607 F. Supp. 3d 1301 (Ct. Int'l Trade 2022) ....................................................... 18, 19

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) .................................................................................... 9

*Goldlink Indus. Co. v. United States*,
431 F. Supp.2d 1323 (Ct. Int'l Trade 2006) ........................................................ 10, 21

*Grobest & I-Mei Indus. Vietnam Co. v. United States*,
853 F. Supp. 2d 1352 (Ct. Int'l Trade 2012) ....................................................... 58, 59

*Guangdong Chems. Imp. & Exp. v. United States*,
460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006) ............................................................ 13

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,
28 CIT 1185 (2004) .................................................................................................. 14

*Heze Huayi Chemical Co., Ltd. v. United States*,
532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) ............................................................ 39

*Home Meridian Int'l, Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014) ................................................................................ 13

iv

*Husteel Co. Ltd. v. United States*,
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) .......................................................... 54, 55, 57, 58

*Hyundai Steel Co. v. United States*,
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) .............................................................. 44

*Jacobi Carbons AB v. United States*,
    422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ............................................................... 37

*Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*,
    322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .............................................................. 59

*Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*,
    698 F. Supp. 3d 1277 (Ct. Int'l Trade 2024) .............................................................. 36

*Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*,
    396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019) .......................................................... 23, 25, 29, 51

*Jiaxing Bro. Fastener Co. v. United States*,
    11 F. Supp. 3d 1326 ................................................................................................ 13, 40

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) ........................................................................... passim

*Jiaxing Brother Fastener Co., Ltd. v. United States*,
    428 F. Supp. 3d 1364 (Ct. Int'l Trade 2020) .............................................................. 20

*Longkou Haimeng Machinery Co., Ltd. v. United States*,
    581 F. Supp. 2d 1344 (Ct. Int'l Trade 2008) .............................................................. 57

*Loper Bright Enteprises. v. Raimondo*,
    603 U.S. 369 (2024) ................................................................................................. 20

*Luoyang Bearing Factory v. United States*,
    288 F. Supp. 2d 1369 (Ct. Int'l Trade 2003) .............................................................. 26

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ..................................................................................... 9

*Mittal Steel Galati S.A. v. United States*,
    502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007) .............................................................. 21

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) .......................................................................... passim

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) ........................................................................... 13

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ........................................................................... 10

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) ............................................................................. 44

*Pirelli Tyre Co., Ltd. v. United States*,
    128 F.4th 1265 (Fed. Cir. 2025) .......................................................................... 51

*Qingdao Qihang Tyre Co., Ltd. v. United States*,
    308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ....................................................... 57

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) .......................................................... 13, 38, 41, 55

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ..................................................................... passim

*Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*,
    59 F. Supp. 2d 1354 (Ct. Int'l Trade 1999) ......................................................... 33

*Shenzhen Xinboda Industrial Co. v. United States*,
    279 F. Supp. 3d 1265 (Ct. Int'l Trade 2017) ................................................... 27, 28

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*,
    494 F. Supp. 3d 1347 (Ct. Int'l Trade 2021) ................................................... 25, 49

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*,
    976 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ....................................................... 50

*Sichuan Changhong Elec. Co. v. United States*,
    460 F. Supp. 2d 1338 (Ct. Int'l Trade 2006) ....................................................... 29

*SolarWorld Americas, Inc. v. United States*,
    962 F.3d 1351 (Fed. Cir. 2020) ........................................................................... 30

*Tianjin Magnesium International Co., Ltd. v. United States*,
    823 F. Supp. 3d 1350 (Ct. Int'l Trade 2026) ....................................................... 37

*Taian Ziyang Food Co. v. United States*,
    783 F. Supp. 3d 1292 (Ct. Int'l Trade 2011) ....................................................... 19

*Timken Co. v. United States*,
  699 F. Supp. 300 (Ct. Int'l Trade 1988) ................................................................ 10

*Torrington v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995) ............................................................................ 57

*Tri Union Frozen Prod., Inc. v. United States*,
  163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) .................................................. 15, 56

*Trust Chem Co. Ltd. v. United States*,
  791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) .................................................... 30

*United Steel & Fasteners v. United States*,
  469 F. Supp. 3d 1390 (Ct. Int'l Trade 2020) .................................................... 19

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) .............................................................................................. 9

*Vulcan Threaded Products Inc. v. United States*,
  311 F. Supp. 3d 1357 (Ct. Int'l Trade 2018) .................................................. 20, 42

*Weishan Hongda Aquatic Food Co., Ltd. v. United States*,
  917 F.3d 1353 (Fed. Cir. 2019) ............................................................................ 25

*Xinjiamei Furniture (Zhangzhou) Co., Ltd v. United States*,
  37 CIT 308 (2013) .......................................................................................... 31, 33

*Yantai Xinke Steel Structure Co., Ltd. v. United States*,
  No. 10-00240, 2014 WL 1387529  (Ct. Int'l Trade Apr. 9, 2014) ............................ 51

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) ........................................................................ 14, 20

**Statutes**

19 U.S.C. §1677f-1(c)(2) ...................................................................................... 53

19 U.S.C. § 1673 .................................................................................................. 10

19 U.S.C. § 1677b(c) ...................................................................................... passim

19 U.S.C. § 1677m(a) ..................................................................................... passim

19 U.S.C. § 3512(d) .............................................................................................. 56

**Regulations**

19 C.F.R. § 351.105 .......................................................................................................... 21, 22

19 C.F.R. § 351.109(h)............................................................................................................... 53

19 C.F.R. § 351.408(c)........................................................................................................ passim

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JA SOLAR USA INC., JA SOLAR VIETNAM CO. LTD, JA SOLAR PV VIETNAM CO. LTD, <br><br> Plaintiffs, <br><br> BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED, JINKOSOLAR (U.S.) INC., JINKO SOLAR (U.S.) INDUSTRIES INC., <br><br> Consolidated Plaintiffs, <br><br> TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> AMIERCAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Court No. 25-00158 |

**DEFENDANT'S RESPONSE TO THE MOTIONS FOR
JUDGMENT ON THE AGENCY RECORD FILED BY PLAINTIFFS,
<u>CONSOLIDATED PLAINTIFFS, AND THE PLAINTIFF-INTERVENOR</u>**

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully

responds to the motions for judgment on the agency record filed by the following parties:  (1)

plaintiffs, JA Solar USA Inc., JA Solar Vietnam Co. Ltd., and JA Solar PV Vietnam Co. Ltd.

1

(collectively, JA Solar), *see* ECF Nos. 49, 50 (JA Solar Br.); (2) consolidated plaintiff Boviet

Solar Technology Co., Ltd. (Boviet Solar), *see* ECF No. 53 (Boviet Br.); (3) consolidated

plaintiffs Jinko Solar (Vietnam) Industries Company Limited, Jinkosolar (U.S.) Inc., and Jinko

Solar (U.S.) Industries Inc. (collectively, Jinko), *see* ECF Nos. 47, 48 (Jinko Br.); and (4)

plaintiff-intervenor Trina Solar Energy Development Company Limited (Trina Solar), *see* ECF

No. 52 (Trina Solar Br.) (collectively, Plaintiffs).

Plaintiffs challenge certain aspects of the U.S. Department of Commerce's (Commerce)

final affirmative determination in the less-than-fair-value (LTFV) investigation of crystalline

silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the Socialist

Republic of Vietnam (Vietnam).  For the reasons explained below, the Court should sustain the

final determination as supported by substantial evidence and otherwise in accordance with law,

deny plaintiffs' motions, and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.    Administrative Determination Under Review**

Plaintiffs challenge certain aspects of Commerce's final determination in the antidumping

investigation of solar cells from Vietnam.  *See Crystalline Silicon Photovoltaic Cells, Whether or

Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative

Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical

Circumstances, in Part*, 90 Fed. Reg. 17,388 (Dep't of Commerce Apr. 25, 2025) (Final

Determination), ECF No. 30-4, and accompanying Issues and Decision Memorandum (IDM),

ECF No. 30-5.  The period of investigation (POI) is October 1, 2023, through March 31, 2024.

**II.     Issues Presented For Review**

1.  Whether Commerce's selection of Indonesian average unit value (AUV) data exclusive of Malaysian imports as the surrogate value for solar glass is supported by substantial evidence and in accordance with law.

2.  Whether Commerce's determination that Indonesian Harmonized Tariff Schedule (HTS) data constitutes the best available information over Bloomberg market data for the purpose of valuing polysilicon and wafers is supported by substantial evidence and in accordance with law.

3.  Whether Commerce's surrogate financial ratio analysis, including the use of financial data from PT Sat Nusapersada Satnusa (Satnusa), is supported by substantial evidence and in accordance with law.

4.  Whether Commerce's finding that it was not practicable for the agency to examine Boviet Solar as a voluntary respondent is in accordance with law.[1]

**STATEMENT OF FACTS**[2]

**I.     Initiation of Less-Than-Fair-Value Investigation and Surrogate Value Comments**

On April 24, 2024, Commerce received an antidumping duty (AD) petition concerning imports of solar cells from Vietnam from American Alliance for Solar Manufacturing Trade Committee, a coalition of domestic producers of solar cells and modules (collectively, the

---

[1]  Plaintiff-intervenor Trina Solar also asserts that "{i}f Commerce recalculates the {antidumping} rate assigned to JA Solar and/or Jinko as a result of this litigation," Commerce should recalculate the separate rate.  Trina Solar Br. at 2.  We agree that it may be appropriate for Commerce to reconsider the rate for separate rate applicants if either mandatory respondents' rate changes.

[2]  To avoid repetition, the relevant facts pertaining to individual issues appear below in the argument section.

3

petitioner).  *See* Petition (April 24, 2024) (P.R. 1-9, C.R. 1-10).  On May 14, 2024, Commerce

initiated the AD investigation on solar cells from Vietnam.  *See Crystalline Silicon Photovoltaic*

*Cells, Whether or Not Assembled Into Modules, from Cambodia, Malaysia, Thailand, and the*

*Socialist Republic of Vietnam: Petitions for the Imposition of Antidumping and Countervailing*

*Duties*, 89 Fed. Reg. 43,809 (May 20, 2024) (P.R. 80).  On July 3, 2024, Commerce selected JA

Solar and Jinko as mandatory respondents in the investigation.  *See* Respondent Selection, (July

3, 2024) (P.R. 204, C.R. 168).  On July 5, 2024, Commerce issued its standard non-market

economy questionnaire to Jinko and JA Solar.  *See* Initial Questionnaire to JA Solar, (July 5,

2024) (P.R. 205); Initial Questionnaire to Jinko, (July 5, 2024) (P.R. 209).  On July 12, 2024,

Boviet Solar requested to be selected as a voluntary respondent.  *See* Boviet Solar's Request for

Voluntary Respondent Status, (July 12, 2024) (P.R. 216).  Both JA Solar and Jinko timely

responded to Commerce's initial questionnaire, *see* Jinko Initial Questionnaire Response, (Aug.

9, 2024) (P.R. 245-248); JA Solar Initial Questionnaire Response, (Aug. 9, 2024) (P.R. 249-251).

On September 9, 2024, Commerce invited interested parties to submit comments and

factual information regarding surrogate country selection and surrogate value (SV) data, and on

September 12, 2024, Commerce placed on the record the list of potential surrogate countries for

parties to comment on.  *See* Commerce's Surrogate Country List, (September 9, 2024) (P.R.

292); Commerce Letter Revising Deadlines for Surrogate Country and SV Responses,

(September 12, 2024) (P.R. 300).  Commerce identified the following as potential surrogate

countries:  Indonesia, Jordan, Philippines, Egypt, Morocco, and Sri Lanka.  *See* Revised

Deadline for Surrogate Country and SV Responses at Attachment 1 (P.R. 300).  From September

through November 2024, interested parties submitted comments regarding surrogate country

selection and placed surrogate value data on the record for valuing factors of production.  *See*

4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Postponement of Final Determination and Extension of Provisional Measures*, 89 Fed. Reg. 96,219 (Dep't of Commerce Dec. 4, 2024) (preliminary determination) (P.R. 545) and accompanying Preliminary Decision Memorandum (PDM) at 5-6 (P.R. 527).

## II.    Preliminary Determination

In December 2024, Commerce released the preliminary determination, preliminarily finding that solar cells from Vietnam are being sold for LTFV in the United States. *See Preliminary Determination* at 1 (P.R. 545). Vietnam is a non-market economy (NME) country. As a result, Commerce does not use prices in Vietnam to determine normal value, but instead determines normal value based on surrogate values from economically comparable market economy (ME) countries that are significant producers of comparable merchandise. 19 U.S.C. § 1677b(c)(4).

With respect to surrogate value selection, Commerce preliminarily selected Indonesia as the primary surrogate country, because: (1) the country is economically comparable to Vietnam in terms of gross national income per capita; (2) it is a significant producer of comparable merchandise as measured by exports of merchandise under six-digit HTS codes that encompass the codes found within the scope of this investigation; and (3) Indonesian SV and financial statement data was the best in terms of quality and availability when compared to the other available sources on the record. *See* Preliminary Surrogate Value Memorandum, (November 27, 2024) (P.R. 536-537) (Preliminary SV Memorandum) at 2.

Thereafter, in March 2025, Commerce received administrative case and rebuttal briefs from Boviet Solar, JA Solar, Jinko, the petitioner, and Vietnam Sunergy Joint Stock Company (VSUN).  *See* Boviet Case Brief, (March 7, 2025) (P.R. 605; C.R. 719); JA Solar Case Brief, (March 7, 2025) (P.R. 606; C.R. 720); Jinko Case Brief, (March 7, 2025) (P.R. 608; C.R. 722); Petitioner Case Brief, (March 7, 2025) (P.R. 612; C.R. 724); and VSUN Case Brief, (March 7, 2025) (P.R. 607; C.R. 721).

### III.    Final Determination

On April 18, 2025, Commerce published its final affirmative determination wherein it continued to find that solar cells from Vietnam were or were likely to be sold at LTFV in the United States during the period of investigation.  *See Final Determination*, 90 Fed. Reg. 17,388 (Dep't of Commerce Apr. 25, 2025) (P.R. 639) and accompanying IDM at 3 (P.R. 636).  For the final determination, Commerce calculated margins for JA Solar, Jinko, non-selected separate-rate entities, and the Vietnam-wide entity of 58.07 percent, 125.91 percent, 82.65 percent, and 271.28 percent, respectively.  *Id.* at 17,389.[3]  Commerce addressed issues raised in case briefs filed by JA Solar, Jinko Solar, Boviet Solar, and petitioner.  *See generally* IDM.

In the final determination, Commerce continued to determine that it was appropriate to use Indonesia as the primary surrogate country because it was at a comparable level of economic development as Vietnam; a significant producer of merchandise comparable to the subject merchandise based on the information available; and provided the best data and information with which to value the factors of production.  *See* Final Surrogate Values Memorandum (Apr. 18,

---

[3] We note that the IDM incorrectly lists certain final estimated weighted-average dumping margins as follows:  59.45 percent for JA Solar and 82.65 percent for non-selected separate-rate entities.  The margins listed in the *Final Determination*, 90 Fed. Reg. at 17,389 are correct.

6

2025) (P.R. 645).  Commerce continued to use:  Indonesian AUV data exclusive of Malaysian import data as the surrogate value for solar glass and financial statements from Satnusa and PT. Tera Data Indonesia Tbk (PT Tera) as surrogate financial statements.  IDM at 12, 72.  With respect to its surrogate value selection for polysilicon and wafers, Commerce reconsidered its finding that Bloomberg market price data constituted the best available information and, in the final determination, relied on Indonesian import prices under HTS codes 2804.61 and 3818.00 to value polysilicon and wafers, respectively.  *Id.* at 39-41.  Commerce also denied Boviet's request to be a voluntary respondent, identifying administrative burden, the significant resources necessary to verify, and overlapping statutory deadlines as reasons why it would be unduly burdensome to examine an additional respondent.  *Id.* at 89-91.

Between May 5 and 13, 2025, Commerce received ministerial error allegation comments and rebuttals thereto concerning its final determination.  *See* JA Solar Ministerial Error Comments, (May 5, 2025) (P.R. 656; C.R. 752); Boviet Ministerial Error Comments, (May 5, 2025) (P.R. 657); Petitioner Ministerial Error Comments, (May 5, 2025) (P.R. 658; C.R. 753); and Petitioner Rebuttal to Respondents' Ministerial Error Allegations, (May 12, 2025) (P.R. 659; C.R. 754).  Commerce agreed with certain of the ministerial error allegations and made corrections accordingly.[4]  *See* Analysis of Ministerial Error Allegations in the Final Determination, (May 19, 2025) (P.R. 660, 664; C.R. 757).  As a result, Commerce calculated revised dumping margins as follows:  62.31 percent for JA Solar and 126.18 percent for Jinko, and 85.45 percent for separate rate respondents, including Boviet.  *See id.*

---

[4] None of the parties' ministerial error allegations are at issue in this litigation.

## SUMMARY OF THE ARGUMENT

Commerce's Final Determination is supported by substantial evidence and in accordance with law, and therefore, should be sustained.  First, Commerce made its surrogate value selections for factors of production (FOP) consistent with the statute and the framework laid out in Commerce's Policy Bulletin 04.l for surrogate value selection.  With respect to the surrogate value for solar glass, Commerce reasonably relied on the import data from the primary surrogate country, Indonesia, and appropriately relied on record evidence demonstrating a particular instance of subsidization to exclude Malaysian import data from the surrogate value.  Plaintiffs' arguments to the contrary amount to mere disagreement with Commerce's weighing of the evidence.  Plaintiffs' arguments concerning the aberrancy and commercial significance of the remaining data must fail, as Commerce's analysis of the data was consistent with the limited comparative data available on the record.  Commerce likewise appropriately declined to utilize PVInsights data to value solar glass on the basis that it had on the record a potential surrogate value from the primary surrogate country.

As is the case with the valuation of solar glass, Commerce similarly appropriately relied on import data from the primary surrogate country (Indonesia) to value polysilicon and wafers.  At most, plaintiffs suggest that Commerce should have prioritized product specificity, but the statute emphasizes the importance of surrogate values from the primary surrogate country.  Likewise, that Commerce has in prior segments relied on Bloomberg world prices for valuing these FOPs does not negate the fact that Commerce appropriately selected Indonesian import data as the best available information *on this record* to value polysilicon and wafers.

Second, Commerce's inclusion of financial data from Satnusa to calculate surrogate financial ratios was reasonable on the basis that Satnusa is a producer of comparable

merchandise.  Plaintiffs assert that Commerce should have rejected Satnusa's financial data because the company received countervailable subsidies but they fail to appreciate that such an analysis necessarily requires evidence of having *benefitted* from countervailable subsidies, evidence which Commerce reasonably concluded was missing from the record.

Finally, Commerce reasonably decided not to investigate Boviet as a voluntary respondent.  The statute grants Commerce discretion to accept voluntary respondents pursuant to the agency's examination of whether such additional individual examination would be unduly burdensome to Commerce and inhibit the timely completion of the investigation or review. Commerce appropriately considered the particular facts and complexities of this LTFV investigation, as well as its workload, and reasonably determined that accepting Boviet as a voluntary respondent would be unduly burdensome.

## ARGUMENT

### I.      Standard of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing

9

inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

"Moreover, the Court may not substitute its judgment for that of {Commerce} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp.2d 1323, 1326 (Ct. Int'l Trade 2006) (internal quotation marks and citation omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

## II.    Non-Market Economy Legal Framework

The antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price." 19 U.S.C. § 1673. If the proceeding involves products from a non-market economy, such as Vietnam, and Commerce determines that available information does not permit a standard normal value calculation, then Commerce determines normal value on the basis of surrogate values for "the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1). This statutory scheme "construct{s} a hypothetical market value" of the subject merchandise in the non-market economy. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

10

### A. Surrogate Country Selection

When determining normal value in non-market economy counties, Commerce values a respondent's factors of production based on "the values of such factors in a market economy country or countries considered to be appropriate{.}" 19 U.S.C. § 1677b(c)(1). "{T}o the extent possible," Commerce uses surrogate values from one or more market economy countries that are "at a level of economic development comparable to that of the nonmarket economy country" and "significant producers of comparable merchandise." *Id.* § 1677b(c)(4)(A)-(B). Accordingly, in selecting a surrogate country, Commerce compiles a list of countries at a level of economic development comparable to that of the non-market economy country; determines which among them, if any, are significant producers of comparable merchandise; and evaluates the reliability and availability of the data from those countries. Import Administration Policy Bulletin 04.1: Non–Market Economy Surrogate Country Selection Process at 2 (Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (Policy Bulletin 04.1).

Commerce's long-standing, judicially sustained practice is to rely on gross national income (GNI) for purposes of identifying countries at a level of economic development comparable to the non-market economy whose products are under review. *See, e.g.*, *Pure Magnesium from the People's Republic of China*, 75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010) (final admin. review), and accompanying IDM at Cmt. 4; *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1347-50 (Ct. Int'l Trade 2009). Moreover, Commerce's data quality is a "a critical consideration affecting surrogate country selection." Policy Bulletin 04.1 at 4. Commerce evaluates the availability and quality of the data available from the potential choices and "the country with the best factors data is selected as the primary surrogate country." *Id.* As Commerce's policy recognizes, "a country that perfectly meets the

requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." *Id.* Hence, because economically comparable countries may offer varying data quality, and because the statute does not require Commerce to select the country that is most comparable to the target non-market economy country, Commerce's methodology is reasonable and appropriate. *See Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1300 (Fed. Cir. 2016) (finding "no error in Commerce's . . . preference to appraise surrogate values from a single surrogate country" with statistics that were "specific, contemporaneous, and represented broad market averages").

### B.  Selection of Surrogate Values for Factors of Production

19 U.S.C. § 1677b(c)(1) directs Commerce to use the "best available information" from a market economy surrogate country that Commerce considers appropriate to derive surrogate values for the nonmarket economy's factors of production.  Factors of production include raw materials, labor, and utilities.  19 U.S.C. § 1677b(c)(3).  Commerce adds to these factors "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  As explained above, in valuing factors of production, Commerce relies upon prices or costs of the factors of production (also referred to as inputs) from a surrogate market economy country that is at a comparable level of economic development to that of the non-market economy country at issue and is a significant producer of comparable merchandise.  19 U.S.C. § 1677b(c)(4).  Commerce selects a surrogate value for each input used in production of the subject merchandise, consistent with the statute's instruction that valuation of the factors of production shall be based on the "best available information" regarding the values of the inputs in an appropriate market economy country.  19 U.S.C. §1677b(c)(1); *see*

*generally Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009). In addition, "Commerce values certain factors of production, such as selling, general, and administrative {SGA} expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010) (citation omitted). Commerce also has a regulatory preference to use as much data as possible from a single primary surrogate country. *See* 19 C.F.R. § 351.408(c)(2). Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 132-33 (Ct. Int'l Trade 2014), *aff'd*, 822 F.3d 1289 (Fed. Cir. 2016).

Commerce possesses "broad discretion to determine what constitutes the best available information" to value factors of production. *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). The data selected need not be perfect, *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014), and the statute "does not mandate that Commerce use any particular data source" in reaching its determination. *Guangdong Chems. Imp. & Exp. v. United States*, 460 F. Supp. 2d 1365, 1368-69 (Ct. Int'l Trade 2006). Furthermore, Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and to rely on the record data that "most accurately represents the fair market value" of the relevant factors of production. *Id.* In practice, Commerce has established several criteria that it considers as part of its analysis, including whether the data is "product specific, representative of a broad market average, publicly available, contemporaneous with the period of investigation or review, and tax and duty

13

exclusive." *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) (final admin. review), and accompanying IDM at 9.

Commerce's surrogate value choice is supported by substantial evidence if the data bears "a rational and reasonable relationship to the factor of production it represents." *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1191 (2004). A reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro. Fastener Co.*, 822 F.3d at 1300-01 (citing *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)); *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable"). For this Court to sustain Commerce's determination, Commerce "need not prove that its methodology was the only way or even the best to calculate SVs for factors of production as long as it was a reasonable way." *Coal. for Fair Trade in Hardwood Plywood v. United States*, 610 F. Supp. 3d 1344, 1371 (Ct. Int'l Trade 2022) (quotation omitted).

III.    **Commerce's Surrogate Value Selections Are Supported by Substantial Evidence**

Having identified Indonesia among the countries that constitute significant producers of comparable merchandise, Commerce selected Indonesia as the primary surrogate country on the basis that it was the sole country for which data was available on the record. *See* Preliminary SV Memorandum at 2 (P.R. 536); Final SV Memorandum at 1 (P.R. 645). Consistent with the statute and governing regulations, Commerce relied on Indonesian imports under certain Indonesian HTS import subheadings as surrogate values for solar glass, monopolysilicon wafers,

14

and polysilicon. *See* IDM at 16-24, 39-41; 19 U.S.C. § 1677b(c); 19 C.F.R. § 351.408(c). In making its selections, Commerce reasonably considered the potential surrogate value data sources on record, as well as the parties' arguments. Plaintiffs inappropriately ask this Court to reweigh the evidence, when "{i}n reviewing Commerce's determination of what constitutes the best available information with respect to a particular {factor of production}, it is not for the court to reweigh the evidence, . . . but rather, to determine if the evidence relied upon by Commerce was sufficient to support its determination while considering detracting evidence." *Tri Union Frozen Prod., Inc. v. United States*, 163 F. Supp. 3d 1255, 1269 (Ct. Int'l Trade 2016) (citations omitted). As demonstrated in the final determination, Commerce relied on substantial evidence in making its surrogate value selections and appropriately weighed detracting evidence for each input. The Court should sustain Commerce's selection of surrogate values as reasonable exercises of Commerce's discretion to select the best available information to value solar glass, monopolysilicon wafers (wafers), and polysilicon.

### A. Commerce Selected the Indonesian AUV as the Surrogate Value for Solar Glass Because It Was the Best Available Information

Plaintiffs assert that PVInsights data are superior to Indonesian AUV for the purpose of valuing solar glass, and that, regardless, Commerce improperly excluded Malaysian solar glass from the Indonesian AUV. JA Solar Br. at 7-28; Jinko Br. at 7-25; Boviet Solar Br. at 4-17; TEDC Br. at 2-3.

In the *Final Determination*, having selected Indonesia as the primary surrogate country, *see* Preliminary SV Memorandum at 2, Commerce continued to find the Indonesian AUV to be the best available information by which to value solar glass. IDM at 12-24. The Indonesia AUV data represents the price of imports of classification of glass that is used for solar glass into Indonesia. *See* JA Solar Surrogate Value Comments at 2-3, Exhibit SV-3 (Oct. 11, 2024) (P.R.

338, P.R. 347).  Later in the proceeding, however, the petitioner provided exhibits containing the Government of India's final finding in a countervailing duty (CVD) investigation that photovoltaic glass from Malaysia received countervailable subsidies.  *See* Petitioner's Final Surrogate Value Submission at 11, Exhibit 39 (Nov. 6, 2024) (P.R. 444, P.R. 452).  This 2020 investigation implemented countervailing duties on Malaysian solar glass for five years, coinciding with this period of investigation.  *Id.*

Separately, JA Solar submitted data from PVInsights to represent purchase prices for solar glass similar to what JA Solar uses.  *See* JA Solar Submission of New Factual Information at 3-4, Ex. 3 (Nov. 6, 2024) (P.R. 454, P.R. 461).  However, because the underlying data used to derive average prices were protected by copyright under a subscription, JA Solar submitted the underlying data as business proprietary information.  *See id.*; *see also* JA Solar Submission of New Factual Information at Exhibit 3 (C.R. 495).

Analyzing all the submissions on the record, Commerce determined that the Indonesian AUV data constituted to the best available information for valuing solar glass.  *See* IDM at 15-20.  However, relying on the Indian CVD determination, Commerce concluded that a "particular instance of subsidization occurred" related to Malaysian solar glass data price values.  IDM at 15-20.  On this basis, in accordance with 19 U.S.C. § 1677b(c)(5), Commerce excluded the Malaysian solar glass data from the Indonesian AUV data.  *Id.*  Finally, having determined that the Indonesian AUV constituted the best available information for valuing solar glass, Commerce declined to use PVInsights data as the surrogate value.  *Id.* at 13-15.

Commerce's selection of the surrogate value for solar glass is supported by substantial evidence and in accordance with the law.  Ample evidence on the record supports Commerce's conclusion that the Indonesian AUV, with Malaysian data excluded, is the best available

16

information by which solar glass can be valued. IDM at 12-24. Likewise, Commerce reasonably concluded that an Indian CVD determination concerning textured tempered glass from Malaysia demonstrated that a "particular instance of subsidization occurred," in accordance with 19 U.S.C. § 1677b(c)(5), meriting exclusion of Malaysian solar glass data from the Indonesian AUV. *Id.* at 15-20. And, JA Solar, Jinko, Boviet Solar, and Trina Solar's arguments notwithstanding, Commerce reasonably declined to use PVInsights data as the surrogate value for solar glass because the data did not present the best information available pursuant to 19 U.S.C. § 1677b(c).

1. Commerce's Decision Not to Rely on PVInsights Data Was Reasonable and Supported by Substantial Evidence

The PVInsights pricing data was sourced from solar glass for China, non-China, Malaysia, Thailand, Vietnam, and Worldwide. *See* Jinko Submission of New Factual Information at Exhibit 1 (Nov. 6, 2024). However, Commerce identified Indonesia, Morocco, and the Philippines as the potential surrogate value countries that were economically comparable and significant producers of subject merchandise. Further, the PVInsights pricing data was only provided to Commerce as business proprietary information, not on the public docket.

Rather than rely on Indonesian AUV data exclusive of Malaysian imports to value solar glass, plaintiffs JA Solar and Boviet argue that Commerce should have relied on PVInsights data. *See* JA Solar Br. at 8-16; Boviet Br. at 14-17. JA Solar and Boviet assert that the PVInsights data constitutes the most specific data on the record for valuing solar glass, particularly the solar glass utilized by the mandatory respondents in their production of solar cells. *See* JA Solar Br. at 8-12; Boviet Br. at 14. Moreover, JA Solar and Boviet assert that Commerce improperly rejected the PVInsights data as not publicly available. *See* JA Solar Br. at 12-16; Boviet Br. at 15. Both arguments misinterpret Commerce's priorities in selecting surrogate values. First and foremost, Commerce aims to utilize surrogate values for factors of production that source from countries

17

that are economically comparable to the NME country and that represent significant producers of the subject merchandise. *See* IDM at 13-14. Commerce thereafter considers whether the potential surrogate values meet the factors listed in the Policy Bulletin to determine which data sources represent the best available information. *Id.* at 13. Commerce appropriately followed this sequential analysis here, and plaintiffs' arguments to the contrary are unavailing.

> a. The PVInsights Data Did Not Pertain to Countries at a Comparable Level of Economic Development as Vietnam that Are Significant Producers of Subject Merchandise

19 U.S.C. § 1677b(c)(4) instructs Commerce to, in valuing factors of production, "utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). No party contests Commerce's finding that the PVInsights data does not constitute prices from a country that is at a comparable level of economic development as Vietnam and also a significant producer of subject merchandise. JA Solar Br. at 12-13; Boviet Br. at 14-17. Rather, JA Solar and Boviet argue for product specificity supremacy. JA Solar Br. at 8-12; Boviet Br. at 14-17. JA Solar and Boviet assert that the PVInsights data is more specific to the valuation of solar glass inputs than the Indonesian AUV, and, as a result, Commerce's surrogate value selection is contrary to law. JA Solar Br. at 8-12; Boviet Br. at 14-17.

But this Court has previously rejected a similar allegation that product specificity is the most important factor in Commerce's surrogate value selection process. *See Fujian Yinfeng Imp & Exp Trading Co., Ltd. v. United States*, 607 F. Supp. 3d 1301 (Ct. Int'l Trade 2022). Just as the plaintiff did in *Fujian Yinfeng*, plaintiffs here likewise "overstate{} the importance of product specificity in Commerce's determination." *Id.* at 1324. The relevant question before the Court is

18

"'not whether Commerce's selected {surrogate value source} is the most … product specific heading available,' … but 'whether substantial evidence supports that {Commerce's selected surrogate value} is sufficiently product-specific to the FOP at issue.'" *Id.* at 1324-25 (quoting *United Steel & Fasteners v. United States*, 469 F. Supp. 3d 1390, 1398 (Ct. Int'l Trade 2020)) (internal quotations omitted).  Though JA Solar cites *Taian Ziyang Food Co. v. United States* to suggest that "product specificity is paramount," JA Solar Br. at 9-10 (citing 783 F. Supp. 3d 1292, 1330 (Ct. Int'l Trade 2011)), JA Solar ignores the many opinions by this Court that have concluded the opposite.  *See Fujian Yinfeng*, 607 F. Supp. 3d at 1324-25 (listing four CIT opinions accepting Commerce's position that there is no hierarchy among the criteria outlined in Policy Bulletin 04.1).

Here, JA Solar would have Commerce prioritize data specific to the inputs over data from an economically comparable country.  *See* JA Solar Br. at 12-13; *see also* Boviet Br. at 15-16 (suggesting that Commerce utilize the Thailand, Malaysia, or non-China prices from the PVInsights data over the Indonesian AUV data).  This proposition improperly disregards the directive in 19 U.S.C. § 1677b(c)(4)(A) that Commerce use data from economically comparable countries "to the extent possible," as exemplified by the sequential nature of the Policy Bulletin. *See* Policy Bulletin 04.1 at 2 (noting the "sequential consideration of the statutory elements"). The Federal Circuit has likewise reached the same conclusion, interpreting 19 U.S.C. § 1677b(c)(4)(A) "to be a clear statement that Congress intended to require use of data from economically comparable countries except in situations where such data were not available or were irretrievably tainted by some statistical flaw." *Dorbest Ltd. v. United States*, 604 F.3d 1363,

1371-72 (Fed. Cir. 2010).[5]  JA Solar and Boviet do not (and cannot) provide any viable justification for Commerce to disregard its statutory directive here.

Rather, in support of its claim, Boviet notes that Commerce has relied on PVInsights and similar potential surrogate values in prior proceedings.  *See* Boviet Br. at 14-16; Jinko Br. at 20-21.  Commerce's selected surrogate values are highly dependent on the facts in a particular case and the record before Commerce.  *See* IDM at 14.  The Federal Circuit has emphasized the record-specific nature of Commerce's examination of facts in determining appropriate surrogate country and surrogate value selections.  *See Jiaxing Bro. Fastener*, 822 F.3d at 1299 ("Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition."); *see also Vulcan Threaded Products Inc. v. United States*, 311 F. Supp. 3d 1357, 1367 (Ct. Int'l Trade 2018).  That Commerce has selected the same or similar potential surrogate values previously is of no moment.  *See Jiaxing Brother Fastener Co. Ltd. v. United States*, 428 F. Supp. 3d 1364, 1379-80 (Ct. Int'l Trade 2020) ("Although Commerce notes that it relies on the same NSO quarterly data to calculate labor hours as in the previous administrative review, {} the records of the two proceedings are not the same. . . .  The agency must make its determinations based on the record before it." (internal citations omitted)).

JA Solar and Boviet would have the Court re-weigh the evidence in favor of selecting PVInsights data over the Indonesian AUV data.  But "{the Court's} task is to discern 'whether a reasonable mind could conclude that Commerce chose the best available information' in {its surrogate financial ratio source selection}." *Zhejiang DunAn*, 652 F.3d at 1341 (quoting

---

[5] The Federal Circuit's analysis in *Dorbest* was conducted pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which the Supreme Court overruled in *Loper Bright Enteprises. v. Raimondo*, 603 U.S. 369 (2024).  However, in doing so, the Supreme Court instituted a prospective rule, which did not "call into question prior cases that relied on the *Chevron* framework." *Loper Bright*, 603 U.S. at 412.

20

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006)).  This

means that "{w}here Commerce is confronted with two alternatives (both of which have their

good and bad qualities), and Commerce has a preferred alternative, the court will not second-

guess Commerce's choice." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1313

(Ct. Int'l Trade 2007).  And Commerce's choice to comply with the statutory directive to use

information from economically comparable countries is reasonable.

> b.   Commerce Reasonably Determined that the PVInsights Data Was Not
>       Publicly Available

JA Solar and Boviet argue that the PVInsights data is publicly available because the

underlying PVInsights monthly data, although obtained through subscription and treated as

confidential, are available to the general public and can be obtained by any interested party.  *See*

JA Solar Br. at 15; Boviet Br. at 15.  Plaintiffs fail to illustrate how PVInsights data are publicly

available consistent with Commerce's practice and regulatory definition of public information.

Commerce "normally will use publicly available information to value factors."  19 C.F.R.

§ 351.408(c).  Commerce's regulations define "public information" as "information that may be

made available to the public."  19 C.F.R. § 351.105(a).  Thus, Commerce has treated as "publicly

available information" information that is on the public record.  *See Final Results Pursuant to*

*Court Remand, Jinko Solar Import and Export Co., Ltd. et. al. v. United States*, Ct. Int'l Trade,

dated May 1, 2024 (*Final Remand*) (citing *Antidumping Duties; Countervailing Duties*, 61 Fed.

Reg. 7308, 7344 (February 27, 1996) (*Preamble*)).  Further, Commerce's regulations enumerate

several categories of information Commerce will normally consider as public information,

including:  (1) factual information that has been published or otherwise made available by the

submitter; (2) factual information not designated as BPI by the submitter; (3) factual information

that, although designated as BPI by the submitter, "is in a form that cannot be associated with or

otherwise used to identify activities of a particular person" or that Commerce determines is improperly designated as BPI; (4) publicly available laws, regulations, orders, and other official documents of a country; and (5) written argument that is not designated as BPI. 19 C.F.R. § 351.105(b). PVInsights data does not fall into any of these categories.

Nonetheless, JA Solar and Boviet argue that the PVInsights data is publicly available because the underlying monthly data, although obtained through subscription and treated as confidential, are available to the general public and can be obtained by any interested party. *See* JA Solar Br. at 15-16; Boviet Br. at 15. However, this argument neglects the fact that JA Solar did not provide the PVInsights data on the public record but rather designated it for BPI treatment. *See* IDM at 14; *see* JA Solar Submission of New Factual Information at 3-4, Exhibit 3 (P.R. 454, C.R. 495). In accordance with its regulatory and statutory obligations, Commerce properly treated JA Solar's submitted PVInsights data as BPI on the confidential record, and no party argues that Commerce's treatment of the data as BPI was improper during the investigation. JA Solar and Boviet fail to show how by simply divulging the source of SV data as PVInsights data but treating the underlying monthly data on the record as BPI, PVInsights should now be considered public information. *See Antidumping Duties; Countervailing Duties*, 61 FR 7308, 7344 (February 27, 1996) (*Preamble*) (explaining that, when selecting surrogate values, Commerce emphasizes "accuracy, fairness, and predictability"). By contrast, the Indonesian import data are publicly available, *i.e.*, on the public record. *See* IDM at 14-15.

JA Solar and Boviet's arguments for leniency in Commerce's practice of defining publicly available data as on the public record seek to carve exceptions into this practice. *See* JA Solar Br. at 13-16; Boviet Br. at 15. Per JA Solar and Boviet, Commerce unreasonably rejected the PVInsights data as not publicly available because the data is available to the general public

22

through a paid subscription and the PVInsights average prices for the period of investigation is on the public record. *See* JA Solar Br. at 13-16; Boviet Br. at 15. As Commerce explained in its final remand redetermination in *Jinko Solar*, *see* IDM at 14, Commerce's aim is to select information that is on the public record to increase transparency in the selection of surrogate values. *See* Final Results of Redetermination Pursuant to Court Order, *Jinko Solar Import and Export Co., Ltd., et. al v. United States*, No. 22-00219, Slip Op. 24-53 (Ct. Int'l Trade May 1, 2024), dated August 29, 2024, at 17 (*Jinko Solar* Final Remand). For example, if selective portions of public data placed on the record were to mischaracterize what the data as a whole represents (because the submitter requests BPI treatment of additional contextual information), only parties with access to the underlying BPI monthly data would have the meaningful opportunity to provide rebuttal factual information. *See Jinko Solar* Final Remand at 13-14.

This Court has sustained Commerce's selection of one data source over another on this basis: "Although the Xeneta data are contemporaneous and rely on more data points, they are proprietary and therefore not publicly available." *Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1352 (Ct. Int'l Trade 2019). Comparing the data at issue to prior determinations by Commerce where Commerce deemed data to be publicly available based on its availability to Commerce, the Court identified the party's request for proprietary treatment of the data as the distinguishing factor. *Id.* at 1353. That same distinction controls here. IDM at 14-15. Because the PVInsights data was submitted as proprietary information, and no party challenged its proprietary nature, Commerce appropriately determined that the data was not publicly available. *Id.* at 14. On this basis, Commerce appropriately selected the Indonesian AUV data over the PVInsights data for valuing solar glass. *Id.* at 14-15.

23

Thus, for these reasons, Commerce reasonably found that the PVInsights data was not usable for the purpose of valuing the solar glass input.  *See* IDM at 15.

    2.    Commerce Reasonably Found That Indonesian AUV Data Were The Best Available Information on the Record to Value Solar Glass

Additionally, JA Solar, Jinko, Boviet Solar, and Trina Solar challenge Commerce's exclusion of Malaysian import data from the Indonesian AUV data utilized to value solar glass. *See* JA Solar Br. at 16-28; Jinko Br. at 15-18, 21-25; Boviet Solar Br. at 4-10; TEDC Br. at 2-3. Plaintiffs assert that the exclusion of Malaysian import data has rendered the Indonesian AUV data unusable.  However, with respect to the viability of the Indonesian AUV data with Malaysian import data included, no party substantively argues that this data does not constitute the best available information.  *See, e.g.*, JA Solar Br. at 16 (limiting its challenge to the Indonesian AUV data inclusive of Malaysian import data as "non-specific").  In fact, Boviet Solar concedes that the Indonesian AUV data constitutes the best available information: "Commerce should have followed its normal surrogate methodology and relied upon the Indonesian import value for glass, *including* the Malaysian imports."  Boviet Solar Br. at 5. Jinko likewise "agrees with this HTS selection."  Jinko Br. at 7.  However, per the plaintiffs, Commerce's exclusion of Malaysian imports of solar glass into Indonesia from the Indonesian AUV data is not supported by substantial evidence.  *See* JA Solar Br. at 16-28; Jinko Br. at 15-18, 21-25; Boviet Solar Br. at 4-10; TEDC Br. at 2-3.  They allege two main flaws:  (1) Commerce's reliance on an Indian CVD investigation concerning solar glass imports from Malaysia (to India) is not in accordance with Commerce's discretion to disregard certain price or cost values pursuant to 19 U.S.C. § 1677b(c)(5), and (2) in excluding the Malaysian import data from the Indonesian AUV data, Commerce's surrogate value selection falls short of being commercially significant and is otherwise aberrational.  *See* JA Solar Br. at 16-28; Jinko Br. at

24

15-18, 21-25; Boviet Solar Br. at 4-10; TEDC Br. at 2-3.  For the reasons detailed in the *Final Determination*, and explained below, these arguments have no merit.

> a.  Commerce's Decision to Exclude Malaysian Import Data Was Reasonable and Supported by Substantial Evidence

For the purposes of valuing factors of production, 19 U.S.C. § 1677b(c)(5) grants Commerce the discretion to:

> {D}isregard price or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order.

19 U.S.C. § 1677b(c)(5).  In identifying a particular instance of subsidization, Congress has directed Commerce to "avoid using any prices which it has *reason to believe or suspect* may be dumped or subsidized prices."  H.R. Conf. Rep. No. 100-576 at 590 (1988).[6]  Congress did not "intend for Commerce to conduct a formal investigation … but rather intended that Commerce base its decision on information generally available to it at the time."  *Jiangsu Zhongji Lamination Materials*, 396 F. Supp. 3d at 1347 (citing H.R. Conf. Rep. No. 100-576 at 590).

In the *Preliminary Determination*, Commerce selected price data for Indonesian imports under HTS 7007.19 for valuing solar glass inputs.  Preliminary Surrogate Value Memorandum at 7-8.  But, relying on an affirmative Indian CVD investigation of solar glass from Malaysia, in

---

[6] Congress amended 19 U.S.C. § 1677b(c)(5) through the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 506, 129 Stat. 362, 386–87 (2015) (TPEA) to state that Commerce "may disregard price or cost values without further investigation if {Commerce} has determined that broadly available export subsidies existed or particular instances of subsidization occurred."  *See Weishan Hongda Aquatic Food Co., Ltd. v. United States*, 917 F.3d 1353, 1365 (Fed. Cir. 2019).  But relevant here, Commerce's practice of utilizing the "reason to believe or suspect" standard is the same both before and after the TPEA amendment.  *See Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347, 1352 n.6 (Ct. Int'l Trade 2021).

effect during the period of investigation, Commerce removed the Malaysian import price data from the build-up of the Indonesian AUV. *Id.* at 7-8. In the *Final Determination*, Commerce continued to rely on Indonesian AUV data for solar glass imports with the exclusion of Malaysian imports as the surrogate value for solar glass on the basis that a particular instance of subsidization occurred with respect to those price values. IDM at 15-20.

Commerce reasonably excluded the Malaysian import data from the selected surrogate value because the Indian CVD determination finding that the Malaysian solar glass industry was being subsidized gave Commerce reason to believe that imports of Malaysian solar glass into Indonesia under HTS 7007.19 constituted subsidized prices. *See id.* Based on the Government of India's CVD investigation of solar glass from Malaysia, which applied countervailing duties on imports of solar glass from Malaysia through this POI, Commerce found an "adequate rebuttable presumption" that solar glass from Malaysia was subsidized. *Luoyang Bearing Factory v. United States*, 288 F. Supp. 2d 1369, 1374 (Ct. Int'l Trade 2003). Because no party refuted this presumption, based on the information on the record, Commerce reasonably determined it had reason to believe Malaysian imports were subsidized and exercised its discretion to disregard such prices from the Indonesian AUV surrogate value. *See* IDM at 15-20; *see also Calgon Carbon Corporation v. United States*, 443 F. Supp. 3d 1334, 1352 (Ct. Int'l Trade 2020) (finding that Commerce "properly exercised its discretion" to disregard price values without further investigation where the record demonstrated subsidization).

JA Solar and Boviet purport to identify several critical flaws in Commerce's reliance on the Indian CVD investigation to disregard Malaysian solar glass import prices into Indonesia, which plaintiffs allege demonstrate that Commerce failed to meet the "reason to believe or suspect" standard. *See* JA Solar Br. at 16-20; Boviet Br. 5-19. These arguments are unavailing.

26

First, JA Solar and Boviet suggest that because the Indian CVD investigation review period did not match the POI of this investigation, the record lacks evidence of subsidization during the POI. *See* JA Solar Br. at 17-19; Boviet Br. at 6. But the imperative fact is that the GOI's subsidy finding was in effect for five years after its issuance, across the entire POI of this investigation. *See* Petitioner's Final Surrogate Value Submission at Exhibit 38 (P.R. 452); IDM at 16. That India does not conduct administrative reviews in the same manner the United States does is of no consequence. *See* JA Solar Br. at 19.

JA Solar's reliance on *Shenzhen Xinboda Industrial Co. v. United States*, 279 F. Supp. 3d 1265, 1309 (Ct. Int'l Trade 2017), in furtherance of this point is misplaced. *See* JA Solar Br. at 18; *see also* Jinko Br. at 16-17 (characterizing Commerce's finding of a particular instance of subsidization here as "akin to specific subsidies provided to specific companies, *i.e.*, subsidies reported in financial statements"). JA Solar points to the Court's quotation of Commerce's remand redetermination therein stating that "mere mention of a subsidy, without information that the company actually received the subsidy … is not enough for {Commerce} to exclude *{a company's financial}* statements." *Shenzhen Xinboda Industrial Co*, 279 F. Supp. 3d at 1309 (emphasis added). The context here is critical: Commerce noted in the remand redetermination that its practice is not to exclude a company's *financial statements* if they contain only mentions of a subsidy "and for which there is no additional information as to *the specific nature of the subsidy*." *Id.* (emphasis in original). The question before the Court in *Shenzhen* was whether the mere mention of subsidies in the relevant companies' financial statements gave reason to believe or suspect subsidies. *Id.* Here, in contrast, Commerce considered a final CVD investigation finding that the Malaysian solar glass industry was being subsidized. *See* IDM at 17; *see also* Petitioner's Final Surrogate Value Submission at Exhibit 38 (P.R. 452). The record here contains

27

uncontroverted evidence (to which no party provided detracting evidence) that the Government of India found Malaysian solar glass production to be subsidized.  *See* Petitioner's Final Surrogate Value Submission at Exhibit 39 (P.R. 452).  It cannot be said that the final results of a CVD investigation constitutes "mere mention" of subsidies.  *See Shenzhen*, 279 F. Supp. 3d at 1309.

JA Solar and Boviet also contend that Commerce's reliance on the Indian CVD investigation was likewise flawed because the Government of India's determination is inherently limited to Malaysian exports to India.  JA Solar Br. at 18, 20 ("{N}o record information suggests that subsidization occurred during the POI or with respect to Malaysian imports to any country other than India."); Boviet Br. at 5-6, 8.  This argument plainly mischaracterizes the relevance of the Indian CVD investigation.  The Indian CVD investigation provides evidence that "the *Malaysian solar glass industry*, specifically, is being subsidized."  IDM at 17 (emphasis added); Petitioner's Final Surrogate Value Submission at Exhibit 39 (P.R. 452).  As Commerce explained, "the evidence of subsidization {provided by the Indian CVD investigation} goes directly to the basic value of solar glass."  IDM at 18.  It does not, as Boviet attempts to portray, illustrate only that Malaysian exports of glass to India are being subsidized.  Boviet Br. at 5-6.  The question is not whether the final determination "had any impact on Malaysian exports to a country other than India."  JA Solar Br. at 20.  Rather, Commerce's task pursuant to 19 U.S.C. § 1677b(c)(5) was to consider whether the record evidence gives Commerce reason to believe or suspect that the Malaysian solar glass industry was being subsidized.  *See* IDM at 17.  The "reason to believe or suspect" standard does not require that Commerce confirm that "another country, such as the United States or Indonesia, would find that the same industry is subsidized."  Boviet Br. at 6.  It is not for Commerce to "conduct a formal investigation," into evidence of subsidization; rather,

28

the task for Commerce is to consider the information it has on the record before it. *See Jiangsu Zhongji Lamination Materials*, 396 F. Supp. 3d at 1347 (citing H.R. Conf. Rep. No. 100-576 at 590). Commerce did so, reasonably finding a reason to believe or suspect subsidization. The Government of India's CVD investigation speaks to the subsidization of the Malaysian solar glass industry as a whole (not to particular imports of Malaysian solar glass) and covered the same product as the input for which Commerce considered a surrogate value. *See id.* Based on this record evidence, Commerce reasonably exercised its discretion to disregard Malaysian import prices within the Indonesian AUV data.

    b.    Commerce Reasonably Selected Indonesian AUV Data with Malaysian Imports Excluded as the Best Available Information

Assuming Commerce reasonably excluded Malaysian import prices from the Indonesian AUV data, plaintiffs challenge the remaining import data as commercially insignificant and otherwise aberrational. *See* JA Solar Br. at 20-28; Boviet Br. at 10-14; Jinko Br. at 21-25. But this argument succeeds only in so much as Commerce has information available on the record to which the agency can compare the alleged aberrational data. *See* IDM at 23. Commerce's surrogate value selection need only "be as representative of the situation in the NME country as is feasible." *Nation Ford*, 166 F.3d at 1377. Though Commerce does not generally disregard import values "merely because they were the product of a small quantity of imported goods," it may disregard small quantity import values where they are distortive or aberrational. *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1253 (Ct. Int'l Trade 2021) (citing *Sichuan Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338, 1356 (Ct. Int'l Trade 2006)). When considering whether an input's surrogate value is aberrational, Commerce will disregard "small quantity import data … when the per-unit value is substantially different from the per-unit values

29

of the larger quantity imports of that product from other potential surrogate countries."
*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1358 (Fed. Cir. 2020) (cleaned up).

Where, like here, parties fail to build the record and provide comparative data *from other potential surrogate countries*, Commerce is unable to perform fulsome commercial significance and aberrancy analyses. *See id.* "Commerce's commercial significance and aberrancy analyses are interdependent and require comparative data from potential surrogate countries." *Ancientree Cabinet Co.*, 532 F. Supp. 3d at 1254; *see also SolarWorld*, 962 F.3d at 1358. This analysis is naturally foreclosed where parties do not provide the required comparative data from potential surrogate countries. *See Ancientree*, 532 F. Supp. 3d at 1254. In *Baoding Mantong* and *Ancientree Cabinet*, this Court sustained Commerce's aberrancy determinations, which were based on a very limited record, like here, because the interested parties did not provide evidence on the record to facilitate a comparison. *Baoding Mantong Fine Chem. Co. v. United States*, 222 F. Supp. 3d 1231, 1248 (Ct. Int'l Trade 2017); *Ancientree Cabinet*, 532 F. Supp. 3d at 1254. Here, the parties did not submit surrogate values from other possible surrogate countries (Morocco or the Philippines). Therefore, Commerce did not have a comparison point to analyze the commercial significance of surrogate value or calculate AUVs with the Indonesian surrogate values. IDM at 23; *see also Trust Chem Co. Ltd. v. United States*, 791 F. Supp. 2d 1257, 1264 (Ct. Int'l Trade 2011) ("While Plaintiff correctly notes the large discrepancy in price, the court agrees with Commerce that Plaintiff did not place sufficient comparative data on the record, such as data from other identified potential surrogate countries, to support its challenge based on numerical differences alone."). Because "the burden of creating an adequate record lies with {interested parties} and not with Commerce," *QVD Food*, 658 F.3d at 1324, plaintiffs have no basis for challenging Commerce's finding here.

30

Commerce's final determination is distinguishable from the facts in *Xinjiamei Furniture (Zhangzhou) Co., Ltd v. United States*, 37 CIT 308 (2013), upon which JA Solar relies, *see* JA Solar Br. at 21-22, because Commerce has provided reasoned explanation for not utilizing plaintiffs' proposed sources to assess whether Commerce's chosen surrogate value was commercially insignificant or aberrational. In *Xinjiamei Furniture*, the Court held that Commerce erred when it did not consider data sets that did not meet the requirements for surrogate values to assess whether its chosen surrogate value data was aberrational. 37 CIT at 317 ("Thus, while the prices might not satisfy the requirements for surrogate values, they are sufficient to call into question the reliability of the GTA data."). There, the relevant data were rejected by Commerce as insufficiently overlapping with the review and because they were not prices from potential surrogate countries. *Id.* at 312. Here, however, Commerce's rationale is a far cry from simply concluding the data sets did not meet the criteria for potential surrogate countries; it cannot be said that these data sets are "sufficient to call into question the reliability of the GTA data." *Xinjiamei Furniture*, 37 CIT at 317; *see* IDM at 23-24. Rather, Commerce provided detailed explanation for its findings that these data sets are unreliable for any form of corroboration, not just as surrogate values. *See* IDM at 13-15, 20-24.

Even assuming there is evidence on the record for which to compare the AUV of the chosen surrogate value, the Court need not consider plaintiffs' arguments that Commerce's surrogate value is aberrational because what information is available on the limited record supports Commerce's finding that its selected value does not constitute a small quantity of import data. *See* IDM at 20-24; *see also Baoding Mantong*, 222 F. Supp. 3d at 1248 (considering the commercial significance of the surrogate value before analyzing Commerce's finding that the data was aberrational). First, the record demonstrates that the quantity of imports exclusive of

31

Malaysia accounts for enough solar glass to produce more than 1,000 solar modules. IDM at 23. Moreover, that the surrogate value includes low-quantity or low-weight line items "does not indicate that the merchandise is unlikely to be subject merchandise of this case because smaller solar modules can use the exact same type of glass as a large module." *Id.* Having considered the record before it, Commerce reasonably concluded that the Indonesian AUV exclusive of Malaysian imports was commercially significant. *See Baoding Mantong*, 222 F. Supp. 3d at 1248 ("The import quantity upon which the $0.56 per kilogram surrogate value was based was relatively small in relation to the sales of the two Indian producers, but Baoding Mantong does not offer a standard, or record evidence, demonstrating that this quantity, 2,110 metric tons, was too commercially 'insignificant' a quantity to serve as a surrogate value.").

JA Solar cites to agency determinations and caselaw wherein Commerce or courts have found import volumes to be commercially insignificant. *See* JA Solar Br. at 21-23. Such a comparison is of little probative value for determining commercial significance. Rather, a determination of commercial significance requires comparative data specific to the proceeding, and here there is none. *See Ancientree Cabinet Co.*, 532 F. Supp. 3d at 1255. Nor is it of any consequence that JA Solar itself purchased solar glass in greater quantities. *See* JA Solar Br. at 23-25; Boviet Br. at 11. While a surrogate value must be as representative of the situation in the non-market economy as is feasible, Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy. *See Nation Ford*, 166 F.3d at 1377. The same is true for the argument that the Indonesian AUV data is aberrational because it does not perfectly align with respondents' own purchases of solar glass. *See* JA Solar Br. at 26-27.

In any event, "{t}he proposition that a small import volume may indicate that the data relied upon is aberrational is not the same as the proposition that a small import volume makes

32

the data aberrational." *Xinjiamei Furniture*, 37 CIT at 316. Commerce does not use quantity *per se* to determine whether a small import quantity results in an aberrational import value. *See, e.g.*, *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354, 1360 (Ct. Int'l Trade 1999) (finding that Commerce has a practice of using per-unit value to determine whether to retain data). Having failed to build the necessary record, plaintiffs cannot now ask the Court to question Commerce's handling of a limited record. *See QVD Food Co.*, 658 F.3d at 1324 ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce."). Moreover, whether Commerce's chosen surrogate value is based on a smaller quantity than other potential surrogate values is of no moment where no other potential surrogate value is derived from a market economy meeting the requirements articulated in 19 U.S.C. § 1677b(c)(4). *See Baoding Mantong*, 222 F. Supp. 3d at 1248 (upholding Commerce's surrogate value selection of a dataset based on a smaller quantity over import data based on a much larger quantity where the latter data was from a country found to be not economically comparable with the NME country).

JA Solar and Jinko's suggested sources for price comparison are not viable, most critically because they do not reflect import data from other potential surrogate countries (here, Indonesia, Morocco, and the Philippines). *See* JA Solar Br. at 25-28; Jinko Br. at 23-25; *see also* Preliminary SV Memorandum at 11. JA Solar and Jinko put forth several sources of comparison that they allege Commerce failed to consider: PVInsights data, the calculated subsidy rate from the Indian CVD investigation of solar glass from India, Indonesian AUV data with Malaysian data included (and including only Malaysian and U.K. data), Jinko's unaffiliated purchases of solar glass, and cost data from the International Trade Commission proceeding. *See* JA Solar Br. at 25-28; Jinko Br. at 23-25. Commerce reasonably found all of these data sets to be

33

inappropriate comparators for the purpose of analyzing whether the Indonesian AUV data minus Malaysian imports is aberrational.  *See* IDM at 21-24.

As discussed above, Commerce primarily rejected the PVInsights data as a surrogate value for solar glass on the basis that they do not represent prices in economically comparable countries that are significant producers of comparable merchandise.  *See* IDM at 13-14.  On this basis, Commerce reasonably found it could not use the PVInsights data to analyze whether the Indonesian AUV data was aberrational.  The same is true regarding Jinko's reliance on Romanian and Turkish data for solar glass.  *See* Jinko Br. at 12-13.  Neither Romania nor Turkey were found to be economically comparable to Vietnam.  *See* Revised Deadline for Surrogate Country and SV Responses at Attachment 1 (P.R. 300); IDM at 23 n.121.  Moreover, the PVInsights data provides data from China and Vietnam, two NME countries.  IDM at 13.  Relying on data that includes prices from NME countries runs plainly contrary to the very purpose of Commerce's surrogate value selection process pursuant to 19 U.S.C. § 1677b(c).

JA Solar and Jinko's reliance on the Malaysian import data and the calculated CVD subsidy rate in the Indian CVD investigation of solar glass likewise runs afoul of the statute.  *See* JA Solar Br. at 27-28; Jinko Br. at 24.  Where record evidence indicates particular instances of subsidization, Commerce's directive is precise: disregard any such prices.  19 U.S.C. § 1677b(c)(5).  The statute does not prescribe any additional usefulness of such record evidence, such as assessing whether the selected surrogate value is aberrational.  Thus, there is no legally required obligation for Commerce to use this data as a comparison as JA Solar and Jinko urge.

With respect to Indonesian AUV data with Malaysian data included (or alternatively, only Malaysian and U.K. imports within the Indonesian AUV data) and Jinko's unaffiliated purchases of solar glass, relying on such data sources to assess whether the selected surrogate value is

34

aberrational would not be appropriate.  *See* JA Solar Br. at 27-28; Jinko Br. at 24-25.  The statute gives Commerce discretion to disregard price data which Commerce has *reason to believe or suspect* may be dumped or subsidized prices."  H.R. Conf. Rep. No. 100-576 at 590; 19 U.S.C. § 1677b(c)(5).  As discussed above, Commerce exercised its discretion to disregard Malaysian import prices in the Indonesian AUV data.  Within the context of this finding, it is inapposite that Commerce would then utilize this otherwise disregarded data to assess whether its remaining surrogate value data is aberrational.

Jinko's suggestion that Commerce was required to utilize exclusively Indonesian imports from the U.K. and Malaysia in the Indonesian AUV data as a comparator, *see* Jinko Br. at 8-9, likewise suffers from three flaws.  First, again, Commerce has already disregarded Malaysian import data.  Second, the imports from the U.K. are already included in the Indonesian AUV data that Commerce utilized as the surrogate value.  Therefore, it does not follow that Commerce would utilize this same data on the other side of its aberrational analysis.  Finally, and most obviously, the price for imports from the U.K. ranks the second lowest in terms of AUV among Indonesian AUV data (after Malaysia).  *See* JA Solar Br. at 26 (chart illustrating AUV of solar glass by country included in Indonesian AUV data).

Meanwhile, Jinko's assertion that Commerce was required to consider Jinko's own unaffiliated purchases of solar glass as a comparison of prices, *see* Jinko Br. at 9-10, bellies the very purpose of the surrogate value framework—to "construct a hypothetical market value" of the subject merchandise in the non-market economy based on prices and costs *outside* the non-market economy.  *Nation Ford*, 166 F.3d at 1375.  Jinko's suggestion to use purchases from within Vietnam, a nonmarket economy, is clearly wrong.

Finally, Jinko relies on a cost model from the U.S. International Trade Commission's (ITC) preliminary injury report as indication that the Indonesian AUV data is aberrational. *See* Jinko Br. at 10-12, 24-25. This data is of no use for this purpose because there is no indication that the underlying information, *i.e.*, costs per watt and percentage of total module cost, are reflective of solar cells producers in Vietnam. IDM at 23-24. Commerce therefore appropriately declined to use the ITC cost model—and the other sources suggested by plaintiffs—to assess the Indonesian AUV data. *See id.*

In any event, even accepting plaintiffs' comparison data sources as viable comparators, plaintiffs' mathematical comparisons, *see, e.g.*, Jinko Br. at 24-25, are equally nonsensical. Plaintiffs improperly conflate this Court's caselaw sustaining Commerce's practice of finding values to be aberrational based on a comparison to import values from other countries with an expectation that Commerce find particular prices *within* the Indonesian AUV data to be aberrational when compared to the aforementioned sources. *See* Jinko Br. at 22 (citing *Best Mattresses International Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1379 (Ct. Int'l Trade 2023). This Court has clarified the appropriate comparison: "Interested parties need to demonstrate that the import data are aberrational in the *aggregate*." *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 698 F. Supp. 3d 1277, 1285 (Ct. Int'l Trade 2024) (emphasis added). For example, Jinko contrasts the AUV for the Indonesian AUV data minus Malaysia and the U.K. ($19.18/kg) to the AUV of only the Malaysian and U.K. import data within the Indonesian data ($0.59/kg). *See* Jinko Br. at 24. But neither data group was utilized by Commerce as the surrogate value. *See* IDM at 20-21. Rather, Commerce utilized the Indonesian AUV data without the Malaysian import data, *i.e.*, $4.85/kg. *Id.* at 20. As explained in Commerce's final determination, the record does not support the conclusion that Commerce's

36

chosen surrogate value is aberrational. *See* IDM at 22-24. Where, as here, a party "merely disagree{s} with Commerce's conclusion" that the quantities underlying a surrogate value data set are not aberrational, "such disagreement is an insufficient basis on which to determine that the {relevant} quantities are aberrational." *Tianjin Magnesium International Co., Ltd. v. United States*, 823 F. Supp. 3d 1350, 1362 (Ct. Int'l Trade 2026) (citing *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1327 (Ct. Int'l Trade 2019)) (internal quotations omitted).

Plaintiffs bore the burden in building the record to equip Commerce to consider the commercial significance and aberrancy of its chosen surrogate value for solar glass but have failed to do so here. Commerce reasonably determined based on the record evidence that the Indonesian AUV data exclusive of Malaysian imports was the best available information. The Court should thus sustain Commerce's determination.

## B. Substantial Evidence Supports Commerce's Selection of Indonesian Import Data as the Surrogate Values of Polysilicon and Wafers

In response to Commerce's request for data sources to value factors of production, the petitioner placed on the record Indonesian price data under HS 3818.00 and HS 2804.61 for wafers and polysilicon, respectively, and Jinko provided a Bloomberg report of global monocrystalline silicon wafer and solar grade polysilicon prices ("Bloomberg data"). Petitioner First Submission of SVs, (October 11, 2024) (P.R. 353; C.R. 314) at Data Submission at Exs. 1A (Jinko FOPs Summary) (C.R. 321) and 3A (original HTS data) (P.R. 359; C.R. 321); Jinko 30-Day SV Submission, (November 6, 2024) (P.R. 434) at Exhibit 2B (Bloomberg data). After examining the data sources on the record, in the *Preliminary Determination*, Commerce utilized the Bloomberg data provided by Jinko to value wafers and polysilicon, finding that the data reflected the best information on the record given its "highly-FOP-specific nature." Preliminary SV Memorandum at 8; *see also* PDM at 27-28.

37

In the *Final Determination*, having considered parties' arguments and re-examined the data sources, Commerce changed its preliminary determination and relied on Indonesian import prices under HS 2804.61 and HS 3818.00 on the basis that the HS subheadings reflect the most specific and best available sources for valuing wafers and polysilicon, whereas the Bloomberg data did not meet Commerce's stated preferences concerning data quality. IDM at 39-41. Commerce found that the Indonesian import data satisfied every criterion for selecting FOP surrogate values, including contemporaneity, public availability, product specificity, broad market average representation, and free from taxes or duties. *Id.* at 40. The Bloomberg data as placed on the record by Jinko (and JA Solar, *see* JA Solar Rebuttal SV Comments, (October 22, 2024) (P.R. 376; C.R. 326) at Exhibit SVR-11 (P.R. 377)), in contrast, lacked sufficient explanation for its underlying methodology and failed to distinguish between prices from market economies and NMEs. IDM at 40. Without the necessary underlying data, Commerce determined it was neither able to discern whether the Bloomberg data were representative of a broad market average nor able to identify whether the prices were tax- and duty-exclusive. *Id.*

Jinko challenges Commerce's reliance on Indonesian import data as an inconsistent change of course from prior proceedings concerning solar cells, in which Commerce selected Bloomberg data to value polysilicon and wafers. *See* Jinko Br. at 36-43. This argument lacks merit, erroneously characterizing consistency in surrogate value selection across proceedings as the paramount consideration in Commerce's analysis. Rather, these prior proceedings are relevant only in so much as they are illustrative of Commerce's obligation to identify the best available data source using *the facts on the particular record*. *See Qingdao*, 766 F.3d at 1387 ("{E}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."). Considering the Indonesian HS

38

subheadings on this record, Commerce found the potential surrogate values—in addition to sourcing from the primary surrogate country—to meet Commerce's criteria as outlined in the Policy Bulletin. *See* IDM at 40. Likewise, re-examining the Bloomberg data placed on *this* record, Commerce identified several shortcomings that limited Commerce's ability to discern whether the data was representative of a broad market average and tax- and duty-exclusive. IDM at 40-41. Consistent with its statutory obligation, *see* 19 U.S.C. § 1677b(c)(1), Commerce undertook the record-specific comparison of the Bloomberg data and the Indonesian price data, concluding that the Indonesian price data constituted the best available information.[7] *Id.*

    1.   Commerce's Finding that Indonesian Import Data Represents the Best Available Information on the Record for Valuing Polysilicon and Polysilicon Wafers Is Supported by Substantial Evidence

As Commerce noted, Jinko "d{id} not substantively contest that the import data do not satisfy Commerce's criteria." IDM at 40. Though it rebuts Commerce's account before this Court, Jinko again fails to present any viable claim detracting from Commerce's finding. *See* Jinko Br. at 38-39. 19 U.S.C. § 1677b(c)(4)(A) directs Commerce to use data from economically comparable countries "to the extent possible." Here, the selected primary surrogate country was Indonesia. As this Court has explained, "{t}he Policy Bulleting explicitly states that Commerce data considerations are to be weighed in a sequential manner, following three other steps in the surrogate country selection process." *Heze Huayi Chemical Co., Ltd. v. United States*, 532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) (sustaining Commerce's use of data from the primary surrogate country over data from a different country where the primary surrogate country data was the only available data on the record from the primary surrogate country).

---

[7] Commerce did not dismiss the Indonesian price data as unusable in the *Preliminary Determination* and identified the data as "usable, reasonably-specific information to value the inputs." Preliminary Surrogate Value Memorandum at 8.

39

The Bloomberg data reflects a world-average price that Commerce could not corroborate as being exclusive of prices from NME countries or countries with generally-available subsidies because the data was provided on the record without identifying marks, source data, or information on the applied methodology. *See* IDM at 40-41; Jinko 30-Day SV Submission, (November 6, 2024) (P.R. 434) at Exhibit 2B (Bloomberg data). In contrast, Commerce had Indonesian price data for imports of polysilicon and wafers on the record via HS 2804.61 and HS 3818.00 subheadings, respectively. *See* Petitioner First Submission of SVs, (October 11, 2024) (P.R. 353; C.R. 314) at Data Submission at Exs. 1A (Jinko FOPs Summary) (C.R. 321) and 3A (original HTS data) (P.R. 359; C.R. 321). On this basis alone, Commerce's decision to rely on these data is consistent with the Policy Bulletin and supported by substantial evidence. Finding no evidence on the record "identif{ying} the use of import data from the HS subheadings as an inappropriate or non-specific source," Commerce reasonably selected the Indonesian HS subheadings to value polysilicon and wafers. IDM at 41.

Jinko fails to acknowledge Commerce's regulatory preference to value all FOPs in a single surrogate country. *See* 19 C.F.R. § 351.408(c)(2). Thus, even assuming, for the sake of argument, the Bloomberg data better conforms to the commercial reality than the selected HS subheadings to some extent, *see* Jinko Br. at 40-42, Commerce reasonably selected the potential surrogate value from the primary surrogate country, consistent with its regulatory preference. *See Jiaxing Brother Fastener*, 11 F. Supp. 3d at 1333 (Commerce will "*only resort* to a secondary surrogate country if data from the primary surrogate country are *unavailable or unreliable*."). The Federal Circuit in *Dorbest* "recognized that a particular country source could be disregarded if the data were 'irretrievably tainted by some statistical flaw.'" *Diamond Sawblades Manufacturers' Coalition v. United States*, 219 F. Supp. 3d 1368, 1384 (Ct. Int'l Trade 2017)

40

(citing *Dorbest*, 604 F.3d at 1371-72). As Commerce explained in its final determination, no such flaw exists. Rather, Commerce determined that the HS subheadings satisfy all of Commerce's criteria for contemporaneity, public availability, product specificity, broad market average representation, and free from taxes and duties. IDM at 40.

2. Commerce Reasonably Selected Indonesian Import Data Over Bloomberg Data to Value Polysilicon and Polysilicon Wafers

Rather than identify flaws or limitations in the Indonesian import data, Jinko relies on prior administrative reviews illustrating what it alleges is Commerce's "longstanding practice of rejecting HTS data to value wafers" and polysilicon. *See* Jinko Br. at 38-39. The notion that Commerce must reject HTS data as a general category of surrogate value where the agency has done so before—on a different record—is belied by the established principle that Commerce's surrogate value selection process is inherently fact-specific. *See Qingdao*, 766 F.3d at 1387; *cf. QVD Food*, 658 F.3d at 1324-25 ("Judicial review of antidumping duty administrative proceedings is normally limited to the record before the agency in the particular review proceeding at issue and does not extend to subsequent proceedings." (citations omitted)). Commerce considered the potential surrogate value sources on the record and, considering parties' arguments, reasonably determined both that the Bloomberg data on the record suffered from flaws, and that the Indonesian import data was superior. *See* IDM at 39-41. Commerce here considered the particular facts on this record and concluded that Indonesian import data was superior to Bloomberg data for valuing polysilicon and wafers.

The Federal Circuit has emphasized the record-specific nature of Commerce's examination of facts in determining appropriate surrogate country and surrogate value selections. *See Jiaxing Bro. Fastener*, 822 F.3d at 1299 ("Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition."). This

41

Court has likewise rejected a similar claim that Commerce is bound by prior findings that a certain dataset is superior, where Commerce's conclusion that a different data source constitutes the best available information is supported by substantial evidence. *Vulcan Threaded Products*, 311 F. Supp. 3d at 1367. The best available information standard is inherently record-specific and cannot be translated between proceedings. Jinko's reliance on prior segments in which Commerce selected a world market price for similar inputs does not implicate the agency's findings here, which are predicated on a weighing of the two sources on this record (Indonesian import data and Bloomberg data). *See* Jinko Br. at 37-40.

For example, in *Canadian Solar*, this Court considered whether Commerce reasonably selected international prices for solar-grade polysilicon as the best available information where the alternative was "construct{ing} a cost, starting with the world-market price of raw polysilicon and adding the costs required to produce a unit of ingot or block." *Canadian Solar International Limited v. United States*, 378 F. Supp. 3d 1292, 1313 (Ct. Int'l Trade 2019); *see also* Jinko Br. at 37 (citing *Canadian Solar* in support of its proposition that the relevant facts here are "identical to the facts in the prior investigations in which Commerce relied on Bloomberg data"). Given the absence of data values for ingots and blocks, the Court held that Commerce reasonably relied on the world market price for raw polysilicon. *Id.* The facts in *Canadian Solar* are thus unlike the facts here, where Commerce was tasked with selecting between import data in the primary surrogate country and world market prices for polysilicon. *See* IDM at 39-41.

Likewise, Commerce's reasoning for selecting Bloomberg international prices to value wafers in an administrative review of the China solar cell order does not implicate Commerce's analysis here, because there, Commerce was comparing Bloomberg data with a Thai HTS

42

category.  *See* Jinko Br. at 39-40 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 83 Fed. Reg. 67,222 (Dep't of Commerce Dec. 28, 2018) (Solar Cells from China AR5) and associated PDM).  This investigation is distinguishable from Solar Cells from China AR5 because the HTS category Commerce considered there—*i.e.*, Thai HTS 3818—is a different HTS category than what was on the record here.  *Compare* Solar Cells from China AR5 PDM at 25 (valuing wafers using Bloomberg international prices over primary surrogate country (Thailand) import data) *and* IDM at 41 (valuing polysilicon and wafers using primary surrogate country (Indonesia) import data over Bloomberg international prices).  And, more notably, Commerce determined that the Thai HTS 3818 data suffered from flaws in Solar Cells from China AR5 that rendered it not the best available information, whereas here the Indonesian import data selected by Commerce do not suffer from flaws that would similarly disqualify it from use.  *See* Solar Cells from China AR5 PDM (noting the lack of product specificity in the Thai HTS category).  For example, the Thai HTS category in Solar Cells from China AR5 did not specify polysilicon concentration, and Commerce thus determined that the data did not contain sufficient product specificity.  Solar Cells from China AR5 PDM at 25.  In contrast, none of the features of the Indonesian HS data rose to the same level of concern that Commerce determined it could not use the data.  *See* IDM at 40.

Relatedly, Commerce also closely considered the Bloomberg data, identifying several flaws that made the data unusable.  Rather than challenge Commerce's findings in this respect, Jinko asserts—without supporting evidence—that the Bloomberg data on this record is identical to that selected by Commerce as surrogate values in prior proceedings.  *See* Jinko Br. at 40.  But

a separate proceeding on a different record cannot undermine Commerce's findings based on this record.  Jinko makes no effort to respond to Commerce's findings that the Bloomberg data submitted by JA Solar and Jinko suffer flaws that make them not the best available information, including restricting Commerce's ability to exclude prices from non-market economies or countries with generally-available subsidies, and lacking source information by which Commerce could corroborate claims that the data reflect the most accurate prices for polysilicon and wafer inputs.  *See* IDM at 41.  Commerce provided sufficient explanation for its findings that Indonesian import data were the better data source for valuing polysilicon and wafers, and the Court should sustain Commerce's surrogate value selections.

Finally, Jinko suggests that, once Commerce had decided it would select Indonesian import data over Bloomberg world prices, Commerce should have reopened the record "to give parties the opportunity to present further evidence on this important issue."  Jinko Br. at 43.  That Commerce relied on the Bloomberg data at the preliminary stage and then reconsidered its findings in the final determination to select the Indonesian import data is not a bug in Commerce's determination, but a feature.  *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("Preliminary determinations are 'preliminary' precisely because they are subject to change.").  "Commerce has the flexibility to change its position" from the preliminary to the final determination provided it "explains the basis for the change."  *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) (internal quotations omitted).  Commerce has done so here, and Jinko fails to provide any compelling argument demonstrating otherwise.[8]  Having found Indonesia HS 2804.61 and HS 3818.00 to be

---

[8] Jinko's suggestion that Commerce should have reopened the record seems to suggest the burden was on Commerce to confirm the record contained all potential surrogate value sources.  *See* Jinko Br. at 43.  "The burden of creating an adequate record lies with interested

not only usable surrogate values for valuing polysilicon and wafers, respectively, but the best available information, Commerce was under no obligation to reopen the record after the preliminary determination to solicit new surrogate value data sources.  *See* IDM at 39-41.

**IV.    Commerce Reasonably Selected Satnusa's Financial Statement to Value Surrogate Financial Ratios**

JA Solar and Jinko both challenge Commerce's inclusion of Satnusa's financial statements in Commerce's surrogate financial ratio calculation.  *See* JA Solar Br. at 28-37; Jinko Br. at 28-36.  JA Solar argues that Commerce's inclusion of Satnusa's financial statements runs afoul of the agency's obligation to, where available, rely on surrogate value information from producers of comparable merchandise.  *See* JA Solar Br. at 28-37.  Jinko avers that Commerce improperly included Satnusa's financial statements on the basis that Commerce had "reason to believe or suspect" that Satnusa received countervailable subsidies during the POI, in contravention of 19 U.S.C. § 1677b(c).  Jinko Br. at 28-36.  Separately, Jinko asks the Court to remand the final determination on the basis that Commerce failed to address its case brief argument that Commerce should have included financial statements from PT Jembo in calculating surrogate financial ratios.  *See* Jinko Br. at 25-28.  The Court should reject JA Solar's and Jinko's arguments, as well as Jinko's separate request for remand, and conclude that Commerce's selection of Satnusa's financial statements for its surrogate financial ratio calculation was reasonable.

Pursuant to 19 C.F.R. § 351.408(c)(3), Commerce values overhead, selling, general, and administrative (SG&A) expenses, and profit using non-proprietary information gathered from

---

parties and not with Commerce."  *QVD Food.* 658 F.3d at 1324.  If Jinko had additional surrogate value information to submit, it could have further developed the administrative record in its numerous factual submissions.

producers of merchandise that is identical or comparable to the merchandise under consideration in the surrogate country. *See* Preliminary SV Memorandum at 12. Commerce prefers to derive these financial ratios using financial statements covering a period contemporaneous to the POI that (1) show a profit, (2) come from companies with production experiences similar to that of respondents', and (3) are not distorted or otherwise unreliable. *See id.* Interested parties placed various potential surrogate value financial statements from Indonesian companies on the record, including, but not limited to, financial statements from Satnusa, PT Tera, and PT Jembo. *Id.* at 12-13. In its preliminary determination, Commerce used the financial statements of Satnusa and Tera Data for the surrogate financial ratios. *Id.* at 12-13. The agency declined, however, to utilize those from PT Jembo on the basis that "the vast majority of the company's production reflects merchandise unrelated to and unlike solar cells." PDM at 31. In the final determination, Commerce continued to use the simple average of the financial ratios of Satnusa and PT Tera. *See* IDM at 72-77.

This Court should sustain Commerce's determination that financial statements from Satnusa and PT Tera constituted the best available information for calculating surrogate financial ratios. The record illustrated that Satnusa was a producer of comparable merchandise whose revenue primarily came from production and sale (as opposed to assembly) of comparable merchandise. *See* IDM at 74. Likewise, the record does not substantiate Jinko's claim that Satnusa received countervailable subsidies. *See id.* at 74-75. In evaluating the financial statements on the record, Commerce considered whether the data on the record was publicly available, product specific, representative of broad market average prices, contemporaneous with the period of investigation, and free of taxes and import duties. IDM at 73; *see also Jiaxing Bro. Fastener*, 822 F.3d at 1293. Commerce thus rationally exercised its discretion to choose the

46

appropriate financial statements to calculate surrogate financial ratios. *See FMC Corp. v. United States*, 27 CIT 240, 251 (Ct. Int'l Trade 2003) (holding that Commerce can exercise discretion in choosing between reasonable alternatives), *aff'd, FMC Corp. v. United States*, 87 F. Appx. 753 (Fed. Cir. 2004).

### A. Commerce Reasonably Concluded that Satnusa Is a Producer of Comparable Merchandise

Commerce properly relied on Satnusa's and PT Tera's financial statements because they "comprise the best available information." IDM at 72. Moreover, the record demonstrates that Satnusa engaged in the production of products like circuit boards, which Commerce has previously found to be similar to solar cells and modules in terms of production process. *See* IDM at 73-74; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63791 (Dept. of Commerce Oct. 17, 2012), and accompanying IDM at Comment 2 ("we continue to find manufacturers and assemblers of electronic components and circuit boards to be producers of merchandise comparable to solar cells and solar modules. Specifically, as noted in the investigation of this proceeding, both circuit boards and merchandise under consideration are manufactured from similar processes, which involve putting together a variety of sensitive components onto a single base or board using both robotics and manual labor, using similar inputs (*i.e.*, silicon base materials and various types of joining parts").

JA Solar argues that Satnusa is not a *manufacturer* of comparable merchandise, but merely an *assembler* and relies on three sources of record evidence: (1) a statement from the company's 2023 annual report; (2) communications with an employee of Satnusa's Business

Department, and (3) Satnusa's website. *See* JA Solar Br. at 31-34. The evidence is insufficient to justify disturbing Commerce's final determination. JA Solar's position is tantamount to mere dissatisfaction with Commerce's weighing of the evidence, which falls far short of establishing a justification to reverse Commerce's finding. *See Ellwood City Forge Company v. United States*, 582 F. Supp. 3d 1259, 1271 (Ct. Int'l Trade 2022) (explaining that the mere "possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Bio-Lab, Inc. v. United States*, 433 F. Supp. 3d 1287, 1296-97 (Ct. Int'l Trade 2020) (quoting *Consolo*, 383 U.S. at 620) (internal quotations omitted).

Commerce identified record evidence that illustrates that Satnusa produces comparable merchandise, *i.e.*, printed circuit boards and hi-tech producers from components. *See* IDM at 73; P.R. 353-356 (providing screenshots of Satnusa's website). Satnusa's website, for example, includes photos of Satnusa's printed circuit board (PCB) production and assembly process and notes the company's years of "manufacturing & assembling experience." *See id.* (citing Petitioner First SV Submission, dated October 11, 2024).

JA Solar argues that Satnusa's website proves that it "does not actually produce PCBs but merely provides assembling services for PCBs." JA Solar Br. at 33. But as noted above, Commerce explained in the final determination that this distinction does not rule the day and that Commerce had previously determined that assemblers of circuit boards were producers of merchandise comparable to solar cells. *See* IDM at 73. Commerce accounted for the fact that Satnusa provided assembly services, noting that this kind of business activity is likewise relevant in the production of solar cells and modules. *See id.* at 73-74. Commerce appropriately weighed

48

the record evidence before it and concluded that Satnusa was a producer of comparable

merchandise.  *See Ellwood City*, 582 F. Supp. 3d at 1271.  Its determination should be upheld.

### B.   Record Evidence Supports Commerce's Determination that There Was No Reason to Believe or Suspect that Satnusa Received Countervailable Subsidies

Jinko's argument that Commerce impermissibly relied on Satnusa's financial statements

on the basis that the company received countervailable subsidies is not supported by the record.

*See* Jinko Br. at 28-36.  Commerce examined the information on the record pertaining to

potential subsidies provided to Satnusa and reasonably concluded that it need not exclude the

financial statements from its surrogate financial ratio calculation.  *See* IDM at 74-77.

As explained above in section III.A.2.a ("Commerce's Decision to Exclude Malaysian

Import Data Was Reasonable and Supported by Substantial Evidence"), 19 U.S.C. § 1677b(c)(5)

grants Commerce the discretion to disregard financial statements where Commerce has

determined, "without further investigation," that the company received countervailable subsidies.

19 U.S.C. § 1677b(c)(5).  Commerce generally only disregards financial statements where there

is explicit evidence of a subsidy previously determined to be countervailable.  *See Shenzhen*

*Xinboda Industrial Co., Ltd.*, 494 F. Supp. 3d at 1351-56 (holding "logical" Commerce's reliance

on legislative history to inform its practice of seeking explicit evidence of a subsidy previously

determined to be countervailable).  Jinko characterizes Commerce's analysis here as improperly

limited to Satnusa's financial statements, where other record evidence demonstrates—per

Jinko—that Satnusa received countervailable subsidies.  *See* Jinko Br. at 31-34.  While it is true

that Commerce primarily examined Satnusa's actual financial statements, as explained in the

final determination, the flaw in Jinko's argument lies in the lack of evidence of *countervailable*

subsidies.  *See* IDM at 74-75; *see also Shenzhen Xinboda Co., Ltd.*, 494 F. Supp. 3d at 1354

49

(distinguishing between evidence of a "previously countervailed subsidy program" and evidence of other financial assistance or potential subsidies).

Commerce found that the evidence cited by Jinko did not demonstrate that Satnusa received countervailable benefits under the previously countervailed customs duty exemption programs Jinko referenced in its case brief.  *See* IDM at 75.  Though Jinko objects to Commerce's distinction between bonded zones and Free Trade Zones (where Satnusa is located), the relevant distinction is that Commerce has previously countervailed the customs duty exemption programs on the basis that they provided benefits to companies in bonded zones, and the record does not indicate that Satnusa operates in such a bonded zone.  *See* IDM at 75; *see also Mattresses from Indonesia: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With the Final Antidumping Duty Determination*, 89 Fed. Reg. 57 (Dep't of Commerce January 2, 2024), and accompanying PDM at 10-12, unchanged in *Mattresses From Indonesia: Final Negative Countervailing Duty Determinatio*n, 89 Fed. Reg. 59,050 (Dep't of Commerce July 7, 2024).  On this basis, Commerce reasonably concluded that the record does not indicate Satnusa received *countervailable* subsidies.  *See* IDM at 74-76.

For this reason, the principle articulated by this Court in *Shenzhen Xinboda (2014)* is inapplicable here.  *See* Jinko Br. at 30-31 (citing *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 976 F. Supp. 2d 1333 (Ct. Int'l Trade 2014)).  In *Shenzhen Xinboda* (2014), the Court took issue with Commerce's failure to examine record evidence beyond a company's financial statement that indicated the company had received previously countervailed subsidies.  *See Shenzhen Xinboda (2014)*, 976 F. Supp. 2d at 1372.  In contrast, here, the record does not indicate that the evidence of subsidies cited by Jinko references subsidies previously countervailed by Commerce.  *See* IDM at 75-76.

50

In any event, Commerce considered the record evidence referencing subsidies "in general terms," *Yantai Xinke Steel Structure Co., Ltd. v. United States*, No. 10-00240, 2014 WL 1387529, at \*21 (Ct. Int'l Trade Apr. 9, 2014), and reasonably concluded that the evidence did not indicate any distortion in the financial statements. *See* IDM at 75-76. "When there is evidence of a potential subsidy but Commerce has not previously found the specific program to be countervailable, Commerce does not *per se* reject the data in question and requires evidence of distortion before it will reject it." *See Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.*, 396 F. Supp. 3d at 1348 (citing *Yantai Xinke*, 2014 WL 1387529, at \*1); *see also* IDM at 75-76. As Commerce explained in the final determination, the record is devoid of evidence of distortion. *See* IDM at 74-76. Jinko points to no evidence here that detracts from that conclusion. Accordingly, Commerce reasonably declined to exclude Satnusa's financial statements from its surrogate financial ratio calculation. *See* IDM at 77 (noting Commerce's preference for using multiple financial statements to determine surrogate financial ratios).

### C. Commerce's Decision Not to Rely on Jembo's Financial Statement Was Reasonable and Supported by Substantial Evidence

Jinko further challenges Commerce's decision not to rely on the financial statements of PT Jembo in its surrogate financial ratio calculation. *See* Jinko Br. at 25-28. Irrespective of the merits, Jinko contends, the issue should be remanded on the basis that Commerce failed to address Jinko's argument in its final determination. *See id.* at 25-26. But Commerce need not mention every piece of evidence when making its determination. *See Pirelli Tyre Co., Ltd. v. United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025). Rather, it is reasonably discernible from Commerce's explanation in the final determination that it would make no changes to its surrogate financial ratio analysis. *See* Final Surrogate Value Memorandum, (April 18, 2025) at 4 (P.R.

645) ("Upon consideration of comments received, we made no change to the preliminary SVs . . . or the financial statements used to calculate surrogate financial ratios.").

Moreover, Jinko states that after Commerce's preliminary determination, it "subsequently demonstrated that {Commerce's} reasoning {for declining to use PT Jembo's financial statements} was incorrect." Jinko Br. at 26. But every piece of evidence Jinko cites in support of its position was on the record and considered by Commerce *prior* to its preliminary determination. *See* Jinko Br. at 26-27 (citing Jinko's Final Surrogate Value Submission at Exhibits 7B-1-7C-5, (November 6, 2024) (P.R. 433-442)). Commerce considered this record information (and extensive pre-preliminary affirmative and rebuttal case briefing) at the preliminary stage and concluded:

> We declined to use the financial statements provided to the record for . . . PT Jembo Cable Company Tbk (PT Jembo), based on concerns that the company's main business line, accounting for the vast majority of its revenue and expenses, relates to the production and sales of telecommunication cables, fiber optic cables, and electrical cables, which the record fails to substantiate to be similar to solar cell production.

Preliminary SV Memorandum at 13; *see also* Final Ministerial Error Memorandum, (May 19, 2025) at 8-9 (P.R. 660). Jinko presented no new argument or record evidence in support of its argument after the preliminary determination, and it does not do so here. *See* Jinko Br. at 26-28. Accordingly, Commerce's exclusion of PT Jembo's financial statements from its surrogate financial ratio calculation was supported by substantial evidence and in accordance with law.

V.    **Commerce Reasonably Declined to Individually Examine Boviet as a Voluntary Respondent in Accordance with 19 U.S.C. § 1677m(a)**

A.  **Legal Framework for Selection of Voluntary Respondents**

19 U.S.C. § 1677f-1(c)(1) directs Commerce to determine an individual weighted-average dumping margin for each known exporter and producer of subject merchandise. Under

52

19 U.S.C. §1677f-1(c)(2), however, Commerce may limit its examination of individual respondents to a reasonable number of exporters or producers if it determines that it is not practicable to determine an individual weighted-average dumping margin for all known producers and exporters because of the large number of exporters and producers involved in the investigation or review.  Where Commerce limits the number of exporters or producers to be individually examined as mandatory respondents, Commerce may choose to examine additional voluntary respondents pursuant to 19 U.S.C. § 1677m(a).  19 C.F.R. § 351.109(h).  Where an exporter or producer not selected as a mandatory respondent requests voluntary respondent status and timely submits information requested of mandatory respondents, 19 U.S.C. § 1677m(a)(1), Commerce shall establish for such exporter or producer an individual weighted average dumping margin if the additional individual examination of said exporter or producer "would {not} be unduly burdensome to {Commerce} and inhibit the timely completion of the investigation or review."  19 U.S.C. § 1677m(a)(1)(B).

The statute articulates four factors which Commerce "may consider" when determining if the individual examination of a requested voluntary respondent would be "unduly burdensome":

> (A)  The complexity of the issues or information presented in the proceeding, including questionnaires and any responses thereto.
> (B)  Any prior experience of the administering authority in the same or similar proceeding.
> (C)  The total number of investigations under subtitle A or B and reviews under section {1675} being conducted by the administering authority as of the date of the determination.
> (D)  Such factors relating to the timely completion of each such investigation and review as the administering authority considers appropriate.

19 U.S.C. § 1677m(a)(2).  Commerce "is not obligated to grant such requests." *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1348 (Fed. Cir. 2016).

53

**B.  Commerce Reasonably Exercised Discretion in Declining to Review Boviet**

Commerce's nonacceptance of Boviet's request for voluntary respondent status was in accordance with law and Commerce's statutory discretion.  *See* 19 U.S.C. § 1677m(a)(1)-(2).  Having considered the particular facts and complexities of this investigation relevant to each of the aforementioned factors, Commerce reasonably exercised its discretion in declining to accept Boviet as a voluntary respondent.  The Court should reject Boviet's arguments to the contrary.

Boviet first takes issue with the purported lack of detail in Commerce's examination of the factors listed in 19 U.S.C. § 1677m(a)(2).  Boviet Br. at 20.  In particular, Boviet alludes to Commerce's remark that this proceeding is an investigation as a generic circumstance in Commerce's proceedings, and thus insufficient reason to find that accepting a voluntary respondent would be unduly burdensome.  *Id.* at 21-22.  Boviet likewise takes issue with Commerce's identification of the agency's workload beyond this investigation.  *Id.*  This very Court, hearing a challenge to an investigation of certain oil country tubular goods (OCTG) from the Republic of Korea (Korea), in which Commerce declined to accept a voluntary respondent, rejected these same concerns:

> Because of the concurrent investigations into the same product and the fact that Commerce is required to do more work in less time when conducting such investigations, Commerce has shown that the burden of reviewing a voluntary respondent in this case would exceed the typical burden Commerce faces in other administrative proceedings.

*Husteel Co. Ltd. v. United States*, 98 F. Supp. 3d 1315, 1336 (Ct. Int'l Trade 2015).  There, Commerce identified—to which the Court concurred—several factors unique to that proceeding, including the shortened deadlines for investigations, requirement of on-site verification of all

54

respondents, and number of parallel OCTG investigations. *See id.* at 1334-37. Similarly, Commerce here identified several unique factors contributing to its unduly burdensome finding: the statutory deadlines of an investigation, the "voluminous information presented in this investigation," and "the number of investigations, reviews, and other case work currently before {the Commerce} office {handling the investigation}." PDM at 16. This investigation in particular, Commerce explained, includes supporting documentation covering over one thousand pages, including "hundreds of pages of briefs identifying over 30 distinct issues for Commerce to address in the final determination." IDM at 91.

In furtherance of its assertion that acceptance of Boviet as a voluntary respondent would not have been unduly burdensome, Boviet points to the unique nature of this investigation as following an existing AD order on solar cells and panels from China. Boviet Br. at 20-21. Though prior experience on the part of Commerce in similar proceedings is included in the factor provided in 19 U.S.C. § 1677m(a)(2)(B), that Commerce has experience with a particular product is not indicative of the amount of time and work a LTFV investigation of the product from a different country, Vietnam, would require of Commerce. Each segment and proceeding before Commerce stands on its own record. *Cf. Qingdao Sea-Line Trading*, 766 F.3d at 1387 (noting that "each administrative review is a separate exercise of Commerce's authority"). Commerce's determination here necessitated a complete investigation of the particular facts on this record, irrespective of Commerce's prior experience with similar products. *See* IDM at 90 ("Calculating a company-specific dumping margin, regardless of the number of reviews done for the product, requires Commerce to fully examine its questionnaire responses, issue (where applicable) supplemental questionnaires and analyze the responses, conduct a verification,

prepare a company-specific computer program to calculate a weighted-average dumping margin, and issue associated analysis memoranda.").

For this same reason, that Commerce had individually examined Boviet in a prior anti-circumvention inquiry (and collected information from Boviet, such as the company's affiliations, *see* Boviet Br. at 20) does not create "substantial{} overlap" between the anti-circumvention inquiry and this LTFV investigation. Boviet Br. at 20. Quite the opposite. As Commerce explained in its *Final Determination*, "regardless of any supposed familiarity Commerce may have had with Boviet, Commerce would have to use significant resources and time that it did not have to verify Boviet's responses submitted." IDM at 89; *see also* 19 U.S.C. § 1677m(i)(1) (mandating verification of all information relied upon in making a final determination in an investigation).

Even assuming, for the sake of argument, that these unique circumstances might have lessened the burden of individual examination, this argument does not take into account the existing workload required to conduct the LTFV investigation examining two mandatory respondents. In *Tri Union Frozen Products, Inc. v. United States*, 163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016), this Court relied on the Statement of Administrative Action (SAA)[9] to hold that the burden a voluntary respondent poses may be assessed within the context of the segment at hand. *Id.* at 1282 (citing SAA at 873). Even where Commerce only receives a single voluntary respondent request, the Court held, "it may be that the burdens implicated with reviewing a single potential voluntary respondent *in combination with other significant administrative burdens* could render individual review of that respondent unduly burdensome." *Id.* (emphasis

---

[9] Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 893 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. The SAA is the "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

added).  Commerce's conclusion that "{t}he significant resources involved {in examining the two selected mandatory respondents} prohibit{ed} the examination of an additional respondent without the imposition of undue burden" was thus in accordance with the statute.  IDM at 91; *see* 19 U.S.C. § 1677m(a).

In any event, Boviet's challenge amounts to a mere disagreement with Commerce's weighing of the unduly burdensome factors and examination of its own capacity.  *See* Boviet Br. at 20 ("The record facts, even in light of these reasons, do not amount to a reasonable decision that reviewing Boviet would have been unduly burdensome.").  Commerce has a great level of discretion in how it analyzes whether accepting a voluntary respondent would be unduly burdensome.  Congress's 2015 amendment to 19 U.S.C. § 1677m(a) made through the TPEA, 129 Stat. 362, 386–87 (2015), which added the factors articulated in 19 U.S.C. § 1677m(a)(2), "provided Commerce with broad discretion in deciding whether or not to accept a request for voluntary respondent status." *Qingdao Qihang Tyre Co., Ltd. v. United States*, 308 F. Supp. 3d 1329, 1365 (Ct. Int'l Trade 2018).  An assessment of an "undue burden" under 19 U.S.C. § 1677m(a) "is predicated on Commerce's ability to complete the investigation on time, which would seem to invite consideration of Commerce's resources." *Husteel Co. Ltd.*, 98 F. Supp. 3d at 1335.  Within the context of assessing its capacity to individually examine a voluntary respondent, the Court has held, "Commerce is in the best position to assess its own administrative capabilities," as "any assessment of Commerce's operational capabilities or deadline rendering must be made by the agency itself." *Longkou Haimeng Machinery Co., Ltd. v. United States*, 581 F. Supp. 2d 1344, 1353 (Ct. Int'l Trade 2008) (holding that Commerce did not violate the statute where it denied a request based on its assessment of its administrative capabilities) (citing *Torrington v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (explaining

that "agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources")). Here, Commerce acted within its discretion when it weighed the outlined factors, including Commerce's resource constraints, and concluded that an individual examination of Boviet would be unduly burdensome. *See* IDM at 89-91; PDM at 16-17.

This investigation is not, as Boviet contends, a scenario in which Commerce has rendered the statute a nullity. Boviet Br. at 19. Rather, in referencing *Grobest* and *Ad Hoc Shrimp*, Boviet construes the rule overly narrowly, excluding an important distinction drawn by this Court. *Id.* at 22 (citing *Grobest & I-Mei Indus. Vietnam Co. v. United States*, 853 F. Supp. 2d 1352, 1365 (Ct. Int'l Trade 2012) (holding that Commerce does not meet its statutory obligation where the Department explains only that the voluntary respondent materials were voluminous and require careful consideration, that prior review was lengthy, and that the Department had a heavy administrative workload); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367, 1371 (Ct. Int'l Trade 2013) (holding that it was not sufficient for Commerce to decide not to review a voluntary respondent where the Department's only reasoning for doing so was the burden of reviewing the respondent before and the need for multiple rounds of questionnaires)). As the Court explains in *Husteel Co.*, *Grobest* "is better understood as a requirement that Commerce rely on something other than its initial decision to limit the number of mandatory respondents when analyzing requests for voluntary respondents," and Commerce must give "specific reasons for why examining any additional respondents" would pose an undue burden. *Husteel Co.*, 98 F. Supp. 3d at 1336. The shortened deadlines and statutorily mandated verifications that accompany an investigation, for example, can provide such specific reasons. *See id.*; *see also* IDM at 89; PDM at 16. The cases cited by Boviet, in contrast, relate to

58

administrative reviews, not investigations. *Grobest & I-Mei Indus. Vietnam Co.*, 853 F. Supp. 2d at 1355; *Ad Hoc Shrimp Trade Action Comm.*, 925 F. Supp. 2d at 1369. And, to the extent that factual similarities may exist between *Grobest* and *Ad Hoc Shrimp* and this investigation, those cases are minimally persuasive, as they were decided prior to the 2015 TPEA amendment to 19 U.S.C. § 1677m(a), which "expanded considerably the discretion Commerce could exercise in denying a qualifying voluntary respondent request." *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 322 F. Supp. 3d 1308, 1336 (Ct. Int'l Trade 2018).

This Court has previously stopped short of "second-guessing Commerce's decisions regarding its own administrative capacity," noting that doing so would "put this Court in the position of routinely second-guessing Commerce's decisions regarding its own administrative capacity. *Id.*; *see* Boviet Br. at 21 ("Moreover, Commerce only issued *one* supplemental questionnaire each to JA Solar and Jinko during the investigation. There were in fact not multiple rounds of supplemental questionnaires." (internal quotations omitted) (emphasis in original)). The Court again should leave such an examination of Commerce's capacity for an additional respondent to Commerce and sustain Commerce's denial of Boviet's request for voluntary respondent status.

**CONCLUSION**

For these reasons, we respectfully request that the Court sustain the final determination in its entirety and enter final judgement in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

59

FRANKLIN E. WHITE, JR.
Assistant Director

s/ Collin T. Mathias
COLLIN T. MATHIAS
JULIUS A. HALSTEAD
Trial Attorneys

OF COUNSEL:                          Commercial Litigation Branch
                                     Civil Division
FEE PAUWELS                          United States Department of Justice
Attorney                             P.O. Box 480
Office of the Chief Counsel          Ben Franklin Station
    for Trade Enforcement and Compliance    Washington, D.C. 20044
United States Department of Commerce    Tel: (202) 307-0315
                                     Collin.T.Mathias@usdoj.gov

August 7, 2026                       *Attorneys for Defendant United States*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's

Standard Chamber Procedures, and the Court's scheduling order (ECF No. 56) in that it contains

17,835 words, including text, footnotes, and headings.

/s/ Collin T. Mathias
COLLIN T. MATHIAS
