UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| JA SOLAR VIETNAM CO. LTD., ET AL.,<br>Plaintiffs,<br>and<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR(VIETNAM) INDUSTRIES CO LTD., ET AL.,<br>Consolidated Plaintiffs,<br>and<br><br>TRINA SOLAR ENERGY DEVELOPMENT CO. LIMITED,<br>LTD. Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br>Defendant,<br>and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br>Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Consol. Court No. 25-0158 |

**REPLY BRIEF**
**CONSOLIDATED PLAINTIFF BOVIET SOLAR TECHNOLOGY CO., LTD.**

C. Kevin Marshall
Hannah Templin
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com

*Counsel to Boviet Solar Technology Co., Ltd.*

Dated: November 19, 2026

## TABLE OF CONTENTS


**I. Commerce's Surrogate Value Selection for Glass is Not Supported by Substantial Evidence and is Otherwise Not in Accordance with the Law .......... 1**

**A. Commerce Improperly Removed the Malaysia Data from the Indonesian Glass Import Value .......... 2**

**B. Alternatively, Commerce Should Have Relied Upon the PVinsights Data to Value Glass .......... 5**

**1. *Commerce did not rely on a commercial quantity of glass* .......... 5**

**2. *Commerce should have relied on PVinsights data* .......... 9**

**II. Commerce Should Have Accepted Boviet as a Voluntary Respondent and Calculated a Margin for Boviet .......... 12**

**III. Conclusion and Prayer for Relief .......... 14**

## TABLE OF AUTHORITIES

### CASES

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984). ........ 1

*Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ........ 4

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (2003) ........ 9

*China Nat'l Mach. Imp. & Exp. Corp. v.* United States, 264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) ........ 2-3

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983) ........ 6

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ........ 11

*Fuyao Glass Indus. Group Co. v. United States*, 30 C.I.T. 165 (2006) ........ 3

*Husteel Co. v. United States*, 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ........ 13

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ........ 6-8

*Juancheng Kangtai*, SLIP OP. 2015-93, 2015 WL 4999476, 2015 Ct. Intl. Trade LEXIS 94 (Aug. 21, 2015) ........ 7-8

*Lasko Metal Prods. v. United States*, 810 F. Supp. 314, 316 (Ct. Int'l Trade 1992) ........ 9

*Luoyang Bearing Factory v. United States*, 288 F. Supp. 2d 1369 (Ct. Int'l Trade 2003) ........ 4

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ........ 10

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ........ 9

*Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ........ 6

*Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 144 (2018) ........ 2-3

*Tri Union Frozen Prods. v. United States*, 163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ........ 12-13

*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ........ 13

*Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, SLIP OP. 2013-30, 2013 WL 920276 (March 11, 2013) ........ 7

**STATUTES**

19 U.S.C. § 1677b(c)(4) .......... 9

19 U.S.C. § 1677b(c)(5) .......... 2-4

19 U.S.C. § 1677m .......... 12

**ADMINISTRATIVE DECISIONS**

*Freshwater Crawfish Tail Meat Final Results of Antidumping Duty Administrative Review and Partial Rescission; 2010-2011*, 78 Fed. Reg. 22,228 (Dep't Comm. Apr. 15, 2013) .......... 10

*Freshwater Crawfish Tail Meat From the People's Republic of China*, 84 Fed. Reg. 58,371 (Dep't Commerce Oct. 31, 2019) .......... 10

*Laminated Woven Sacks Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008) .......... 10-11

Consolidated Plaintiff Boviet Solar Technology Co., Ltd. ("Boviet"), hereby files its reply brief to Defendant United States' and Defendant-Intervenor's response briefs. *See* U.S.Br. (August 7, 2026), ECF57; Def-Int.Br. (September 4, 2026), ECF61; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 17,388 (Apr. 25, 2025) ("Final Determination") *incorporating* Issues and Decision Memorandum ("IDM"), **PR636**. Boviet also supports and incorporates by reference the arguments raised by JA Solar Vietnam Company Limited and Jinko Solar (Vietnam) Industries Company Limited in their reply briefs.

## I. Commerce's Surrogate Value Selection for Glass is Not Supported by Substantial Evidence and is Otherwise Not in Accordance with the Law.

The Government argues that Plaintiffs are asking this Court to unlawfully reweigh the evidence between surrogate values rather than giving Commerce appropriate discretion to selection surrogate values. U.S. Br. at 14-15; see also Def-Int Br. at 9. Not so. Plaintiffs insist only that Commerce's decisions must be supported by substantial evidence—that is, that Commerce review the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Commerce's decisions in this investigation have narrowly focused on only the data that supports its conclusions, ignoring other record evidence or administrative practice that contradicts its conclusions.

In the Final Determination, Commerce valued Respondents' glass inputs using Indonesian import data for HTS 7007.19.90.00. However, Commerce improperly removed Malaysian imports of glass into Indonesia from the surrogate value calculation due to supposed

subsidization by the Government of Malaysia. This decision is contrary to Commerce practice and unsupported by record evidence. Commerce should have followed its normal surrogate methodology and relied upon the Indonesian import value for glass, *including* the Malaysian imports into Indonesia. Alternatively, if excluding Malaysian imports is upheld as reasonable and in compliance with established practice, then the resulting Indonesian import value is nonetheless an unusable surrogate value because it is a non-commercial quantity. Boviet submits that the PVinsights data, which is also the most specific information on the record to value glass, constitutes the best available information to value this input.

**A. Commerce Improperly Removed the Malaysia Data from the Indonesian Glass Import Value.**

First, in so doing, Commerce removed the Malaysia import data for this HTS on the grounds that it had "reason to believe or suspect" the Malaysian glass imports into Indonesia were subsidized. But this finding is not consistent with either Commerce practice or the record.

Commerce found that the Malaysian imports of glass into Indonesia were subsidized solely based on an Indian countervailing investigation on Malaysian glass from 2020. Based upon this, the Government claims that Commerce properly followed it discretion under 19 U.S.C. § 1677b(c)(5) to disregard prices if Commerce decides a particular instance of subsidization occurred. U.S. Br. at 25. But the Government and Defendant-Intervenor cannot provide a single example of Commerce ever making a similar finding of subsidization based solely the findings of an entirely unrelated country. *See* generally U.S. Br. at 25-29; Def-Int Br. at 14-17.

The Government attempts to characterize the "reason to believe or suspect" standard as a very low bar, but that is not the case. The reason to believe or suspect standard must still be predicated on "particular, specific, and objective evidence." *China Nat'l Mach. Imp. & Exp.*

*Corp. v.* United States, 264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003); *Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 144, *11 (2018) (upholding Commerce's decision not to reject a surrogate financial statement for reason to believe or suspect subsidization because the record lacked particular, specific, objective evidence of subsidization); *Fuyao Glass Indus. Group Co. v. United States*, 30 C.I.T. 165, 173 (2006) (Finding the United States "failed to provide specific and objective evidence to support its conclusion that it had a reason to believe or suspect that prices from Korea and Indonesia were subsidized."). While still not requiring "further investigation" as contemplated in the statute, Commerce has always based its finding to disregard prices in a country on a conclusive finding of subsidization by *Commerce itself* or by the *selected surrogate country* (here, Indonesia).

For example, Commerce will disregard prices imported into the surrogate country under an specific HTS from a particular third country if that surrogate country maintains an antidumping or countervailing Order against that particular third country for that HTS. Or, Commerce will disregard imports prices into the surrogate country for all HTS from a particular third country if based on specific, objective findings in Commerce's *own* proceedings and investigations, Commerce determines that significant generally available subsidies were available to the third country, such that all exports from that country were considered subsidized. Boviet R56.2 Br. at 7-9 (discussing when Commerce has disregarded prices). Here, there is no U.S. finding that the Malaysian glass industry or exports are subsidized; there is no Indonesian finding that the Malaysian glass industry or exports are subsidized. Accordingly, rejecting the Malaysian imports of glass into Indonesia in this investigation is contrary to Commerce's practice under 19 U.S.C. § 1677b(c)(5).

Rather than address Commerce's departure from prior practice, the Government claims

that "no party refuted this presumption" of government subsidization. U.S. Br. at 26. But no case supports a "presumption" based a third-country finding not directly related to any of the countries involved. In *Luoyang Bearing*, the country where the supplier to the Chinese trading company was located is a country that Commerce itself had determined provides generally available export and industry specific subsidies broadly available, such that all exports from that country can reasonably be expected or believed to be subsidized. Commerce was not "presuming" subsidization at all, but rather following *its own findings*, which were applicable in all cases for all types of products exported. Similarly, in *Calgon,* Commerce found a particular surrogate financial statement was subsidized because the financial statement showed receipt of the precise subsidy program that Commerce itself had previously found countervailable. Neither case supports the Government's notion that the Indian government's finding of Malaysian glass subsidization creates a rebuttal presumption of subsidization in a U.S. case concerning Indonesian imports.

At any rate, Plaintiffs have clearly "refuted" the Government's intimation that the Indian CVD investigation entails that Malaysian glass imports into Indonesia are subsidized. U.S. Br. at 26. The Indian subsidy decision made *in 2020*, based on even older data, is not specific or objective that Malaysian exports of glass to Indonesia were subsidized *in the 2023-24 review period*. The Indian investigation is certainly not "uncontroverted evidence" of Malaysian subsidization of glass directed to the Indonesian market. U.S. Br. at 27-28. In addition to the arguments presented, the information from PVinsights also corroborates that the Malaysian glass value into Indonesia is not artificially low—i.e. there is no objective evidence that the exports were actually subsidized. The Malaysian import value into Indonesia was $0.57/kg, PVinsights has world prices ranging lower than this with a non-China price of $0.46/kg. JA Solar Final SVs

(November 6, 2024) at Exhibit 2, **CR491-494 PR454-455.** The PVinsights domestic Malaysian solar glass price was lower than the Malaysia export price into Indonesia of $0.57/kg—also undermining Commerce's finding that Malaysian exports are subsidized. *Id.* The total evidence on this record does not contain specific or objective evidence that Malaysian exports of glass to Indonesia are subsidized.

The Court should find that Commerce's decision to exclude the Malaysian glass imports into Indonesia is not supported by substantial evidence and is contrary to well-established agency practice.

### B. Alternatively, Commerce Should Have Relied Upon the PVinsights Data to Value Glass, Rather than the Non-Commercial Indonesian Dataset.

Alternatively, if excluding Malaysian imports is upheld as reasonable and in compliance with established practice, then the resulting Indonesian import value is nonetheless an unusable surrogate value because it is a non-commercial quantity. Instead, the record supports relying upon PVinsights as the best available information for the valuation of solar glass.

#### *1. Commerce did not rely on a commercial quantity of glass.*

In the Final Determination, Commerce relied upon an Indonesia import value for glass, but removed the Malaysian imports from the value. The Government wrongly states that Boviet conceded that the Indonesian dataset is the best available information to value glass. U.S. Br. at 24. Rather, Boviet clearly argued that the Indonesian dataset that Commerce relied upon (i.e. with Malaysia removed) is not the best available information to value glass, *see* Boviet R56.2 Br. at 4-10, and that PVinsights constitutes that best available information to value glass, *id.* at 10-17.

During the POI, Indonesia imported 250,868 kg of glass from Malaysia. Pet. Final SVs at Exhibit 3E, **PR444**. After removing this dataset, Indonesia only imported 13,217 kilograms.

*Id*. 13,217 kg is not a commercial quantity. The Government submits that this argument is "naturally foreclosed" because the parties did not submit comparative import data from the other listed surrogate countries. U.S. Br. at 29-30. As an initial matter, Commerce must still base its decision on substantial evidence in consideration of the entire record, even if it does not have its "preferred" data set for an analysis. None of the cases[1] cited support that Commerce can simply ignore record evidence detracting from its determination. *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (Substantial evidence must be viewed in its entirety, including the body of evidence opposed to its view).

Moreover, the Government confuses two arguments. Its brief focuses on whether Plaintiffs can make an aberrancy argument. *See also* Def-Int Br. at 18 (focusing on the *value* of the Indonesian imports and not the *quantity*). But Plaintiffs' argument that the surrogate value is not based on a commercial quantity is altogether different. Even if a party has not specifically argued that an AUV is aberrant, the Department is always obligated to rely upon a statistically or commercially significant quantity for an import value. *See, e.g., Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) (Where Commerce erred in failing to establish that the import value relied on was based on a statistically or commercially significant quantity).

The requirement for a commercially significant volume is tied to the purpose and accuracy of the dumping margin calculation. "Representativeness is important if Commerce is to fulfill its statutory mandate of calculating dumping margins as accurately as possible." *Jacobi*

[1] *Ancientree* criticized Plaintiff for only providing one other surrogate country import data set against which to measure aberrancy. *Boading* criticized Plaintiffs for not providing any standard for commercial quantity. The record of this case is more robust and Plaintiffs have argued that the quantity in this case fails to meet two standards for significant production, a commercial container load and Respondent purchasing experience.

*Carbons*, 313 F. Supp. at 1361-1362 (remanding to consider significant commercial quantity) (citing *Juancheng Kangtai*, SLIP OP. 2015-93, 2015 WL 4999476, at *25; *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, SLIP OP. 2013-30, 2013 WL 920276, at *5 (CIT Mar. 11, 2013); *Shanghai Foreign*, 318 F. Supp. 2d at 1352-53. As such, selecting "a surrogate value … as representative of the situation in the NME country as is feasible" is critical. *Id.* And that requires using a "sufficiently significant" quantity. *Id.* A commercial producer purchases commercial quantities of its raw materials. Small insignificant import volumes are understandably presumed not representative of the commercial quantity and value that a hypothetical commercial producer would purchase. Indeed, in *Jacobi*, the court questioned Commerce's "conclusory assertion" that "122 metric tons {was} sufficiently significant to yield a representative price." *Id.* Here, Commerce similarly has made a conclusory assertion that *13 tons* are significant, and largely ignores Plaintiffs' arguments and comparisons.

First, the quantity imported into Indonesia in total was less than a container load—which is a standard commercial unit. A normal 20 foot container load[2] is 20,000 kg (20 tons), and the Indonesian import value was based on a mere 13,217 kg (13 tons). The Indonesian import quantity during the entire POI <u>in aggregate</u> was less than a container load, the most basic form of commercial international shipments and imports of raw materials. Boviet also excerpted the dataset on a monthly basis by exporter, demonstrating that each monthly total was very insignificant, with imports of a mere 1-2 kilograms or a couple hundred kilograms. Boviet R56.2 Br. at 13. These are not commercial quantities. Such small loads would be consolidated with other goods to maximize use of the container and at a premium for the "less than full load". These fractional amounts are not commercial for the industrial producers such as respondents

[2] The other typical commercial shipment size is a 40 foot container with a larger load.

and therefore not representative of their buying patterns. The widely varying import values associated with these tiny quantities also underscore the fact that this is not a commercial surrogate value for a hypothetical solar manufacturer in Indonesia. The import values showed prices ranging from 1 USD/kg to over 1,000 USD/kg, with no clear relationship to the quantity. *Id*. In comparison, Respondents own purchasing prices were stable and the PVinsights data contains six different country or region prices, all ranging in a narrow band around $0.50/kg, consistent with large volume commodity purchasing.

Next, the Indonesian dataset is not based on a commercial quantity compared to the Respondents' purchasing situation. JA Solar and Jinko purchased many times more of glass than this small residual quantity during POI. Jinko Sec D (August 30, 2024) at Exhibit D-5, **CR243 PR281**; JA Solar Sec D (August 30, 2024) at Exhibit D-6, **CR283 PR282**. The imports into Indonesia cannot possibly sustain even a single hypothetical Indonesian solar panel manufacturer for any commercial production activity.

The Government claims it is of "no consequence" that Respondents purchased more glass, arguing Commerce is not required to duplicate the precise experience of the manufacturer. U.S. Br. at 32. While Commerce does not have to perfectly match the Respondent's purchasing situation, Commerce must rely upon a commercially significant import volume for surrogate values and a Respondents' own purchasing situation is a clear indicator of commercial quantity in the industry. *Jacobi Carbons*, 313 F. Supp. 3d at 1361-1362; *see also Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21, 2015) (finding the Department's refusal to consider the respondent's actual purchasing and consumption quantity at odds with the Department's practice regarding other surrogate values and the statutory objective in general, maintaining that, "the commercial significance of import

statistics is not something in the abstract, they must be reflective of, if not 'exactly' reflecting, such significance in comparison with actual experience, of the producers or exporters of the input under consideration, to the extent possible.").

### *2. Commerce should have relied on PVinsights data.*

Because the Indonesian glass import value after removing the Malaysian imports cannot constitute the best available information, Commerce should have relied on the non-China, Thailand, or Malaysia PVinsights prices.

PVinsights is specific to the precise solar glass used by Respondents. Commerce does not dispute this. IDM at Comment 1. Instead, Commerce maintains it cannot rely upon PVinsights because the source includes values from non-economically comparable countries and because it is not publicly available. IDM at 14-15; U.S. Br. at 15-23; Def-Int Br. at 10. The Government argues Plaintiffs have improperly prioritized specificity over economic comparability, contrary to the statute. U.S. Br. at 19. However, Commerce must rely on economically comparable countries only to the "extent possible," and the entire purpose of this provision is in pursuit of relying upon the best available information and calculating the most accurate margin. 19 U.S.C. § 1677b(c)(4)(A); *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365, n.12 (2003) (Commerce's discretion "is constrained by the underlying objective of [19 U.S.C. § 1677b(c)]; to obtain the most accurate dumping margins possible."); *Lasko Metal Prods. v. United States*, 810 F. Supp. 314, 316 (Ct. Int'l Trade 1992) quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("The purpose of the antidumping statute, according to the Federal Circuit, is 'determining current margins as accurately as possible.'").

Recognizing this, Commerce itself in is surrogate country policy bulletin states "After all, a country that perfectly meets the requirements of economic comparability and significant

producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." Policy Bulletin 04.1 (discussing Commerce may have to rely upon countries not on the surrogate country list). Indeed, for the sake of specificity in surrogate data, Commerce has relied upon data from non-economically countries. For example, in the reviews of Crawfish from China, Commerce relied upon a crawfish surrogate value from Spain, a non-economically comparable country, due to data specificity and availability. *See*, e.g., *Freshwater Crawfish Tail Meat Final Results of Antidumping Duty Administrative Review and Partial Rescission; 2010-2011*, 78 Fed. Reg. 22,228 (Dep't Comm. Apr. 15, 2013); *Freshwater Crawfish Tail Meat From the People's Republic of China*, 84 Fed. Reg. 58,371 (Dep't Commerce Oct. 31, 2019) and accompanying IDM at Comment 2. In the China Solar reviews, Commerce consistently relied upon an international price, specifically a "non-China" price, from a benchmarking source, Bloomberg, to value solar cells, solar wafers, and/or solar blocks in antidumping reviews for many years. Boviet R56.2 Br. at 16-17. According to Commerce itself, an international benchmarking source for particular solar inputs was a reliable surrogate value source and even the best available information. Accordingly, product specificity can result in Commerce relying upon a non-economically comparable country. *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than other criteria).

Lastly, PVinsights is publicly available. Commerce has previously found that, if the data can be obtained for a fee by anyone, this fulfills Commerce's requirements and policy interests in relying on publicly available information. Commerce previously explained that "[w]e consider the appropriate indication of public availability to be whether any entity can obtain the data. At the very least, public availability should enable any interested party to obtain the same

information." *Laminated Woven Sacks Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008) and accompanying IDM at 75. Indeed, even the import data Commerce relied upon in this investigation and every review and investigation before Commerce is from a subscription purchased for a fee.

It is true that due to the terms of the subscription, JA Solar could not make the entire PVinsights dataset public on the record, but this does not change the fact that it is publicly available as any member of the public could obtain the same data. The policy concerns raised by the Government are not triggered by this dataset being confidential. U.S. Br. at 22-23; Def-Int Br. at 12. The underlying BPI data is not limited in availability to only certain parties, such that the submitter could "mischaracterize what the data as whole represents." Any party, whether on the APO or even in the case, can obtain the exact same data from PVinsights for a fee. The parties of this case had a full meaningful opportunity to submit rebuttal factual information.

Further, JA Solar did make the POI average public, and thus Commerce could still make the surrogate value itself public in its decision. Commerce has relied upon this dataset and others in the same manner in the countervailing reviews, relying on the public average despite the detailed underlying data being confidential due to the subscription terms. Thus, PVinsights fulfills Commerce's practice of relying on public surrogate values.

In sum, the Court should find that no reasonable mind can conclude that the Indonesian dataset relied upon is the best available information. The only rational decision on this record, if excluding Malaysian data into Indonesia, is that the PVinsights is the best available information: it is most specific to solar glass, commercial, reliable, publicly available, and otherwise best fulfills Commerce's requirements for a surrogate value. *Dorbest*, 462 F. Supp. 2d at 1268 (Court role is

to evaluate "whether a reasonable mind could conclude that Commerce chose the best available information.").

## II. Commerce Should Have Selected Boviet as a Voluntary Respondent and Calculated an Individual margin for Boviet.

It is not disputed that Boviet requested to be a voluntary respondent and timely filed all voluntary questionnaire responses in accordance with 19 U.S.C. § 1677m. The issue in dispute is whether Commerce's decision not to select Boviet as a voluntary respondent is lawful in accordance with 19 U.S.C. § 1677m(a)(1)-(2). While the statute has provided Commerce with flexibility to determine whether it is unduly burdensome to review a voluntary respondent, the Courts have been critical that Commerce cannot merely use the normal workload reasoning that it used to limit the respondent selection as reasoning to reject selecting a voluntary respondent. Otherwise, the voluntary respondent statute would be nullified. *See*, e.g., *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367, 1371 (Ct. Int'l Trade 2013).

The Government's argument has primarily focused on the discretion given to Commerce, particularly with the 2015 amendment codifying reasons Commerce could find examination burdensome. U.S. Br. at 56-58. However, the discretion is not boundless and Commerce must still support its determination in a manner giving meaning to the statute. The caselaw cited by the Government supports that Commerce must consider the unique posture of each investigation or review and justify on the particular facts that reviewing a voluntary respondent was unduly burdensome. In those cases, Commerce has done so, but not in this investigation.

In *Tri Union*, Commerce explained that it had a new mandatory respondent it had not reviewed before, a large number of separate rate requests, and was conducting two changed circumstance reviews in the context of the single administrative review. *Tri Union Frozen Prods. v. United States*, 163 F. Supp. 3d 1255, 1284-1285. In *Qingdao Qihang Tyre*, Commerce

explained that it had issued four supplemental questionnaires to one mandatory and five to the other mandatory, one mandatory had multiple subsidiaries and affiliates as well as EP and CEP sales while the other used tollers—all of which greatly impacted the complication of the case. *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1365. In *Husteel*, it was an investigation of a product that Commerce has not reviewed before, three companies asked to be a voluntary respondent, and Commerce was simultaneously investigating eleven concurrent AD and CVD investigations for the same product. *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1225-336. In these cases, Commerce "spelled out each and every burden specific to this case that caused it to believe that it would be unduly burdensome to additionally review" and the Court upheld Commerce's determination in the unique circumstances. *Tri Union*, 163 F. Supp. 3d at 1285. But for the instant case with Boviet, Commerce's decision is not explained and justified.

The unique familiarity Commerce had with this product and with Boviet itself actually justified that Commerce would not have been unduly burdened to have reviewed Boviet. While this is an investigation, at the time of this investigation, Commerce was in the twelfth review of the China Order of the precise same product with the precise same scope. Commerce had also reviewed Boviet before in the circumvention inquiry, while not the same as a normal antidumping investigation, it had substantial overlap on affiliation, process, normal value, etc. Moreover, unlike *Qingdao Qihang Tyre*, the mandatory respondents did not have complicated producing affiliates or sales types and Commerce only issued <u>one</u> supplemental questionnaire each to JA Solar and Jinko during this investigation. While Commerce was conducting an investigation in four countries including Vietnam, this is hardly the same as eleven countries in *Husteel*. Lastly, while Commerce references that the final IDM had "30 distinct issues," the

majority of these issues were surrogate value issues that would have been common to all mandatory respondents—i.e. did not require unique consideration by including Boviet.

Accordingly, the Department's explanation as to why it could not examine a voluntary respondent was not supported by substantial evidence or in accordance with law. Commerce should have individually examined Boviet as a voluntary respondent and should have calculated a margin based upon its submissions and lawfully selected surrogate values.

## III. Conclusion and Prayer for Relief

In light of the foregoing, Commerce's *Final Determination* was not supported by substantial evidence or in accordance with the law. Consolidated Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com

C. Kevin Marshall
Hannah Templin
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com

Date: November 19, 2026

*Counsel to Boviet Solar Technology Co., Ltd.*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **4,137** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**Inter-Global Trade Law Group**