**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

JA SOLAR USA INC., JA SOLARVIETNAM CO. LTD., and JA SOLAR PV VIETNAM CO. LTD.,

Plaintiffs,

BOVIET SOLAR TECHNOLOGY CO. LTD., JINKO SOLAR (VIETNAM) INDUSTRIES CO. LTD., JINKOSOLAR (U.S.) INC., and JINKO SOLAR (U.S.) INDUSTRIES INC.,

Consolidated Plaintiffs,

and

TRINA SOLAR ENERGY DEVELOPMENT CO. LTD.,

Plaintiff-Intervenor,

v.

UNITED STATES,

Defendant,

and

THE AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,

Defendant-Intervenor.

Consol. Court No. 25-00158

**PUBLIC VERSION**

**PLAINTIFFS' REPLY TO DEFENDANT AND DEFENDANT-INTERVENOR'S RESPONSES TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Ned H. Marshak*
Jordan C. Kahn
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*599 Lexington Ave FL 36,
New York, NY 10022
(212) 557-4000

1201 New York Ave., NW, Suite 430
Washington, DC 20005
(202) 783-6881

*Counsel for Consolidated Plaintiffs Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc.*

Dated: November 19, 2026

**TABLE OF CONTENTS**

**I. COMMERCE UNLAWFULLY VALUED SOLAR GLASS AT $4.85/KG .................. 1**

**II. COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS .......................................................................................................................... 9**

A. SATNUSA RECEIVED COUNTERVAILABLE SUBSIDIES...................................... 10

B. COMMERCE DID NOT CONSIDER ALL RECORD EVIDENCE WHEN REJECTING PT JEMBO'S FINANCIAL STATEMENTS ........................................................................... 13

**III. COMMERCE UNLAWFULLY VALUED POLYSILICON AND WAFERS BASED ON HTS DATA RATHER THAN BLOOMBERG DATA .................................................. 16**

**CONCLUSION ....................................................................................................................... 21**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allegheny Ludlum Corp. v. United States*,
24 CIT 452 (2000) ....................15

*Ancientree Cabinet Co. v. United States*,
532 F. Supp. 3d 1241 (CIT 2021) ....................2

*CP Kelco US, Inc. v. United States*,
949 F.3d 1348 (Fed. Cir. 2020) ....................8

*CS Wind Vietnam Co. v. United States*,
971 F. Supp. 2d 1271 (CIT 2014) ....................4, 6, 8

*Elkay Mfg. Co. v. United States*,
180 F. Supp. 3d 1245 (CIT 2016) ....................7

*Fujian Yinfeng Imp & Exp Trading Co. v. United States*,
607 F. Supp. 3d 1301 (CIT 2022) ....................6

*Jacobi Carbons AB v. United States*,
313 F. Supp. 3d 1344 (CIT 2018) ....................19

*Jacobi Carbons AB v. United States*,
422 F. Supp. 3d 1308 (CIT 2019) ....................2, 19

*Jiaxing Brother Fastener Co. v. United States*,
751 F. Supp. 2d 1345 (CIT 2010) ....................11

*Koyo Seiko Co. v. United States,*
36 F.3d 1565 (Fed. Cir. 1994) ....................19

*Lasko Metal Prods., Inc. v. United States*,
43 F.3d 1442 (Fed. Cir. 1994) ....................1

*National Ford Chem. Co. v. United States*,
166 F.3d 1373 (Fed. Cir. 1999) ....................1, 3

*NMB Singapore Ltd. v United States*,
557 F.3d 1316 (Fed. Cir. 2009) ....................14

*Pirelli Tyre Co. v United States*,
128 F.4th 1265 (Fed. Cir. 2025) ....................14, 15

*Risen Energy Co. v. United States*,
569 F. Supp. 3d 1315 (CIT 2022), *vacated and remanded on other grounds*,
122 F.4th 1348 (Fed. Cir. 2024) ....................19

*Risen Energy Co. v. United States*,
611 F. Supp. 3d 1384 (CIT 2022) ....................19, 20

*Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*,
268 F.3d 1376 (Fed. Cir. 2001)....................1, 3

*SNR Roulements v. United States*,
402 F.3d 1358 (Fed. Cir. 2005)....................19

*SolarWorld Americas, Inc. v. United States*,
962 F.3d 1351 (Fed. Cir. 2020)....................19

*Tianjin Wanhua Co. v. United States*,
253 F. Supp. 3d 1318 (CIT 2017) ....................7, 8

*U.S. Steel Grp. v. United States*,
225 F.3d 1284 (Fed. Cir. 2000)....................19

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013)....................4, 21

*Yantai Xinke Steel Structure Co., Ltd. v. United States*,
No. 10-00240, 2014 WL 1387529 (Ct. Int'l Trade Apr. 9, 2014) ....................12

**Statutes**

19 U.S.C. § 1677b....................7, 10

**Federal Register Notices & Publications**

*Aluminum Extrusions from Indonesia*, 89 Fed. Reg. 17,405 (Mar. 11, 2024)
(preliminary determination) ....................12

*Aluminum Extrusions from Indonesia*, 89 Fed. Reg. 80,536 (Oct. 3, 2024)
(final determination) .................... 12

*Certain Preserved Mushrooms from the People's Republic of China*,
77 Fed. Reg. 55,808 (Sept. 11, 2012) (final results)....................2

*Corrosion Inhibitors from China*, 89 Fed. Reg. 82,975 (Oct. 4, 2024) (final results).................. 15

*Mattresses from Indonesia*, 89 Fed. Reg. 57 (Jan. 2, 2024) (preliminary determination)...... 11, 12

*Mattresses from Indonesia*, 89 Fed. Reg. 59,050 (July 7, 2024) (final determination).......... 11, 12

*Pure Magnesium from China*, 75 Fed. Reg. 80,791 (Dec. 23, 2010) (final results)..................... 15

*Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*,
90 Fed. Reg. 26,786 (June 24, 2025) (antidumping duty orders) ............................................ 1

*Solar Cells from China*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) (preliminary results) .................. 20

*Solar Cells from China*, 84 Fed. Reg. 36,886 (July 30, 2019) (final results) .............................. 20

*Solar Cells from Vietnam*, 90 Fed. Reg. 17,388 (Apr. 25, 2025) (final determination) ........ *passim*

**<u>Other Authorities</u>**

Commerce Policy Bulletin 04.1 (Mar. 1, 2004)........................................................................ 15

Consolidated Plaintiffs Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc. (collectively, "Jinko") reply to the Responses filed on August 7, 2026, by Defendant United States ("Government"), ECF 57 ("Gov. Br."), and on September 4, 2026, by Defendant-Intervenor American Alliance for Solar Manufacturing ("Petitioner"), ECF 61 ("Pet. Br."). Those Response Briefs opposed Jinko's Rule 56.2 Motion for Judgement on the Agency Record (Apr. 6, 2026), ECF 47-48 ("Jinko Br."), challenging the U.S. Department of Commerce's ("Commerce") final determination in its less-than-fair-value ("LTFV") investigation on crystalline silicon photovoltaic cells, whether or not assembled into modules ("Solar Cells"), from the Socialist Republic of Vietnam ("Vietnam"). *Solar Cells from Vietnam*, 90 Fed. Reg. 17,388 (Apr. 25, 2025), PR 639 ("*Final Determination*"), resulting in the antidumping duty ("ADD") order published as *Solar Cells from Cambodia, Malaysia, Thailand, and Vietnam*, 90 Fed. Reg. 26,786 (June 24, 2025), PR 673 ("*ADD Order*"). As discussed below, the arguments of Defendant and Petitioner (collectively, "Defendants") do not rehabilitate Commerce's legal and factual errors in its LTFV investigation of Solar Cells from Vietnam.

## I. <u>COMMERCE UNLAWFULLY VALUED SOLAR GLASS AT $4.85/KG</u>

The most significant surrogate value ("SV") issue in Commerce's investigation concerns the valuation of solar glass. The ultimate purpose of Commerce's SV analysis is to calculate margins as accurately as possible. *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994). Commerce was therefore required to select a price that Jinko "might pay" for solar glass "in a market economy setting," *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001), and to rely on data that "most accurately represents the fair market value of the relevant factors of production." Gov. Br. at 13 (citing *National Ford Chem. Co. v. United States,*166 F.3d 1373, 1377 (Fed. Cir. 1999)). In selecting SVs, Commerce considers "whether the data is "product specific, representative of a

broad market average, publicly available, contemporaneous with the period of investigation or review, and tax and duty exclusive." Gov. Br. at 13-14 (citing *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808 (Sept. 11, 2012) (final results), accompanying Issues and Decision Memorandum ("IDM") at 9). Just as significantly, data cannot be used if it is aberrational, leading to absurd results. *See* Jinko Br. at 21-23. Commerce must "adequately address the commercial significance of the quantities underlying its selected {SVs}" and should "reject a proposed {SV} if it determines that the value is aberrational compared to other market values on the record." *Ancientree Cabinet Co. v. United States,* 532 F. Supp. 3d 1241, 1253-55 (CIT 2021); *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308, 1318 (CIT 2019).

In its *Final Determination*, Commerce paid lip service to these principles. The Government and Petitioner briefs have failed to rehabilitate Commerce's analysis. In their briefs, the Government and Petitioner find flaws in each of the datasets submitted by Respondents Jinko and Plaintiffs JA Solar Vietnam Co. Ltd., *et al*. (collectively, "JA Solar"). That is neither surprising nor dispositive. None of the datasets on this record are perfect; all are flawed, some more than others. However, it was not enough for Commerce in its *Final Determination*, and now for the Government and Petitioner on appeal, to point out an imperfection in a dataset, and then reject that set because of that flaw. Rather, to determine whether it was reasonable to conclude that Commerce's decision, in fact, was based on the best information on the record, this Court should conduct a holistic review of all facts and circumstances and decide, based on examining the entire record, whether Commerce's SV selections were supported by substantial evidence. As discussed below, they were not.

In conducting this analysis, Commerce was initially required to accurately describe the

input being valued. Solar glass purchased by Jinko is one of the primary components used by Jinko to produce solar modules in Vietnam. During the period of investigation ("POI"), Jinko consumed [ ] million kg of solar glass. The solar glass consisted of [ ] individual pieces, valued at [ ]. Jinko Section D Supplemental Questionnaire Response (Nov. 6, 2024), CR 470-76, PR 559 ("SDQR"), Exhibit SD-2; Jinko Verification Exhibits (Dec. 17, 2024), CR 652-73, PR 423, Cost Reconciliation R-2 at 113-125. Each solar panel weighed 12.814 kg/panel, 150 solar panels were contained in each case, and between 36 and 360 cases were shipped on each invoice. Jinko Brief at 9. The smallest weight of solar glass on the packing list was [ ] kg, and the average weight on each packing list was [ ] kg. The total purchase quantity of solar glass from market economy ("ME") sources was [ ] pieces, equal to [ ] kg. Total purchase value was [ ], resulting in an average unit value ("AUV") of [ ] kg. *See* Jinko SDQR Exhibit SD-12A. Prices ranged from [ ]/kg. Jinko Br. at 9.

Solar glass panels are necessary component parts of solar modules. Solar modules are produced by assembling solar cells (primarily produced in Vietnam) with aluminum frames, back-sheets, solar glass, EVA, junction boxes, and other less significant materials. *See id*. at 10. The modules are then reworked and packed. During the POI, solar glass constituted [ ] percent of Jinko's total cost of materials ([ ] of [ ]). *Id*. at 11.

In valuing solar glass, this Court should consider all of the factors specified above and determine whether the SV selected by Commerce reasonably reflected the price that Jinko "might pay" for solar glass "in a {ME} setting." *Shakeproof Assembly Components*, 268 F.3d at 1382. To be supported by substantial evidence that price should "most accurately represents the fair market value of the relevant factor{} of production." *National Ford Chem.,*166 F.3d at1377.

And that price cannot undermine the ADD statute's primary goal of calculating margins as accurately as possible. *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

Defendants ask this Court to ignore these critical, overarching principles. Rather, they direct the Court's attention to perceived shortcomings in each dataset submitted by Respondents, and ask the Court to discount that dataset because, standing alone, it is not perfect. By raising these flaws in this manner, Defendants ignore the important principle that Commerce is required to examine the entire record in selecting a surrogate value, including datasets which could not themselves be selected as surrogates. In *CS Wind Vietnam Co. v. United States*, this Court discussed this principle as follows:

> Accordingly, although Commerce may have some legitimate basis for rejecting the JPC data as a primary source for {SVs}, it was unreasonable for Commerce to reject the data entirely in considering whether the GTA data is aberrational. Therefore, the court remands to Commerce for reconsideration of the JPC data at least for corroboration purposes, if not more.
>
> Corroboration data, including Infodrive data in particular, need not meet the same standards as data offered to calculate surrogate values in order to be relevant for Commerce to consider.

971 F. Supp. 2d 1271, 1279, 1282 (CIT 2014). This Court discussed its analysis of the entire record as follows:

> This choice is also in the context of other data sets that Commerce must reconsider on remand, which, if accepted, closely corroborate the Steel India data but differ significantly from the GTA data. Commerce's choice here in selecting the GTA data is akin to valuing a red onion not based on the prices of yellow or white onions but based on the prices of a basket of all root vegetables, simply because one red onion is in the bushel. Assuming equivalence of steel grades for the Steel India data, which Commerce did not address, it is perplexing how any reasonable mind could consider the first data set the best available information on the record, even when giving priority to the grade of steel over the thickness of steel.

When these principles are applied to the record in this case, the reason why Commerce's

decision to value solar glass at $4.85/kg should be reversed is readily apparent. Set forth below is a summary of the datasets which Commerce was required to consider in valuing solar glass.

| | Dataset | $/kg | Qty (kg) | Comments |
|---|---|---|---|---|
| 1 | PV Insights | 0.46 | N/A | "glass price, non-China"; data set is reliable in multiple Commerce decisions; summary data public; back-up data available via subscription |
| 2 | Jinko total | 0.48 | 110 million | Consumption Quantity/ Value ("Q/V")_ |
| 3 | Jinko ME | 0.50 | 13.6 million | Smallest purchase: 3000 panels = 38,442 kg (14 times greater quantity than 40 line items in total "all other" data) |
| 4 | Harmonized Tariff Schedule ("HTS") Malaysia ("MY") | 0.57 | 250,852 | Subsidy decision by India |
| 5 | HTS MY plus 9.7% subsidy | 0.625 | 250,852 | Subsidy decision by India plus 9.71% subsidy determined by India |
| 6 | Romania from Bulgaria HTS | 0.84 | 7.6 million | Solar Cells from China ADD order 10th Administrative Review ("AR10") (12/1/21 – 11/30/22) |
| 7 | Turkey HTS | 0.98 | 143 million | Solar Cells from China ADD order AR10 (12/1/21 – 11/30/22) |
| 8 | HTS United Kingdom ("UK") | 1.07 | 10,469 | 7.8 times greater qty than next country |
| 9 | Romania from Turkey HTS | 1.16 | 6.2 million | AR10 China order (12/1/21 – 11/30/22) |
| 10 | U.S. International Trade Commission ("USITC") costs (bill of materials ("BOM") materials) | 2.06* | N/A | *2.06 = cost of all BOM materials (glass, EVA, aluminum frame, back sheet and junction box) |
| 11 | HTS other | 19.18 | 2,764 | 40 line items; Qty from 1 kg to 927 kg; AUV from $2.35/kg to $1069/kg; includes flat-glass, not solar glass, per CBP Headquarter rulings; Q/V inconsistent with Jinko solar glass |

Jinko Br. at 7-14.

These data show that the row 11 data - 2764 kgs of safety glass ("HTS other") valued at $19.18/kg - are distinctly different in quantity (all line items less than 928 kg) than the other datasets. These miniscule quantities and high prices of safety glass constitute substantial evidence that these glass products are distinctly different from the solar glass panels purchased

by Jinko to produce solar modules in Vietnam. There is not a scintilla of corroborating evidence of record supporting Defendants' claim that these products constitute solar glass panels.

In their Briefs, the Government and Petitioner present several reasons why this Court should reject each of the data sets in Jinko's analysis. The reasons why these arguments fail follow.

First, this Court need not decide whether product specificity is the "most important" factor in Commerce's SV analysis, or "merely" a very important factor. *See* Gov. Br. at 18; Pet. Br. at 9. HTS 7007.19.90 undeniably includes safety glass which is not solar glass; Jinko ME purchase data and PV Insights data undeniably do not. Commerce was required to consider this distinction in its analysis.

Second, it is not a relevant factor in this case "that it is within Commerce's discretion to choose a basket header over a more specific one as long as the chosen header is sufficiently product specific." *Fujian Yinfeng Imp & Exp Trading Co. v. United States*, 607 F. Supp. 3d 1301, 1324 (CIT 2022); Gov. Br. at 19. HTS 7007.19.90 is the only HTS subheading in issue, and substantial evidence exists that certain data in this subheading do not constitute solar glass.

Third, Commerce decided that flaws in PV Insight's data were sufficient to disqualify its use as a surrogate value. *See* Gov. Br. at 17-24; Pet. Br. at 9-14. Jinko disagrees and supports the arguments raised by JA Solar as to why Commerce's decision should be reversed. However, even if this Court does not agree with JA Solar, Commerce's decision to totally reject PV Insights data was contrary to law. At the very least, PV Insights qualifies as corroboration data, which "need not meet the same standards as data offered to calculate surrogate values in order to be relevant for Commerce to consider." *CS Wind*, 971 F. Supp. 2d at 1279.

Fourth, Petitioner claims that "once Commerce reasonably concluded that Malaysian-

origin prices may have been distorted, Commerce was not required to preserve those prices through a hypothetical adjustment." Pet. Br. at 17. Petitioner is wrong. The 9.71 percent uptick to the Malaysian values was not hypothetical; this increase represented the actual subsidy rate calculated by the Government of India ("GOI"). Jinko Br. at 17. Thus, increasing Malaysia prices by 9.71 percent was as real as Commerce's decision that Malaysian exports to Indonesia were subsidized. Once Commerce decided to rely on a subsidy decision by a foreign government (in this case India) as to whether exports from Malaysia to a third country (in this case Indonesia) were subsidized, Commerce also was required to rely on the subsidy rate calculated by the GOI. Moreover, contrary to Petitioner's claim, the 9.71 percent subsidy rate constitutes a "reasonable estimate of the effect of any subsidy on the prices reflected in the Indonesian import statistics." Pet Br. at 17. That is the purpose of calculating a specific rate; to determine the impact of a subsidy on export prices.

Fifth, the Government incorrectly states that Commerce has a "precise" directive to "disregard any . . . prices" which are subsidized. Gov. Br. at 24. Commerce by statute has the discretion to disregard such prices "without formal investigation." 19 U.S.C. § 1677b(c)(5). And in appropriate circumstances, this Court has affirmed Commerce's decision to rely on subsidized data as an SV. *See, e.g., Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245, 1253-54 (CIT 2016) ("Despite the record evidence that POSCO received one or more government subsidies, Commerce still could conclude based on the record evidence that the Thai market as a whole was not so distorted by the subsidization that data on the value of *imports* into Thailand were unsuitable for use in determining the surrogate value."); *Tianjin Wanhua Co. v. United States*, 253 F. Supp. 3d 1318, 1328-29 (CIT 2017) ("This Court in *Tianjin I* concluded that although Wanhua raised serious issues about the potential unreliability of Argha Karya's financial report

(specifically the report's incomplete nature and the potential distortive effect of Indonesian subsidies on the data), a reasonable mind, and therefore Commerce, could select the Argha Karya data over the AstraPak data given Commerce's uncontroverted finding that the Indonesian company produced identical merchandise, whereas the South African company produced the less exact comparable merchandise."); *CP Kelco US, Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020) ("{W}e are satisfied that here, with its third redetermination, Commerce sufficiently explained its reason for choosing between two flawed financial statements.").

Sixth, the Government argues that it would be "inapposite" for Commerce to "utilize this otherwise disregarded data to assess whether its remaining surrogate value data is aberrational." Gov. Br. at 35. This rationale was rejected in *CS Wind*, holding that corroboration data "need not meet the same standards as data offered to calculate surrogate values in order to be relevant for Commerce to consider." 971 F. Supp. 2d at 1279. Thus, even if this Court agrees that the presence of subsidies constitute sufficient reason to conclude that Malaysian prices cannot themselves be used as SVs, Commerce was required to consider whether these prices could be used to corroborate other data. Commerce's failure to act in this manner was contrary to law.

Finally, the Government argues that this Court should reject Jinko's "small quantity – high price" analysis because "the quantity of imports exclusive of Malaysia accounts for enough solar glass to produce more than 1,000 solar modules." Gov. Br. at 32; *see* Pet. Br. at 17-18. This argument distorts the data submitted by Jinko. As discussed above, Indonesia import data falls within three distinct categories: Malaysia (rejected by Commerce); U.K. (accepted by Commerce and Jinko); and "Other" (accepted by Commerce; rejected by Jinko).

| Group | No. Lines | Value - USD | QTY - KG | QTY–PCS | AUV USD/kg | AUV USD/PCS |
|---|---|---|---|---|---|---|
| **Malaysia** | 3 | $143,457 | 250,852 | 19,576 | $0.57/kg | $7.33/pcs |
| **UK** | 1 | $11,238 | 10,469 | 817 | $1.07/kg | $13.76/pcs |
| **Other** | 40 | $53,006 | 2,764 | 216 | $19.18/kg | $245.74/pcs |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total | 44 | $207,701 | 264,085 | 20,609 | $0.79/kg | $10.08/pcs |

*See* Jinko Br. at 8, accompanying Attachment.

Contrary to Defendants' claims, Jinko does not question the fact that the U.K. data (10,469 kg) arguably are solar panels, and, accordingly, should be included in the SV analysis. In contrast, the 2,764 kg imported from 15 other countries in 40 observations cannot be used. The small quantities and high prices of each of these 40 distinct data points (country by month) confirm that they are not solar panels. The Government's argument that "smaller solar modules can use the exact same type of glass as a large module," Gov. Br. at 32, is pure speculation, and is contrary to record evidence as to the size of the solar glass used by Jinko.

In sum, for all these reasons, this Court should remand this issue to Commerce to recalculate the SV of solar glass in a manner which is supported by substantial evidence and conforms to law.

## II. COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS

Defendants argue that Commerce reasonably relied only on the financial statements of PT Sat Nusapersada Satnusa ("Satnusa") and Tera Data Indonesia Tbk ("Tera Data") for its surrogate financial ratio calculation. Gov. Br. at 45; Pet. Br. at 22. Specifically, they claim that because Satnusa and Tera Data satisfied all of Commerce's criteria for SV selection, and because Commerce has broad discretion in selecting surrogate financial ratios, Commerce's decision was reasonable. Gov. Br. at 45-46; Pet. Br. 22. They contend that "the record does not substantiate Jinko's claim that Satnusa received countervailable subsidies." Def Gov. Br. at 46, 49-51; *see* Pet. Br. at 23-24. They also allege that Commerce, in fact, considered all record evidence in rejecting the financial statements PT Jembo Energindo ("PT Jembo"), and that "Commerce need not mention every piece of evidence when making its determination." Def Gov. Br. at 51; *see* Pet. Br. at 24-26. Thus, Defendants conclude that Commerce's exclusion of PT Jembo from its

surrogate financial ratio calculation was supported by substantial evidence and in accordance with law. Gov. Br. at 52; Pet. Br. at 25-26.

These arguments improperly disregard Commerce's failure to analyze in the *Final Determination* critical record evidence that: (1) Satnusa received countervailable subsidies; and (2) PT Jembo was a producer of identical and comparable merchandise that should be considered for calculation of surrogate financial ratios.

**A. SATNUSA RECEIVED COUNTERVAILABLE SUBSIDIES**

Defendants argue that substantial record evidence supports Commerce's finding that Satnusa did not receive countervailable subsidies. Gov. Br. at 46, 49-51; *see* Pet. Br. at 23-24. Specifically, they emphasize that "19 U.S.C. § 1677b(c)(5) grants Commerce the discretion to disregard financial statements where Commerce has determined, 'without further investigation,' that the company received countervailable subsidies", and that "Commerce generally only disregards financial statements where there is explicit evidence of a subsidy previously determined to be countervailable." Gov. Br. at 49; *see* Pet. Br. at 23-24. Moreover, the Government contends that "the flaw in Jinko's argument lies in the lack of evidence of *countervailable* subsidies." Gov. Br. at 49.

This argument falls flat because both the Government and Petitioner, like Commerce in its *Final Determination*, ignore overwhelming record evidence that there is "reason to believe or suspect" that Satnusa received countervailable subsidies.

The sole focus of Defendants' argument is the distinction between "bonded zones" and "Free Trade Zones." They claim that Commerce's decision is supported by the record evidence because Commerce previously found companies located in "bonded zones" to be countervailable, and Satnusa is in a Free Trade Zone, which according to Defendants is not a "bonded zone." Gov. Br. at 49; *see* Pet. Br. at 23-24. This conclusion ignores additional

substantial record evidence that Satnusa received countervailable subsidies. And the purported distinction between a "bonded zone" and "Free Trade Zone" cannot, standing alone, considering the additional record evidence, support a finding that there is no "reason to believe or suspect" that Satnusa was the beneficiary of countervailable subsidies. *See Jiaxing Brother Fastener Co. v. United States*, 751 F. Supp. 2d 1345, 1352 (CIT 2010) ("Commerce's established practice is 'to disregard financial statements where we have reason to suspect that the company has received . . . subsidies, and where there is other usable data on the record.'").

As Jinko demonstrated in its opening brief, there exists substantial record evidence that Satnusa received government subsidies. Jinko Br. at 32-34. Jinko noted that Commerce has expressly concluded, in a 2024 decision on *Mattresses from Indonesia*, that the identical benefits received by Satnusa constitute countervailable subsidies:

> The {Government of Indonesia} reported that imports of capital goods and equipment that stay within the bonded zone are not subject to import duties, but subsequently processed goods that are sold domestically in Indonesia are charged import duties. However, the above explanation does not account for the capital goods, machinery, and equipment imported into the bonded zone and used to produce goods sold both domestically and for export. Imported equipment can be used to produce finished goods sold domestically, but such equipment is never subject to import duties if it does not leave the bonded zone within four years. Furthermore, the operation of this bonded zone program resembles a duty drawback scheme, whereby export-oriented companies can be exempted from import duties on inputs consumed in the production of subsequently exported products. However, exemptions on inputs not consumed (i.e., capital goods, equipment, and machinery) are excessive, and thus, provide a financial contribution and benefit).

*Mattresses from Indonesia*, 89 Fed. Reg. 57 (Jan. 2, 2024) (preliminary determination), accompanying Preliminary Decision Memorandum ("PDM"), at 10-12, unchanged in *Mattresses From Indonesia*, 89 Fed. Reg. 59,050 (July 7, 2024) (final determination).

While there is a distinction in the language used in *Mattresses from Indonesia* and the

instant case ("bonded zone" versus "free trade zone"),[1] that distinction cannot reasonably trump all other record evidence suggesting that Satnusa received countervailable government benefits.

In fact, record evidence demonstrates that the programs described in the *Mattresses from Indonesia* decision **are the same import duty exemptions** from which Satnusa benefited *See* Jinko Final Surrogate Value Rebuttal (Nov. 13, 2024), PR 477-491, Exhibits 2N at 2, 2H at 2, 2J at 5, 2G at 2 (*e.g.*, according to Yohanes Lim, Project Manager, PT Satnusa: "Regarding Import Duty Exemptions: Yes, it is correct that our company does not pay import duties on raw materials, machinery, or equipment used in manufacturing. This exemption has indeed been applicable over the past two years, as noted on our company website.").

Thus, substantial evidence does not support the Government's statement that "Jinko points to no evidence here that detracts from {Commerce's} conclusion." Gov. Br. at 51. The Government repeats Commerce's argument: "Commerce considered the record evidence referencing subsidies 'in general terms,' *Yantai Xinke Steel Structure Co., Ltd. v. United States*, No. 10-00240, 2014 WL 1387529, at *21 (Ct. Int'l Trade Apr. 9, 2014), and reasonably concluded that the evidence did not indicate any distortion in the financial statements." *Id*. But the Government's citation to *Xinke Steel Structure* is not dispositive because Commerce previously did find similar programs to those benefits received by Satnusa to be countervailable.

In sum, the record in this case undeniably shows that Commerce had "reason to believe or suspect" that Satnusa benefited from countervailable subsidies." Accordingly, Commerce should have excluded these financial statements from its SV calculation.

[1] Nearly identical language can be found in *Aluminum Extrusions from Indonesia*, 89 Fed. Reg. 17,405 (Mar. 11, 2024) (preliminary determination), IDM Analysis of Programs B(1), unchanged *Aluminum Extrusions from Indonesia,* 89 Fed. Reg. 80,536 (Oct. 3, 2024) (final determination).

### B. COMMERCE DID NOT CONSIDER ALL RECORD EVIDENCE WHEN REJECTING PT JEMBO'S FINANCIAL STATEMENTS

Defendants argue that Commerce was justified in not using PT Jembo's financial statements in its financial ratio calculations.Gov. Br. at 50-51; Pet. Br. 24-26. Specifically, the Government states that Commerce's decision "is reasonably discernible from Commerce's explanation in the final determination that it would make no changes to its surrogate financial ratio analysis." Gov. Br. at 50. Similarly, Petitioner states that "remand is not warranted merely because Commerce declined to discuss every subsidiary argument or factual assertion raised by a party." Pet. Br. 24. Both the Government and Petitioner conclude that Commerce's discussion of PT Jembo in its preliminary determination was sufficient to continue rejecting the company's financial statements in the Final Determination, without further discussion. Gov. Br. at 51; Pet. Br. 25-26. This justification should be rejected.

In its preliminary determination, Commerce rejected the PT Jembo statement in one conclusionary sentence:

> PT Jembo Cable Company Tbk (PT Jembo), based on concerns that the company's main business line, accounting for the vast majority of its revenue and expenses, relates to the production and sales of telecommunication cables, fiber optic cables, and electrical cables, which the record fails to substantiate to be similar to solar cell production.

Commerce Preliminary SV Memorandum (Nov. 27, 2024), PR 536-37 ("Preliminary SV Memo"), at 13.

Jinko's Case Brief contained a detailed analysis as to why Commerce's preliminary conclusion was wrong. Jinko Case Brief (Mar. 7, 2025), CR 722-23, PR 608-09, at 51-55. Jinko directed Commerce's attention to:

1. Exhibits 7-C1 to 7C-5 of Jinko's Final SV Submission which show that end-use of PT Jembo's cables and solar panels – energy storage and energy transport – is comparable to the end-use of Jinko's solar panels;

2. Exhibits 7C-2-3 of Jinko's Final SV Submission which show that PT Jembo's cable manufacturing operation uses machinery that is comparable to machinery used in solar manufacturing operations. Jinko Final SV Submission (Nov. 6, 2024), PR 433-43, Exhibit 7C-2–3; and

3. Final SV Exhibits 7B-1–2, showing that (a) PT Jembo produces solar modules and panels through its subsidiary, PT Jembo Energindo; (b) PT Jembo's "Public Expose" documents describe the company as a "manufacturer of electrical cables, telecommunication cables, fiber optic cables and solar panels;" and (c) PT Jembo Energindo is a member of the Indonesian Solar Module Manufacturing Association.

*Id*. Jinko also noted that as a matter of law even if the Department were to conclude that one component of Commerce's three-part SV comparability test has not been completely satisfied, it nevertheless should include PT Jembo in its ratio calculations.

In its *Final Determination*, Commerce totally ignored this evidence and said nothing about its decision to exclude PT Jembo's financial from the SV financial ratio calculations. Defendants' claim that Commerce was not required to reply to Jinko's argument fails, insofar as PT Jembo's status was a significant stand-alone issue, in which Jinko supported its position with substantial evidence. Commerce never addressed Jinko's arguments in its one sentence preliminary statement, since Jinko did not formally raise these arguments until it filed its case brief.

Defendants misplace reliance on precedent in support of their position that Commerce, in its preliminary decision, adequately responded to Jinko's claim. *See* Gov. Br. at 51; Pet. Br. at 25-26. The Government relies on *Pirelli Tyre Co. v United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025), and Petitioner relies on *NMB Singapore Ltd. v United States*, 557 F.3d 1316 (Fed. Cir. 2009). *Id*. These cases are readily distinguishable from the facts in this case. *NMB Singapore* was based on the fact that the argument which Commerce failed to address in its final determination was "non-dispositive" to its ultimate decision. 557 F.3d at 1323. In contrast, here, Jinko's arguments regarding PT Jembo were dispositive; *i.e.*, they were the only arguments

raising the PT Jembo issue. *Pirelli Tyre* also is not on point, since in that case, the Federal Circuit referenced substantial, specific evidence upon which Commerce relied in reaching its conclusion. 128 F. 4th at 171. In contrast, here, Commerce's decision was issued before Jinko addressed the PT Jembo issue in its Case Brief and consisted of a single conclusionary sentence. Thus, this case is governed by the principles set forth in *Allegheny Ludlum Corp. v. United States*, that it is "well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." 24 CIT 452, 479 (2000).

Moreover, Commerce's preliminary determination to exclude PT Jembo from its financial ratios simple average was not supported by substantial record evidence. In particular, Commerce's "concerns that the company's main business line, accounting for the vast majority of its revenue and expenses, relates to the production and sales of telecommunication cables, fiber optic cables, and electrical cables, which the record fails to substantiate to be similar to solar cell production" was not correct. Preliminary SV Memo at 13. Rather, "the record contained substantial evidence that solar panels and Jembo's products are comparable merchandise in accordance with Commerce's three-prong test, which focuses on physical characteristics, end uses, and production processes of the product in question." Jinko Br. at 26-28 (citing *Pure Magnesium from China*, 75 Fed. Reg. 80,791 (Dec. 23, 2010) (final results), IDM Comment 2; *Corrosion Inhibitors from China*, 89 Fed. Reg. 82,975 (Oct. 4, 2024) (final results), IDM Comment 1; Commerce Policy Bulletin 04.1 (Mar. 1, 2004)).

Commerce's decision does not discuss the reasons why PT Jembo fails Commerce's three-part comparability test. And neither the Government nor Petitioner address this concern. Thus, this Court should reject their arguments and remand this issue to Commerce to apply the

three-part comparability test to the record evidence to determine whether PT Jembo is a producer of comparable merchandise. It is not sufficient to merely say that "Satnusa and PT Tera provided the best available information on the record before Commerce for calculating {SVs}," without further analysis of the record evidence concerning PT Jembo. Pet. Br. 26.

## III. COMMERCE UNLAWFULLY VALUED POLYSILICON AND WAFERS BASED ON HTS DATA RATHER THAN BLOOMBERG DATA

The reasons why this Court should remand Commerce's valuation of polysilicon and wafers for further consideration are similar to the reasons why Commerce's valuation of solar glass is not supported by substantial evidence, albeit the polysilicon/wafer record is not as robust. *See* Jinko Br. at 42. Commerce preliminarily valued polysilicon and wafers based on Bloomberg data, at $8.84/ kg. Preliminary SV memo at 8. In its *Final Determination*, Commerce relied on HTS data, leading to a valuation of polysilicon at $127.89/kg and wafers at $564.47/kg, 14 and 64 times the preliminary valuations, respectively. Commerce Final SV Memorandum (Apr. 18, 2025), PR 645-46, Attachment.

The record contains two corroborating datasets to value polysilicon and wafers. First, the USITC cost structure discussed above shows that wafer costs ($0.091/watt) constitute 32% of total module costs ($0.281/watt). JA Final SV Rebuttal (Nov.18, 2024), CR 573, PR 497, Exhibit 4 at I-19. Valuing wafers at $564.47/kg, equal to $0.650/watt, results in purchased wafer costs being 2.3 times greater than total module costs, and seven times greater than the sustainable costs of wafers. Jinko Br. at 41. The $127.89/kg value for polysilicon ($0.199/watt) results in polysilicon costs being 70% of total module costs ($0.281/watt) under the USITC cost structure. *Id*.

Second, during the POI, Jinko self-produced wafers in Vietnam. The $564.47/kg wafer surrogate value is 10 times Jinko's cost of production ("COP") of self-produced wafers

[ ]. *Id.* at 41 n. 9. Jinko consumed [ ] kg of wafers during the POI, [ ] times greater than the 9563 kg used to calculate the SV. *Id.* at 48. To produce wafers in Vietnam Jinko purchased [ ] kg of polysilicon from market economy ("ME") countries at [ ]:[2]

| Supplier | Country of origin | Purchase Quantity (KG) | Purchase value (USD) | Unit Price (USD/KG) |
|---|---|---|---|---|
| [ ] | [ ] | [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] | [ ] | [ ] |
| **Total** | | **[ ]** | **[ ]** | **[ ]** |

Jinko SDQR Exhibit SD-12A (supporting documents in Exhibits SD-12B, 13A, 13B).

The $127.89/kg ($0.199/watt) valuation, based on 48,231 kg of imports (merely [ ] of Jinko's ME purchases) is [ ] times greater than Jinko's ME purchase price. Jinko Br. at 41-42.

During the POI, October 1, 2023, through March 31, 2024, the vast majority of Jinko's sales were to the United States, and these sales consisted of modules with wafers self-produced in Vietnam, using polysilicon purchased from ME countries. *See* Commerce Jinko Verification Report (Feb. 24, 2025), CR 716, PR 598, at 25-26.[3] Moreover, the record reveals that in 2023,

[2] Jinko also purchased [ ] of polysilicon from China. Jinko SDQR Exhibit SD-12A. Thus, [ ] percent of Jinko's polysilicon purchases were from ME sources.

[3] As Commerce verified: "We note that the SDQR explains that, with the exception of one test sample, [ ]. Additionally, Jinko Solar states that 'during the POI, {it} did not export modules {or} cells to the U.S. using polysilicon purchased from [ ]. . . . For completeness, we requested that company officials demonstrate that purchases of polysilicon inputs originating from [ ] were excluded from the production of subject merchandise. Jinko Solar officials explained that their production system identifies the cell specifications associated with module assembly inputs. Specifically, the cell description includes supplier-specific information, (*e.g.* [ ] refers to [ ]). . . . We noted no discrepancies." Commerce Jinko Verification Report at 25-26 (footnote omitted).

Jinko Vietnam realized [ ] profit on sales of [ ]. Jinko Section A Questionnaire Response (Aug. 9, 2024), CR 181-87, PR 245-48, Exhibit A-10C. These facts constitute additional confirmation of the commercial absurdity of valuing polysilicon at $127.89 kg and wafers at $564.47/kg

Thus, the Bloomberg data which Jinko placed on the record, and which Commerce used to value polysilicon and wafers in the preliminary determination, is corroborated with record evidence. The SV data upon which Commerce relied is not. Nevertheless, in its *Final Determination* Commerce relied on the HTS data, notwithstanding that these data were not corroborated and led to commercially unrealistic results.

The Government defends Commerce's *Final Determination* by claiming that Commerce had no choice. According to the Government, HTS valuation checked the SV boxes – "contemporaneity, public availability, product specificity, broad market average representation, and free from taxes or duties" – while the Bloomberg data "lacked sufficient explanation for its underlying methodology and failed to distinguish between prices from market economies and {nonmarket economies}." Gov. Br. at 38. In rejecting Jinko's argument that Commerce's decision was a dramatic departure from Commerce precedent, Commerce emphasized the axiom that each Commerce decision is "record-specific." *Id.* at 41.

In their Response Briefs, Defendants direct this Court's attention to judicial precedent supporting Commerce's *Final Determination*. They rely on general principles that "Commerce's surrogate value selection process is inherently fact-specific," based on "the facts presented in each case," and that Commerce has the "flexibility to change its position from the preliminary to the final determination provide it explains the basis for the change." Gov. Br. at 41, 44; Pet. Br. at 13. The Government also notes that interested parties have "the burden of creating an adequate

record." Gov. Br. at 44 n.8.

Jinko acknowledges the existence of these general principles. These principles, however, do not trump the over-overriding principle that that "antidumping laws intend to calculate {ADDs} on a fair and equitable basis." *SNR Roulements v. United States,* 402 F.3d 1358, 1363 (Fed. Cir. 2005); *see U.S. Steel Grp. v. United States*, 225 F.3d 1284, 1290 (Fed. Cir. 2000 ("antidumping laws strive 'to calculate {ADDs} on a fair and equitable basis'") (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994)). It is also axiomatic that "{SVs} must be as representative of the situation in the NME country as is feasible and result in a dumping margin as accurate as possible." *Risen Energy Co. v. United States,* 569 F. Supp. 3d 1315, 1329 (CIT 2022), *vacated and remanded on other grounds*, 122 F.4th 1348 (Fed. Cir. 2024). Thus, Commerce is required to "provide a sufficient justification for its conclusion that . . . import value . . . is reliable in light of detracting evidence that the value is not reflective of the commercial reality of solar cell and module production." *Id.* at 1328.

Commerce also is required to "adequately address the commercial significance of the quantities underlying its selected {SVs}" and to "reject a proposed {SV} if it determines that the value is aberrational compared to other market values on the record." *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361 (CIT 2018); *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d at 1312. The Federal Circuit has affirmed Commerce's "longstanding 'administrative practice with respect to aberrational data . . . 'to disregard small-quantity import data {from the primary surrogate country} when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other {potential surrogate} countries.'" *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1357-59 (Fed. Cir. 2020); *see Risen Energy Co. v. United States*, 611 F. Supp. 3d 1384 (CIT 2022) ("Commerce disregards 'small

quantity import data . . . when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other potential surrogate countries.'").

Here, Commerce ignored economic reality and its mandate to calculate accurate margins, summarily rejecting the data submitted by Jinko. It did not rely on a scintilla of evidence to affirmatively support its selection of HTS data to value wafers/polysilicon; rather, it relied on its conclusion that Jinko had not met its burden of discrediting Commerce's choice.

In reaching this conclusion, Commerce relied on the axiom that each decision rises and falls on the record before the agency and that Commerce has the discretion to change its position. While these principles may lead to a specific result in certain cases based on the record in those cases, the record in this investigation as to the why Bloomberg data are superior to HTS data cannot be ignored. First, Commerce has consistently held that HTS data for polysilicon and wafers are seriously flawed. In its fifth administrative review of the ADD Order on Solar Cells from China, Commerce reasoned:

> {W}afers for solar cells are primarily made of polysilicon. . . . {I}n the investigation and first four administrative reviews of this proceeding, we found that differences in silicon purity levels can result in significant price differences. Given the wide range of products covered by the Thai HTS number covering wafers, it is more likely that the Thai imports include products with a silicon purity level that significantly differs from the silicon purity level required for wafers used to manufacture solar cells

*Solar Cells from China*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) (preliminary results), PDM at 25; unchanged, *Solar Cells from China*, 84 Fed. Reg. 36,886 (July 30, 2019) (final results).

The record in this investigation does not contain a scintilla of evidence undermining this conclusion. Thus, this record is no different than the record in multiple cases which led Commerce to reject HTS data to value polysilicon and wafers.

Second, any flaws in the Bloomberg data were overcome by the substantial record evidence as to market economy prices of polysilicon used by Jinko to produce wafers in Vietnam. In other words, in this case, Commerce was faced with two imperfect datasets. In its preliminary determination, Commerce relied on its institutional knowledge and record evidence that nothing had changed in this case to select SVs that conformed to commercial reality. In its *Final Determination*, Commerce abruptly reversed course and relied on data which it had a long-standing practice of rejecting, notwithstanding that the final and preliminary record facts were identical, and that the record contained substantial evidence – *e.g.*, USITC cost structure and Jinko purchase price of polysilicon – supporting selection of the Bloomberg data and rejection of the HTS data.

Finally, as discussed in Jinko's Opening Brief, Commerce should have – at the very least, after it had decided to reject the Bloomberg data – reopened the record to obtain data which would lead to the calculation of reasonably accurate margins on a fair and equitable basis. Jinko Br. at 43. In this regard, insofar as the "record before the agency does not support the agency action," this Court should remand the selection of the proper SV of polysilicon Commerce "for additional investigation or explanation." *Yangzhou Bestpak*, 716 F.3d at 1380.

## CONCLUSION

For the foregoing reasons, Jinko respectfully requests that this Court remand the *Final Determination* for reconsideration by Commerce.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*
Jordan C. Kahn
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*599 Lexington Avenue FL 36
New York, NY 10022
-and-
1201 New York Ave., NW, Suite 430
Washington, DC 20005

*Counsel for Consolidated Plaintiffs Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc.*

Dated: November 19, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Reply contains 6,747 words including footnotes, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's Microsoft Word processing system, and is less than the 7,000 word limit.

/s/ *Ned H. Marshak*
Ned H. Marshak*

*Counsel for Consolidated Plaintiffs Jinko Solar (Vietnam) Industries Company Limited, JinkoSolar (U.S.) Inc., and Jinko Solar (U.S.) Industries, Inc.*

Dated: November 19, 2026